IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER,** <br> Plaintiff <br><br> v. <br><br> Ronald Lee, 11418 Raedene Way, San Diego, CA 92131, Teresa Lee, 230 North Camac Street, Philadelphia, PA 19107, Jeffrey Mai, 6905 Frankford Avenue, Philadelphia, PA 19135, Canaan Realty Investment Group, 6905 Frankford Avenue, Philadelphia, PA 19135, Teresa Lee Revocable Trust, 230 North Camac Street, Philadelphia, PA 19107/11418 Raedene Way, San Diego, CA 92131, and Kenneth L. Baritz, Esq., 100 South Broad Street, Philadelphia, PA, 19110 <br><br> Defendants | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | **Case No:** <br><br> **Complaint for abuse of process, breach of contract, invasion of privacy, fraudulent misrepresentation, for violations of the Fair Housing, Fair Debt Collection Practices (FDCPA) and Dragonetti Acts, and for Declaratory Relief** |

**COMPLAINT FOR BREACH OF CONTRACT, INVASION OF PRIVACY, ABUSE OF PROCESS, FRAUDULENT MISREPRESENTATION, VIOLATIONS OF THE FHA, FDCPA, AND DRAGONETTI ACT, AND FOR DECLARATORY/INJUNCTIVE RELIEF**

Gordon Roy Parker ("Gordon"), Plaintiff in the above-styled action, submits this Complaint and Prayer for Relief, and in support thereof, avers the following:

## THE PARTIES

1.    Plaintiff Gordon Roy Parker ("Gordon") is a resident of Philadelphia, domiciled at the Broad Street Ministry, 315 South Broad Street, #0106, Philadelphia, PA 19107, where he may be served.  He resides with his brother in Chinatown, at an undisclosed location known to all parties ("the Building") first in a basement ("the Basement"), and then in an upper-floor apartment ("the Apartment").

2.    Defendants Ronald and Teresa Lee are residents of and are domiciled in, respectively, San Diego, CA and Philadelphia, PA, and are co-owners of The Building.  They collect rent through Defendant Teresa Lee Revocable Trust.  They can be served at the addresses listed in the caption.

3.     Defendant Jeffrey Mai is the property manager for The Building, and is employed by Defendant Canaan Realty Investment Group.  They may be served at the address listed in the caption.

4.     Defendant Kenneth L. Baritz is an attorney in Philadelphia who was retained by the other defendants to attempt to evict his brother.  He may be served at the address listed in the caption.

## JURSIDCTION AND VENUE

5.     Subject-matter jurisdiction is conferred by 28 USC §1331, for federal questions under the Fair Housing Act, 42 USC §§3601-3631 *et seq.*, and Fair Debt Collection Practices Act (FDCPA), 15 USC §1692 *et seq*.

6.     Supplemental jurisdiction is conferred over all state-law claims.

7.     Personal jurisdiction is conferred over all parties, as they are all domiciled, reside, conduct business, or have minimum contacts with Pennsylvania, in this federal district.

8.     Venue in the EDPA is proper because the parties either reside, are domiciled, conduct business in, or have minimum contacts with Philadelphia.

## NATURE OF ACTION

9.     Based on indisputable conduct, this is a complaint for abuse of process, and for violations of both the Dragonetti Act and Fair Debt Collection Practices Act.  Based on easily provable conduct, it is also a complaint for violations of the discrimination and retaliation provisions of the Fair Housing and Americans With Disabilities Acts, breach of contract (including but not limited to illegal attempts to evict), and for declaratory relief concerning disputes over monies claimed to be owed to some Defendants by Plaintiff.  Based on conduct which will require extensive discovery to prove, it is also a complaint for invasion of privacy and fraudulent misrepresentation, as well as for declaratory relief.

## BACKGROUND

10.     Plaintiff is litigating over an ***atrocity*** to stop it from becoming two:

*An eviction filing—even one that is wrongfully filed by the landlord, or where the tenant successfully defends against the eviction—can effectively bar a person from future rental housing. As Matthew Desmond has noted, "[m]any landlords will not rent to persons who have been evicted, and an eviction can also ban a person from affordable housing programs."[1]*

11.    Of all the potential abuses of the legal system, few present life-and-death consequences like the misuse of an eviction lawsuit.  Defendant Baritz, this time on behalf of Plaintiff's new landlord, and previously on behalf of Fairfax Apartments ("The Fairfax"), with both on behalf of the University of Pennsylvania, has once again violated Pennsylvania law, and this time a municipal order, in an attempt to make Plaintiff homeless, bar him from future housing, and ultimately drive him to suicide. in coordination with a group of known cyberterrorists with strong ties to UPenn.  Plaintiff asks this court to enjoin this conduct once and for all.

### Fairfax/UPenn History

12.    A long series of events led to Defendant Baritz, on behalf of the Fairfax, filing an eviction lawsuit against Plaintiff and his brother on July 3, 2017, and to UPenn's and direct involvement.[2]

### 1986-1988

13.    Plaintiff's first two years in Philadelphia saw him and his family relocate and rebuild in Philadelphia, after losing a rent-stabilized luxury apartment in Manhattan (New York City, NY), and the once-thriving transcription/typing service which was run from it, and which employed Plaintiff:

a.    On July 5, 1986, Plaintiff moved into #904 of the Fairfax, with his business partner, having arrived from Manhattan with literally just the shirt on his back, to rebuild the family typing and transcription service which perished in Manhattan, along with his childhood, three-bedroom, rent-stabilized apartment in a Yorkville skyscraper.  His mother and brother would remain in Manhattan for the summer, until joining him in Philadelphia at the beginning of September.

---

[1] *The Anti-Tenancy Doctrine*, Sarah Schindler & Kellen Zale, *University of Pennsylvania Law Review*, January 2023.
[2] Case #LT-17-07-03-3161, Municipal Court of Philadelphia (against Plaintiff and his brother, the latter dismissed at trial), and appealed as #170801716 in the Court of Common Pleas (Philadelphia) and #17-2434 (September Term 2017) in Commonwealth/State Court (Pennsylvania) by Plaintiff.

     b.    On September 1, 1986, Plaintiff moved to 41st and Spruce Streets, into a one-bedroom apartment, taking in his mother and brother, who could not find housing in New York.

     c.    On October 1, 1986, Plaintiff's family moved into #806 of the Fairfax, at a rent of $550.00 a month, raised to $600.00 a year later.

     d.    Due to the UPenn campus typing store in Philadelphia failing, Plaintiff moved in with his family in March, 1987, along with the word processing business, conducted by phone appointment without objection from the landlord.

     e.    In December, 1987, Plaintiff worked five overnight shifts for the concierge (front) desk ("the Desk"), at $6.00 an hour (other shifts paid $5.50). He was paid for only four by the manager, Victor Scott, who was fired four months later.

     f.    In April, 1988, building manager Gene M. Martin offered Penny the Desk manager's job, at a salary of $314.00 a month for scheduling and payroll management, plus an hourly rate for working at the desk separate from the manager's compensation. Plaintiff and his brother split the seven overnight shifts, plus three evening shifts, and any fill-in shifts resulting from unexpected absences.[3]

14.    While Plaintiff's family upgraded the image of the building, and its security, becoming building employees placed them front and center in the building's affairs, unlike regular tenants.

15.    Also during this time, Plaintiff worked as an office temp, including multiple assignments at the University of Pennsylvania, where he rejected three separate offers of fulltime employment. He alternated between temping, the Desk, and playing in chess tournaments

---

[3] Plaintiff's family covered all seven overnight shifts because whenever they scheduled anyone else, they would inevitably have to wind up covering the shift anyway. The Desk had tremendous problems before Plaintiff's family was hired: absenteeism (resulting in a rape in the lobby in 1983 that led to an insurance controversy which almost eliminated the desk), poor management, sleeping on the job, and other recurrent issues which all resolved immediately upon the change in management. Plaintiff was training fulltime at chess, and the third shift allowed him to remain occupied while alert and always present, pleasing the landlord, and functioning as a stipend for what he had been doing for free upstairs. In later years, he would write books or computer programs, encouraged to "bring something to do." Robert Radke, the manager, told Plaintiff that he liked Plaintiff's attitude that he ran the building during the overnight. No crimes were committed against tenants during his eleven years on the job, with keys to every apartment in the building.

16.   In August, 1988, the roof above #906 collapsed, flooding #806, which was never properly repaired, leading to a permanent cockroach infestation due to the water damage above the apartment ceilings.  Plaintiff was living in Midwood in Brooklyn, NY for that period.

## 1988-1993

17.   Mr. Martin (the building manager) was well aware of Plaintiff's family's financial condition, and didn't hesitate to exploit it:

a.   Mr. Martin's loyalty to the minorities in maintenance, and the retired female part-timers, caused him to stand down in the face of increasing mistreatment and harassment, as well as the normal stress of being perpetually on-call without any time off unless covered by a family member, all for a barely survivable wage, with no paid overtime (not yet a big issue).

b.   In 1989, a relative of a maintenance worker was hired at the Desk.  He was a problem employee, alcoholic, and would often show up inebriated.  He also physically assaulted Plaintiff in the lobby, with Plaintiff warned his family would be "on the street" if he complained.

c.   In 1990, the building superintendent hired a friend to work the evening shift at the desk, fed him disparagement about Plaintiff, and one day the friend physically assaulted Plaintiff as he began his shift, with Plaintiff warned his family would be "on the street" if he complained.

d.   Plaintiff's apartment was often entered without notice by building workers or staff, who thought nothing of pounding on the door if no one answered, either for desk-related issues, or for phantom emergencies that did not require immediate entry, often for the sole purpose of invading Plaintiff's privacy to obtain sensitive information.

e.   Hostility from minority workers in the building who had keys to their apartment made living in the Fairfax barely tolerable, but with no alternative, Plaintiff and his family made the most of it.

Even if most days were uneventful, those that were ruined all but brief enjoyment of what should have been a pleasant, simple lifestyle.

      f.    In June, 1990, Plaintiff began working as an office temp, and did not work the desk again until June, 1991, when he obtained fulltime employment and resigned the desk. This resulted in Plaintiff's brother often working more than forty hours a week, with his extra hours credited to Penny, to prevent any overtime from being recorded or paid, costing his brother substantial wages over time.

    18.   In July, 1992, Plaintiff began working at the UPenn Medical Center, in a highly abusive environment where he endured sexual harassment from a middle-aged, divorcing boss. He tolerated this for resume stability, lasting barely a year before resigning under duress in June, 1993, returning to the desk and continuing to temp until December, 1994, after which he remained at the desk.

    19.   In November, 1992, Penny was hospitalized with an infection, and Plaintiff's brother managed the desk, while putting in unpaid overtime, while Jackie Mouton, an elderly tenant, was overworked to the point of exhaustion. Ms. Mouton cited racial harassment from a "black cabal" of minority building employees who were openly hostile to Plaintiff and his family.

    20.   Also in 1992, a drug-related murder (shooting) occurred in Apartment #6, around the hall from the Desk, on the lobby floor.

### 1994-1998

    21.   By 1994, University City had gentrified significantly, with the UPenn police presence extended to Forty-Third Street, and the rents in the Fairfax began climbing, with the Desk a primary driver of growth. The Desk had more or less stabilized, with problem employees either fired, in jail, or dead, and the building looking to upgrade its image and break from its "gritty" past, leaving Plaintiff and his family slightly less favored, but still the only reliable third-shift option.

22.   In 1996, the Fairfax sent a 15-day demand for "back rent" totaling ~$7,215.00+, when in fact they owed Plaintiff and his family double that in unpaid overtime.  Plaintiff, unaware of this, arranged to have the rent caught up by October, 1998 by paying $750.00 a month, including the current rent.

23.   Beginning in 1996, Plaintiff was targeted by numerous cyberstalkers and harassers, who doxed, defamed, harassed, and even threatened the lives of him and his family:

   a.    In 1996, Kenneth "Shrink" Weitzner, a sports betting influencer, "doxed" Plaintiff by posting private information about his living situation to discredit his handicapping expertise, while members of the *alt.hypnosis* USENET newsgroup who took issue with his warnings about sexual predators performing stage hypnosis at high schools also threatened his life, and even sent a private investigator to follow him.  Additionally, Plaintiff was doxed, defamed, harassed and threatened in the AOL gymnastics chat and on USENET by "groupies" of the sport who did so at the direction of abusive coaches, in exchange for backstage access to Olympians during their victory tour.

   b.    In 1997, On USENET, Plaintiff was called a pedophile who was using abuse claims to infiltrate the sport, repeatedly doxed, and was impersonated by a man in Massachusetts who signed Plaintiff's name to an essay about raping and murdering *The Magnificent Seven* Olympic gymnastics team, while Penny's name, address and contact information were posted to *alt.sex.stories* on USENET, with an invitation to men; four called, apologizing to Plaintiff.  The author of both posts was a gymnastics groupie acting on behalf of something calling itself the *gymnastics mafia*, run by a coach who later admitted to covering up sexual abuse at her gym.

   c.    The cumulative impact of this *gangstalking* drove Plaintiff to suicidal ideation, and brief hospital stays, while his reputation had been demolished, soon to be archived by Google, all the while his family remained vulnerable as Desk employees.

   d.    In late 1997, Weitzner's website was ordered shut down for defamation.

e.    In October, 1998, Plaintiff's allegations were confirmed when an Olympic gymnast ran away from home, citing the same abuse Plaintiff had publicized; *__she was believed__*.

24.    Also in October, 1998, Plaintiff encountered a tenant verbally abusing Penny and giving her "the finger."  Plaintiff was nonthreatening, but in response to his noting that she was targeting his mother, the tenant said *"I'll __kick your ass__"* to Plaintiff.  Fortunately for Plaintiff, there was a witness.

f.    Prior to the witness coming forward, the tenant called UPenn's off-campus housing department, claimed to have a *restraining order* against Plaintiff (she did not), and this prompted UPenn to call Mr. Martin, threatening to blacklist the Fairfax from off-campus housing lists if they did not fire Plaintiff from the desk.

g.    Because Plaintiff's family was threatened with firing if he spoke up, he was unable to pursue employment or defamation claims, and instead resigned the desk so that his family could continue working, but he continued to assist Penny in managing the Desk, while shifting his attention to the internet, where he had finally begun to make money.

### 1999-2001

25.    From 1999-2007, those targeting Plaintiff – internet business rivals, child abusers, Penn, and the Fairfax – merged their interests, their conduct increasingly overlapping.

26.    In September, 2000, Plaintiff moved to Albany, GA, taking a job with the Jones Law Firm. He was laid off and returned to Philadelphia in February, 2001; while in Albany, he was visited by someone who asked him if he was "Ray Parker," and was later confirmed to be an internet stalker who had publicly threatened his life with a "thirty-day countdown" before being stopped by law enforcement.

27.    Plaintiff had returned to Philadelphia from Albany in 2001 to "level the playing field," and filed an EEOC complaint against UPenn in August, 2001, alleging gender, race, disability, and retaliation discrimination, as well as a constitutional challenge to UPenn's affirmative-action program.

Soon after, a UPenn student named ***Wintermute*** threatened to murder Plaintiff at his home, where his family still worked the Desk.

        c.     When Plaintiff reported Wintermute to UPenn police, he was initially told by the detective that Wintermute had been "spoken to" and advised to "knock it off," which Wintermute confirmed in his own post to USENET.  Soon after, however, the detective began quoting internet postings impersonating Plaintiff (including the essay), threatening Plaintiff with arrest, until he realized that the posts were written by imposters.

    29.    Also in response to Plaintiff reporting the threat from Wintermute, the Office of General Counsel began coordinating with multiple UPenn departments regarding how to "handle" Plaintiff:



30.   At the end of 2001, an ASF user named Jihad Battista (a/k/a "*Formhandle*") created a website he called *"moderated ASF"* (mASF), then posted an "ASF FAQ" to USENET promoting mASF, from which Plaintiff or any mention of his work was banned, and which became the home for the *seduction syndicate*, a dating-advice cartel exposed by Ross Jeffries in his blog in 2010 (after Jeffries had run afoul of the syndicate).

31.   The Syndicate worked in concert with UPenn, because each was terrified that Plaintiff would accumulate money and influence sufficient to defend his rights against increasingly illegal and threatening conduct, all the while his disabled brother and aging mother were working the Desk, for an employer who used this leverage to exploit their labor and steal their wages.

32.   *Section 230* was circumvented by the Syndicate, with the original libel posted anonymously and untraceably, and then quoted by the remainder of the group, most notably Derek "Odious" Trunk, who repeated the worst lies about Plaintiff, including Pedophilia.  Trunk would later be convicted of possession of CSAM, including a video of a seven year-old girl being sexually tortured.

### 2002-2006 (Cancel Culture)

33.   On February 4, 2002, Plaintiff filed a Title VII lawsuit against UPenn:

a.      Shortly after the lawsuit was filed, two extremely disparaging articles about Plaintiff were published in the *Daily Pennsylvanian*, one questioning his qualifications, and the other quoting UPenn general counsel Eric Tilles stating that Plaintiff had never applied to work at Penn, and wasn't sure if he had ever been employed there, both of which were provably false.  The comments section of the article was filled with republished internet defamation and links to doxing websites.

b.      In Parker v. Tilles, 867 A.2d 656 (2004), a libel lawsuit over the article, UPenn's lawyers introduced, as Exhibit #23, a copy of a doxing website designed to defame and harass Plaintiff (call it *harassthem.com*), a site hosted on a website run by violent white supremacists.

c.   In 2003, in response to a subpoena over a defamatory posting made merely seven days earlier and tied to GreekNET, UPenn claimed not to be able to identify Wintermute, a direct contradiction to their own internal documents, which noted that all internet activity was traced to registered IP addresses on campus.  Despite this, UPenn was not sanctioned at the hearing.

d.   Also in 2003, UPenn argued that Plaintiff – **employed** at the time as a freelance psychology transcriptionist for a DHS subcontractor – was "unemployable as a secretary," and moved for a Rule 35 examination, supposedly to prove standing to sue.  Judge Brody, a former UPenn law professor who once claimed gender bias had cost her a judicial election, granted the order, and then sanctioned Plaintiff $1,000.00 for a missed-appointment fee, rendering him insolvent (credit-card debt), though able to pay his bills.  Two other motions for Rule 35 exams in the other claims were denied.

e.   In 2005, it was revealed that Dr. Tracy McIntosh of UPenn had drugged and raped a female job applicant, which was covered up by UPenn, and had previously harassed up to **fifty** women in his lab, effectively proving Plaintiff's claims of massive sexual harassment in corporate America and academia, many years before **#metooi**.

34.   From 2002-2006, Plaintiff fell into a routine of weekly psychology transcription to pay his bills (one day of work at $200.00+/week on average), winning substantial money betting, and producing internet content which generated revenue, while caring for his mother, but this ended suddenly.

## 2007-2015

35.   In April, 2007, Plaintiff opened a threatening letter sent to his mother (almost certainly by Derek Trunk), advising her to stop his "internet activities," and threatening "legal consequences" if she did not comply.  Copies of this and a similar letter were sent to Fairfax management.

36.   On July 26, 2007, Penny died, and Plaintiff's brother became Desk manager:

a.    Because UPenn had blacklisted Plaintiff from employment within its sphere of influence, Plaintiff's brother now had to cover all seven overnights, plus two evenings, and fill-in shifts, often on but a single hour of sleep in a twenty-four hour period, literally a form of human trafficking, while also performing the manager's duties.  His overtime wages were not paid, which was reflected in the payroll data on his checks.

b.    By early 2008, Plaintiff's brother's hours were reduced to fifty-six per week, plus any extra shifts for covering absent workers.  His overtime remained unpaid; Plaintiff assisted as he could with the phones and as a "town watch" in the lobby to allow him time to run errands.

c.    In February, 2008, Plaintiff and his brother were given the option of moving into #119 or #921 of the Fairfax, choosing the former due to proximity to the Desk.  Both apartments had serious damage: the building roof over #921 had collapsed in 1988, while #119 was occupied by a maintenance worker who performed undocumented, DIY repairs, resulting in major issues.[4]

d.    On May 9, 2008, new building manager Gary Kerstein called Plaintiff at 9:00 a.m., *screaming* into the phone, and blaming Plaintiff and his brother for the roach infestation caused by the roof collapse in 1988, as well as other damage not caused by Plaintiff.  Mr. Kerstein then threatened to fire his brother, saying he was "lucky to have a job and a place to live."  Plaintiff responded by saying he would begin sending his brother's resumes out that evening and explore legal options, to which Mr. Kerstein replied: *"I heard you like to sue people."*  He then backed down, noting that finding a third-shift Desk worker was "like pulling teeth."

e.    From the night Penny died, with the exception of one day off, Plaintiff's brother worked the overnight shift (and fill-in shifts) for *eight years* without a single night off.

---

[4] On September 17, 2014, eight year-old Emmeline Valadez plummeted to her death from #921, landing right outside #119 while Plaintiff was ten feet away.  Plaintiff had his brother, who was at the Desk at the time, notify the building management, and handled a chaotic situation with aplomb.

37.   In 2013, Mr. Kerstein repeatedly harassed and threatened Plaintiff, claiming water damage below #119 was caused by spillage during his baths, which was refuted by the building's own tile person.  The pipes had been decimated by the previous worker-tenant; after a week of threats and screaming, with Plaintiff threatening a fair-housing lawsuit, the Fairfax backed down, also because of difficulty replacing his brother.

38.   After ***VH-1's The Pickup Artist*** aired from 2007-2008, the "seduction community" quickly crumbled under its own weight, and endured a backlash that included Plaintiff:

a.    In 2009, "*incel*" George Sodini murdered three women in a Pittsburgh L.A. Fitness, and was discovered to have a "pickup artist" handbook on his coffee table, angering feminists.

b.    In 2014, "incel" Elliot Rodger murdered six students in Isla Vista, California, leading to an organized feminist backlash led in part by a female UPenn Law graduate and current AUSA, who threatened to abuse legal process to harm his cases, and fed defamatory information to UPenn.

c.    On January 9, 2014, Adam Steinbaugh of FIRE (a right-wing law firm disguised as a free-speech nonprofit) replied to Plaintiff's anti-feminist tweets with links to the doxing websites, which at the time included his address and false allegations of pedophilia, resulting in death threats.

d.    In December, 2015, Plaintiff was SWATTED by a group with ties to Steinbaugh.

### 2016-2018: Whistleblower And Eviction Lawsuits

39.   By early 2016, Plaintiff's brother had worked eight years without a single night off, resulting in serious neglect to his personal life, and even his ability to seek medical care.  The only light at the end of the tunnel was Social Security and retirement with an inflated check due to the overtime, but that was still several years of mistreatment away, yet the lesser evil.

40.   On February 29, 2016, Plaintiff received a death threat from someone who had been instigated by the doxing websites, who linked to them and cause this person to act out as a vigilante:

a.     The user claimed to live in New Jersey, two hours away, and was on his way to "smash [Plaintiff's] head open."  The threat seemed chillingly credible, sufficient for Plaintiff to have his brother call out from the Desk, which did not sit well with part-owner Marla Klein Kerstein.[5]

b.     That evening, Plaintiff identified the source of the threat, and elected to remain in the Fairfax rather than move, as he was prepared to.  When Plaintiff called police to report the threat, a building maintenance worker eavesdropped for several minutes before Plaintiff noticed him and asked him to leave.  The police had mistakenly thought he was an ally until the situation was explained.

c.     The next morning, Marla Klein Kerstein *pounded* on Plaintiff's door, demanding to speak to his brother, but Plaintiff refused.

d.     Plaintiff's brother would wind up taking years of accumulated paid time off, through June, 2016, but was not allowed to return to the Desk due to self-disclosure of his disability, for which he requested the adjustment working only overnight shifts.  Plaintiff represented him successfully on his unemployment claim, and his brother eventually wound up collecting SSDI, freeing him economically.

41.   Also in 2016, Plaintiff and his brother filed an FLSA lawsuit with this court.  Plaintiff's federal claims were dismissed and were not worth pursuing in state court, while his brother's claim ultimately settled.  On September 1, 2016, the rent on #119 was raised to $1,000.00 a month.

42.   On November 15, 2016, Plaintiff's brother moved into the Basement in the Building in Chinatown where he still resides:

a.     Plaintiff had intended to move in with his brother, fronting him $1,900.00 to move in, including a nonrefundable application deposit of $950.00. A lease was not provided until after Plaintiff had fronted this money, and specified only one occupant in the apartment, which, according to the FHA,

_____

[5] Ms. Kerstein held a longstanding grudge against Plaintiff over an incident in 1988 when, at the Desk, he asked her where she was going, and for identification.  She complained to her father, who sided with Plaintiff, who had an excellent relationship with the building until 1998, in what was once a somewhat beneficial, though exploitative relationship.

constitutes family discrimination under the Fair Housing Act.  The Basement was previously occupied by two tenants, a mother and her young, imperiled daughter.

b.    Since his brother's medical well-being was paramount, Plaintiff did not object, and could not seek a refund of his money.  To mitigate damages, he allowed his brother to move into the Basement, while he remained in the Fairfax.

c.    In March, 2017, Plaintiff was offered a settlement of his wage and other claims in return for renting #119 for $1,000.00 a month, with the lawsuits "suspended" until such time as he moved out, for whatever reason.  Plaintiff declined, since he had no reason to remain in the Fairfax other than to avoid homelessness, which he did.

d.    In June, 2017, Plaintiff notified the Fairfax that his brother had moved, and not to include him in any future actions relating to his tenancy.  Instead of complying with the law, Fairfax, acting in concert with UPenn and the doxing websites (who removed a page about Plaintiff once he sued them as well), attempted to undermine Plaintiff by harming his brother.

43.   In late June, 2017, the Fairfax retained Defendant Baritz as their counsel:

a.    An eviction lawsuit was filed in Municipal Court on July 3, 2017, against Plaintiff and his brother, and was served concurrently with a thirty-day Notice to Vacate, rendering the latter moot, and stigmatizing Plaintiff with an eviction lawsuit which would harm his ability to secure future housing,

b.    Plaintiff attempted to counterclaim in the eviction, but was threatened by his brother's wage attorney to drop the case or lose representation for the wage case.

c.    Plaintiff's brother was dropped from the eviction lawsuit at trial, but the Fairfax obtained judgment against Plaintiff, who appealed.

d.    For the appeal, UPenn's law firm, which had also shown up in Plaintiff's internet and Title VII cases, joined Baritz in representing the Fairfax, who won a zero-dollar judgment for possession that was not appeal.

e.    During this appeal, UPenn's lawyers (and Baritz) repeated the lies from the doxing websites and the feminist UPenn-alum lawyer, calling him a *rape-enabler*, and painting him as a danger to society, despite his having had keys to all tenant apartments for eleven years without incident.

f.    Plaintiff, legally blind and now suffering from numerous degenerative conditions (cirrhosis and Type II diabetes), was unable to vigorously defend his rights, and lost possession of #119 as of February 28, 2018.  He vacated fourteen days earlier, landing in the Basement.

### 2018-2021: Warren Buffet's Rat-Infested Basement (88 Ways To Die)

44.  In the Basement, nicknamed *88 Ways To Die* by Plaintiff, he found decrepit conditions:

a.    The Basement was never up to code; therefore, any certificate of rental suitability is therefore fraudulent.

b.    The Basement was laid out like a railroad flat, with a small bedroom and bathroom at one end, and a kitchen and bathroom at the other.

c.    The hallway included the entrance to the apartment, a deep closet, and a maintenance area which included the building's water controls and meter, and its very noisy freight elevator that opened literally next to the bedroom, and which was often used by the landlord to enter without notice.

d.    Situated directly under a restaurant, the pipes in the Basement were rotted, leading to regular flooding of the bedroom and hallway.

e.    The Basement had no egress window.

f.    The landlord and housekeeper would often have extremely loud conversations in the building office, directly above the Basement.

g.   The Basement had a bad rodent infestation, due to code-violating holes in the exterior (greater than 7-14cm$^2$ for mice and rats), and the Building's location on a primarily retail block. Plaintiff lost count after his *rat killing fields* netted thirty-two kills.

h.   The apartment layout rendered half of the square footage unusable, or a maintenance area not in possession of the tenants, while the remaining square footage was disconnected.

i.   The Building has no garbage disposal area (contributing to the rodent problem), requiring Plaintiff's brother to store trash in the Basement for weekly pickup.

j.   The Basement was incredibly isolated, which was medically ideal for Plaintiff's brother, but also extremely dangerous in any emergency in which one of the eighty-eight ways to die might occur, making it unsafe for a lone occupant, as did the perpetual threat of flooding in their absence.

45.   Over the years, substantial money was spent on RAID, glue traps, towels to collect water, and on increased utility bills due to inefficient ventilation and the layout of the apartment.

46.   It was clear that Mr. Buffet's subordinate at Fox Roach, Ian Wilson, rented to Plaintiff's brother primarily because he seemed like *easy prey*, not likely to complain.  The resulting abusive and dangerous conditions, as well as the need for two people to be in the apartment for safety reasons.

### 2021-Present: The New Apartment

47.   In November, 2021, the Basement flooded to the point where the city became involved, declaring it uninhabitable, due to an obstruction of city pipes, and other violations.  In response, Plaintiff's brother was relocated to the new Apartment, a much larger, unfinished place on an upper floor, with more than double the square footage, which had listed for $1,695.00/month.

48.   The new Apartment is also not up to code, and had other issues:

a.   The Apartment is much larger than the basement, which makes it more difficult for Plaintiff to navigate, as he has very limited mobility.  The bathrooms are over a hundred feet from the bedroom.

b.   The bedroom window has been broken since Plaintiff moved in, resulting in blasts of cold wind in winter, and increased utility bills due to the need for space heaters.[6]

c.   No mailbox key was ever provided, preventing Plaintiff from getting his mail in the new Apartment, and requiring his brother to continue to use Warren Buffet's Rat-Infested Basement as his mailing address.

d.   The apartment is unfinished, in contrast to the Apartment directly above.

e.   The heater is broken.

f.   Unlike the Basement, the Apartment is situated above ground, on one of the noisiest blocks of Chinatown.[7]

g.   Plaintiff and his brother have also made major expenditures to deal with issues in the new apartment, including but not limited to three small refrigerators, six space heaters (plus extra utility bills), a portable air conditioner, as well as RAID and glue traps to catch rodents and cockroaches.

49.   Immediately after moving in, Plaintiff's brother inquired about available one-bedroom apartments on another floor, which rented for slightly less than the Basement, as a permanent solution, but were ignored, apparently because the Landlord could rent those apartments, while the new

---

[6] The landlord actually complained about cardboard that was used to plug up the window, indicating awareness that it needed repair, yet merely asked Plaintiff's brother to remove the cardboard, which he did.

[7] The building is situated near city-owned buildings where extremely loud heavy equipment runs literally day and night, large vehicles are idled at all hours, and garbage collection occurs regularly during prohibited hours, in addition to an elevated level of street noise from passing foot and automobile traffic.  Quiet enjoyment in the Apartment is impossible: Plaintiff, who regularly practices hypnosis, has lost many excellent trances to a sudden loud noise, exacerbated by the broken window.

Apartment was not yet ready for the market, thus maximizing its revenue. No other alternative apartments were offered by Defendant Mai, who manages many area properties.

50.   In February, 2022, after the housekeeper harassed his brother yet again by pounding on the door and screaming on a Sunday morning, Plaintiff advised him to **give notice to Defendant Mai that he would be moving at the end of July, 2022**, and that the remaining five months of rent would be considered an offset for the degraded use and breach of the warrant of habitability.

51.   In response, Defendant Mai replied that Defendant Ron Lee had asked him to resolve the issue, because Plaintiff's brother was a valued, long-term tenant, on which Plaintiff relied to advise his brother to remain in the Apartment; if the landlord wanted him to move out, they had their chance.

52.   On June 3, 2022, Defendant Ron Lee's wife sent to Plaintiff's brother, via e-mail, a fatally defective Notice to Vacate:

    a.   The Notice appears to have been in reaction to the housekeeper crossing paths with Plaintiff on the staircase earlier that morning; immediately thereafter, Plaintiff noticed the housekeeper literally screaming into her cellphone, apparently in reaction to having seen him.

    b.   The Notice did not specify good cause, stating only nonrenewal of the lease.

    c.    The Notice was addressed solely to Plaintiff's brother, and to no one else: neither Plaintiff nor "all occupants" were named in the Notice. Plaintiff avers that this was intentional.

53.   In response to the Notice, Plaintiff's brother called Defendant Ron Lee's wife, quickly handing the phone to Plaintiff, who would be representing him in the eviction with the City:

    a.   Plaintiff informed Mrs. Ron Lee of his fulltime presence in the apartment, that he would be representing his brother as an advocate, and that the notice was defective.

    b.   In response to being put on notice, Mrs. Lee said "it's time to move out of that expensive apartment" or something to that effect, advising Plaintiff that she would be involving lawyers.

c.   By explicitly notifying the landlord of his fulltime presence in the apartment, Plaintiff formally established occupancy as his brother's live-in caregiver, as he had already done by living in the Basement and new Apartment openly for several years, without objection.[8]

54.   Subsequent investigation has revealed a preponderance of evidence indicating that the Defendants may have wanted to evict Plaintiff's brother in order to harm Plaintiff much earlier, but was prevented from doing so by the pandemic, and because Plaintiff had filed a $2.6 million personal injury lawsuit California, with a high-powered, San Diego-based attorney (Michele M. Betti).

### Bathroom Flood (November, 2022)

55.   On November 21, 2022, the bathroom toilet overflowed, causing alleged water damage:

a.   Plaintiff, and not his brother, is the one who used the toilet prior to its overflowing.

b.   The toilet had notoriously bad pipes, which required monitoring after each use.

c.   ***The bathroom was not watertight***, as required by the building code for habitability, causing the overwhelming majority of the damage.  Alternatively, and more likely, the primary flooding occurred behind the walls, which Plaintiff could not have seen, nor stopped.

d.   Plaintiff and his brother have never abused the toilet, using it only for toilet paper.

e.   Plaintiff, after monitoring the toilet following its use, saw no stoppage or flooding, and returned to bed.  His brother was also asleep, and unaware of the situation.

f.   A while afterward, the landlord contacted Plaintiff's brother, perhaps after knocking on the door, to inform him of the flooding, and that someone would be entering the apartment to take pictures of the damage, "for insurance," as Plaintiff or his brother could easily have done by then.

---

[8] Plaintiff should have been on the original Basement lease, but also should have been added to a two-occupant lease for the Basement. Any claims by the landlord that they would not have rented to Plaintiff fall flat, as he was merely an occupant, and prior to 2018, had no eviction lawsuit in his history.  Even if that were a factor temporarily, by 2021 the laws had changed to bar the use of four-year-old evictions to deny housing.  Regardless, Plaintiff maintains that ***any*** use of prior evictions against an older, disabled renter constitutes disparate-impact discrimination in violation of Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 (2015).

g.    Instead, the landlord sent a worker into the apartment, with a cellphone camera, taking pictures not just of the water damage, but the entire living room, with Plaintiff in a state of undress. Moments later, a female neighbor entered the apartment despite being told she was unwelcome.  Her ***trespass*** irreparably compromised Plaintiff's privacy and his brother's medical privacy.  The Apartment was difficult to maintain due to the need to store a full week of garbage in the living room, also exacerbating the rodent and cockroach infestations.  The resulting impression left on the neighbor irreparably compromised his and his brother's reputation.

### Lease Renewal Offer (December, 2022)

56.    Despite subsequent attempts to use the bathroom flood as good cause for eviction, the landlord offered Plaintiff's brother a ***one-occupant*** lease for the 1,600-sq. ft. Apartment, at a rent of $2,200.00/month, more than double the rent in the Basement, and beyond what Plaintiff's brother could pay on his own.  The offer was not made in good faith:

a.    The lease offer constitutes a transactional waiver of any claims related to the bathroom water damage, which was not Plaintiff's fault to begin with.

b.    The increased rent constitutes a breach of the Basement lease, no longer mitigated by the identical, $1,000.00/month rent on the new Apartment.

c.    The lease violates the family discrimination and retaliation provisions of the Fair Housing Act, and the Philadelphia Housing Code;

d.    The deliberate omission of Plaintiff from the lease renewal constitutes a backdoor attempt to evict him for no good cause.

e.    The rent was $400.00 higher than the last rent charged for the apartment directly above, which was in superior condition and (apparently) up to code.

f.    Neither one-bedroom apartment was offered as an alternative.

     g.    Any rent above the Basement rent (with incremental increases) should liquidate back to Plaintiff and his brother as liquidated damages (Plaintiff has been paying half the expenses in the apartment).

     h.    As Plaintiff had explicitly notified the landlord that he was living in the Apartment (not that he had to, due to the nature of his occupancy and caregiving) in June, any objection to this was waived when not exercised within three months.

     i.    Plaintiff now suffers from end-stage liver disease, type II diabetes, and stage III COPD. He requires assisted living which is currently provided by his brother, for whom he also functions as caregiver. The arrangement is extremely cost-efficient and would have been destroyed had Plaintiff had to move. As it stands, he would land in a hospital directly after leaving the Apartment in the absence of replacement housing, at a six-figures cost to the taxpayer.

57.   The lease offer also violated the spirit, if not the letter, of the Bar Association rule against contacting represented parties who are alone. Defendants knew Plaintiff represented his brother, yet attempted to badger him into a meeting with Mr. Mai's "friend" (attorney), alone. On Plaintiff's advice, his brother declined the lease renewal.

### The FHC Hearing (February 1, 2023)

58.   On February 1, 2023, a Fair Housing Commission (FHC) hearing was held relating to the complaint filed by Plaintiff's brother, a requirement to contest a notice to vacate:

     a.    The landlord testified that Plaintiff was "always there" in the new Apartment, indicating full awareness of his caregiver status.

     b.    Plaintiff waived any penalties related to the $1,000.00 excess security deposit that should have been returned at the end of 2017, in exchange for applying it to the December, 2021 rent.

Defendants had lied under oath that that certified rent check was "lost," leading to a protracted process of canceling the check.

      c.    The PCHR ruled that the landlord was barred from bringing any eviction actions, or even from collecting rent, until open code violations with the City were remedied, and further that they could only collect rent going forward once they were. They also ruled that Plaintiff's brother (and, by extension, Plaintiff) had an oral lease for the new Apartment.

59.    The landlord appealed the PCHR ruling, with a hearing held on October 12, 2023, at which this Order was overturned, freeing the landlord to serve a fresh Notice To Vacate on Plaintiff's brother, and starting the time clock as of the ruling.

## Second Illegal Notice To Vacate (Baritz)

60.    It is not clear when the landlord searched the internet for information concerning Plaintiff (and found defamation about him in the course of their search), or when one of Plaintiff's cyberstalkers fed them with information, but they were certainly made aware by their first attorney, Jeffrey Katz, and even more certainly by Defendant Baritz, who they retained to write a second, illegal Notice to Vacate on August 22, 2023:

      a.    The Notice was addressed to Plaintiff's brother, not Plaintiff, and not any additional occupants of the apartment. This is a deliberate omission designed to circumvent Plaintiff's due process rights by making it impossible for him to respond to the Notice.

      b.    Regardless of a) above, the Notice should be construed as being directed towards Plaintiff, who could still wind up named in a lawsuit, and with whom a legitimate controversy exists. Plaintiff is also impacted by any debt owed to the landlord, as it directly impacts his own housing.

      c.    The Notice claimed past due rent and "damages" (presumably related to the bathroom flood) of $20,300.

d.    The Notice violated the PCHR order of February 1, 2023, for at the time it was issued, no back rent was owed, and the landlord was barred from moving to evict tenants.

e.    Secondary to c) above, the Eviction Diversion Program rejected the landlord for participation due to the open code violations with the city.

f.    Any water damage attributable to Plaintiff or his brother (there should be none) should count as plenary debt rather than possessory debt and should not be the basis for any eviction claim.

g.    Any past rent claimed beyond three months is subject to a laches defense, and should also be pursued as plenary rather than possessory debt.

h.    The Notice ignores the massive rent offsets to which Plaintiff and his brother are entitled, in an amount which far exceeds the allegedly owed money.

i.    Defendants breached the Basement lease; any expenses incurred because of this, including higher rent in a new apartment, or having to move, should be billed to the landlord, who has chosen not to mitigate these damages by simply offering one of the one-bedroom apartments on another floor to Plaintiff and his brother.

61.    In response to the Second Notice, Plaintiff and his brother have filed separate complaints with the PCHR (and Plaintiff's Brother with the Fair Housing Commission), which have been received and which are in process.

**Temporal Proximity (Retaliation And Censorship)**

62.    Plaintiff's internet activities are well-tracked by his legal adversaries, who were therefore aware that, a few months ago, he began speaking out on social media against code violations in "an off-campus apartment in the UPenn area":

a.    In the past, Twitter's censorship department was run by UPenn alum Yoel Roth, but he was fired when Elon Musk took over the platform, which also eliminated the influence of the feminist

UPenn alum and AUSA who conspired with Roth to silence Plaintiff's whistleblowing about employment at UPenn (he would regularly share links to news about Dr. McIntosh's cases).

      b.     Unable to silence Plaintiff, and facing a major expose about the Fairfax (see below), Defendant Baritz was recruited to once again abuse process against Plaintiff, and to gain access to private information available only to the Fairfax, and otherwise unavailable to Defendants

      c.     Defendant Baritz has a clear conflict of interest, as he represents the Fairfax, whose interests are not aligned with the landlord, and is also operating as a proxy for UPenn, who has an interest in purchasing property in the neighborhood, as does its affiliated University, Jefferson..

### Fairfax Open Housing Code Violations

63.   It seems the Fairfax has been "pulling a fast one" on the city as follows:

      a.     The mailing address for the Fairfax is listed as 4247 Locust Street, which has a perfectly clean record with L&I:



b.    The *actual* address of the building, and the one tracked by L&I, is 4231-41 Locust Street, which tells a much different story:



c.    As of this writing, several of the violations are still open, and run the gamut from minor (reports and signs), to major (violation of a stop-work order, illegal construction, new wiring, etc.).

d.    In theory, and in the Philadelphia Housing Code, the Fairfax is not supposed to even charge rent, or move to evict anyone, yet has managed to sidestep this with sleight-of-record.

## COUNT ONE: DRAGONETTI ACT VIOLATIONS (ALL PARTIES)

64.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-63 above.

65.   While a lawsuit has yet to be filed by Defendants, the Notice to Vacate of August 22, 2023 constitutes an initiation of civil proceedings against Plaintiff (the Notice is a prerequisite for filing suit),

a known occupant of the Apartment, and these proceedings were terminated when rejected by the Eviction Diversion Program.

66.    Defendant Baritz was hired by Defendants specifically to violate Plaintiff's rights and target him on behalf of his former client's master, UPenn, by targeting his brother in an attempt to undermine his resources.

67.    The losing outcome and improper purpose for initiating civil proceedings constitute a clear violation of the Dragonetti Act; Plaintiff states this claim for relief on this basis.

68.    Defendant Baritz conspired with UPenn's lawyers to unjustly evict Plaintiff in 2017, ignoring the law by not providing a true thirty-day notice to vacate, resulting in potential blacklisting in the housing market which has since been undone by the Renters Access Act, which bars use of evictions filed more than four years prior; Defendant Baritz is attempting to restart that time clock and once again harm Plaintiff.[9]

69.    Defendant Baritz is also fully aware of, and weaponizing, the existence of doxing websites which he knows will use his pleadings to further defame, dox, and harass Plaintiff, with the ultimate goal of driving him to suicide.  He has a history of abusing his position as attorney in cases involving the Plaintiff, and is likely to do so again unless enjoined and/or disqualified.

70.    For the violations of the Dragonetti Act, Plaintiff is entitled to a) compensatory and punitive damages, in an amount to be determined at trial, b) attorney fees, if accrued (he is currently *pro se*), c) costs of suit, d) injunctive relief, and e) such other relief deemed just and proper to make him whole.

## COUNT TWO: ABUSE OF PROCESS (ALL PARTIES)

71.    Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-70 above.

---

[9] It is worth noting that ***New York*** state's total ban on landlord use of eviction records is the only thing enabling this lawsuit as it provides a last resort for housing in the event of a blacklist in other states, including Pennsylvania.

72.   Defendant Baritz's conduct, for which the other Defendants are liable, as set forth hereinabove, also constitutes a violation of the Pennsylvania tort of abuse of process; Plaintiff states this claim for relief on this basis.

73.   The damages caused by an abusive Notice to Vacate cannot be overstated: this is a direct attack on Plaintiff's housing – the *second* – by an attorney who will not stop unless enjoined.

74.   For this abuse of process claim, Plaintiff is entitled to a) compensatory and punitive damages, in an amount to be determined at trial, b) attorney fees, if accrued (he is currently *pro se*), c) costs of suit, d) injunctive relief, and e) such other relief deemed just and proper to make him whole.

## COUNT THREE:
## FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS (ALL PAR TIES)

75.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-74 above.

76.   The Notice to Vacate of August 22, 2023 was an attempt to collect a debt that falls within the scope of the FDCPA.

77.   Defendant Baritz used blatant, egregious deception in creating a Notice to Vacate which was fatally flawed in numerous ways:

    a.   The notice offered no supporting documentation for the debt.

    b.   The alleged debt was not itemized.

    c.   The amount owed was incorrect.

    d.   Bogus legal action (no standing) was threatened as a means of collecting the debt.

78.   Plaintiff avers that Defendant Baritz's conduct, as set forth hereinabove, constitutes a violation of Fair Debt Collection Practices Act, 15 USC 1692(d), and states this claim on that basis.

79.   Plaintiff is entitled to statutory damages of ONE THOUSAND DOLLARS $1,000.00.

80.   Plaintiff is further entitled to costs of suit, including any attorney fees (none incurred so far), and such other and further relief as deemed necessary to make him whole.

## COUNT FOUR: BREACH OF CONTRACT (ALL PARTIES EXCEPT BARITZ)

81.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-80 above.

82.   At the hearing of February 1, 2023, it was ruled that Plaintiff and his brother have an implied lease for the Apartment, and that the Basement lease ended when Plaintiffs were relocated in 2021. Thus, any offsets or alleged damages impact the rent Plaintiff would pay going forward.

83.   The breaches as set forth hereinabove include the following offsets:

a.   Degraded habitability in the amount of half of all rent paid on the Basement, and one-quarter of all rent paid on the Apartment, with interest.

b.   Reimbursement in an amount to be determined at trial.

c.   Breach of habitability in an amount to be determined at trial.

d.   Breach of quiet enjoyment, in an amount to be determined at trial.

c.   Any relocation expenses to a new apartment and increased rent once there, as this is directly attributable to the breach, in an Amount to be determined at trial.

84.   Breaches and offsets in the Apartment include, but are not limited to, the following:

a.   Increased utility bills due to size of apartment and broken bedroom window, in an amount to be determined at trial.

b.   Reimbursement for rodent traps, roach spray, six desktop space heaters, and three mini-refrigerators, in an amount to be determined at trial.

c.   Compensatory damages for breach of quiet enjoyment and breach of the warrant of habitability.

d.    Reimbursement for any increased rental or other expenses related to the breach of the Basement lease, including but not limited to increased rent on any new apartment, and expenses of moving into that apartment, in an amount to be determined at trial and in the future, as more specifics become known.

85.   Plaintiff avers that the above conduct by the Landlord violates the Pennsylvania tort of breach of contract, and state this claim for relief on that basis.

86.   Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, costs of suit, and injunctive, declaratory, and other relief as deemed necessary and just to make Plaintiffs whole.

**COUNT FIVE: INVASION OF PRIVACY (ALL PARTIES EXCEPT BARITZ)**

87.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-88 above.

88.   Defendants violated Plaintiff's privacy after the bathroom flood:

a.    The neighbor who entered the apartment should never have been allowed to, as she had no legitimate purpose nor permission for being there.

b.    The worker who took pictures went well beyond documenting the damage to the floor, and snapped several pictures of private areas of the Apartment; moreover, Plaintiff could have taken these photographs himself.

89.   Once privacy is compromised, it cannot be undone; the damage to Plaintiff, and any embarrassment secondary to having his privacy stripped, is permanent.

90.   This is not the only intrusion on Plaintiff's privacy, as the landlord had made it standard practice to come and go from the Basement as they pleased, and to bring other tenants into the Basement during its many floods.

91.   Defendants' conduct, as set forth hereinabove, constitutes a violation of the Pennsylvania tort of invasion of privacy.  Plaintiff states this claim for relief on that basis.

92.   Plaintiff is entitled to compensatory damages in an amount to be determined at trial, costs of suit, and any injunctive relief deemed necessary to administer justice.

**COUNT SIX:**
**FRADULENT MISREPRESENTATION (ALL PARTIES EXCEPT BARITZ)**

93.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-92 above.

94.   Defendants claimed, on February 27, 2022, that Plaintiff's brother was a valued, longterm tenant and that they wanted him to remain a tenant, yet sent a Notice to Vacate in June, 2022.

95.   Plaintiff, who makes his brother's housing decisions as his caregiver, relied on Defendants' statements when deciding not to seek new housing, as was his intent when he advised his brother to give five months' notice of moving.

96.   Had Plaintiff known Defendants' true intentions, he would have moved out with his brother as soon as they could secure replacement housing.  Now, they are facing legal action and threats which may compromise their ability to move.

97.   Plaintiff avers that Defendants' conduct, as set forth hereinabove, constitutes fraudulent misrepresentation under Pennsylvania law, and states this claim for relief on that basis.

98.   Plaintiff further avers that the nature of this fraud was wanton, willful, motivated by common-law malice, retaliatory, and with total and wanton disregard for his rights.

99.   Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

100.  The egregious nature of Defendants' conduct further entitles Plaintiff to punitive damages, in an amount to be determined at trial,[10] costs of suit, and injunctive and other relief deemed necessary.

---

[10] The Notice To Vacate violated a City order and was downright fraudulent.  It deserves maximum sanctions.

## COUNT SEVEN: FAIR HOUSING ACT VIOLATIONS (ALL PARTIES)

101. Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-100 above.

102. Defendants' conduct as set forth hereinabove, including but not limited to paragraphs 26-29, constitute *prima facie* evidence of FHA violations against Plaintiff:

    a.    A superior apartment was offered at a lower rent to a young, ethnic female tenant in violation of 42 USC §3604(a), also in retaliation for Plaintiff having exercised his rights.

    b.    One-bedroom apartments were rented (or advertised as rentals) to female and non-American tenants, for reasons of gender and race, yet not offered to Plaintiff, in violation of §3604(c).

    c.    The one-occupant leases constitute family-status discrimination in violation of §3604(a), and were designed expressly to illegal exclude and evict Plaintiff..

    d.    The Landlord's overall conduct, including but not limited to that set forth hereinabove (broken window, no mail key, and other conduct), constitutes retaliation under 42 USC §3617.

    e.    The Landlord is abusing process against Plaintiff's brother and attempting to evict him in order to undermine Plaintiff's housing resources, and for assisting his brother in exercising his rights as a tenant under this Act, and other laws.

103. For the above violations of the Fair Housing Act, Plaintiff is entitled to relief, and states this claim on that basis.

104. The evidence here is overwhelming on all counts, and reveals *retaliatory* pretext with the first Notice to Vacate, issued without good cause, without good-faith participation in the Eviction Diversion Program. Even if this notice had nothing to do with Plaintiff, it still reveals common-law malice on the part of Defendants, who were already in breach of the Basement lease.

105. In addition to any separate motivation to evict his brother, Defendants have been targeting Plaintiff for retaliation, in violation of the Fair Housing Act; he states this claim for relief on that basis.

106. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but which is not less than FIVE MILLION DOLLARS ($5,000,000.00).

107. Plaintiff is further entitled to the maximum punitive damages allowed by law, costs of suit, including any attorney fees incurred (none so far), injunctive relief, and such other relief as deemed necessary and proper to make him whole.

**COUNT EIGHT: FRAUDULENT MISREPRESENTATION (ALL EXCEPT BARITZ)**

108. Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-107 above.

109. The landlord's communication of February __, 2022 in which they claimed Plaintiff's brother was a valued, longterm tenant was intentionally misleading.

110. Nothing occurred between February and June, 2022 that would have caused a reasonable landlord to change their opinion of Plaintiff's brother, nor did they have any grounds to evict.

111. Despite the above, the landlord served a Notice to Vacate on Plaintiff's brother on June 3, 2022.  No good cause was given in that notice, revealing discriminatory motive.

112. Plaintiff relied upon the landlord's communication to advise his brother to remain in the apartment.  Had he known a Notice to Vacate was coming, he and his brother would have simply moved out and filed a lawsuit to recover any offsets.

113. Defendant's conduct as set forth hereinabove violates the Pennsylvania tort of fraudulent misrepresentation.  He states this claim for relief on that basis.

114. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but which is not less than FIVE MILLION DOLLARS ($5,000,000.00).

115. Plaintiff is further entitled to the maximum punitive damages allowed by law, costs of suit, including any attorney fees incurred (none so far), injunctive relief, and such other relief as deemed necessary and proper to make him whole.

## COUNT NINE: FOR DECLARATORY RELIEF

116. Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of paragraphs 1-115 above.

117. Plaintiff is entitled to the following declaratory relief, all of which relate to legitimate controversies in which Plaintiff has an interest:

    a.    That the water damage was not Plaintiff's (nor his brother's) fault, but instead the result of contributory negligence, as set forth hereinabove.

    b.    That no back rent is owed due to the offsets outlined above.

    c.    That any rent above $1,000.00 for a new apartment (except for reasonable increases) in the Building is liquidated, ongoing damages from the landlord's breach of the Basement lease.

    d.    That the doctrines of laches and failure to mitigate/prosecute makes any recovery for monetary damages or past rent due plenary, rather than possessory debt.

    e.    That no good cause for eviction exists.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

1.    Compensatory damages in an amount to be determined at trial, but not less than FIVE MILLION DOLLARS ($5,000.000.00).

2.    Punitive damages in an amount to be determined at trial.

3.    Costs of suit, including any reasonable attorney fees where applicable (none have been incurred as of now).

4.    A declaration that the Notice to Vacate is legally invalid.

5.    An injunction enjoining the Landlord from pursuing eviction for any reason based on events up to and including the date of this filing.

6.    A declaration that Plaintiffs owe no money to the Landlord as of the date of this filing, and an injunction enjoining Defendants from attempting to collect.

7.    A declaration that no good cause for eviction exists, based on anything which has occurred up to and including this date.

8.    A declaration that Defendants have violated the race, gender, age, disability, national origin, and retaliation provisions of the Fair Housing Act.

9.    Such other and further relief as this court deems just and proper.

This the 16th day of October, 2023.

Gordon Roy Parker, Pro Se
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131

*e-mail or text preferred contact

05/2023

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

REC'D OCT 16

Address of Plaintiff: 315 South Broad Street, Philadelphia, PA 19107

Address of Defendant: 100 South Broad Street, Philadelphia, PA 19110

Place of Accident, Incident or Transaction: Philadelphia

---

*RELATED CASE IF ANY:*
Case Number:_____   Judge:_____   Date Terminated_____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year      Yes ☐   No ☐
   previously terminated action in this court?
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit
   Pending or within one year previously terminated action in this court?      Yes ☐   No ☐
3. Does this case involve the validity or infringement of a patent already in suit or any earlier
   Numbered case pending or within one year previously terminated action of this court?      Yes ☐   No ☐
4. Is this case a second or successive habeas corpus, social security appeal, or pro se case filed
   by the same individual?      Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ **is not** related to any now pending or within one year previously terminated
action in this court except as note above.

DATE:_____   _____   _____
                  *Attorney-at-Law (Must sign above)*   *Attorney I.D. # (if applicable)*

---

**Civil (Place a √ in one category only)**

*A. Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☒ 15. All Other Federal Question Cases. *(Please specify):* Fair Housing

*B. Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):*_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, Gordon Roy Parker _____, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action
   case exceed the sum of $150,000.00 exclusive of interest and costs:

☒ Relief other than monetary damages is sought.

DATE: October 16, 2023   _____   Gordon Roy Parker, Pro Se
                         *Attorney-at-Law (Sign here if applicable)*   Gordon Roy Parker, Pro Se
                                                                       *Attorney ID # (if applicable)*

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REC'D OCT 16

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
|  | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.         (X)

| October 16, 2023 | Pro Se | Gordon Roy Parker |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 1-267-951-4131 |  | GordonRoyParker@aol.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02



American LegalNet, Inc.
www.FormsWorkFlow.com

REC'D OCT 16

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 – Assignment to a Management Track

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.


American LegalNet, Inc.
www.FormsWorkFlow.com

RECD OCT 16

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gordon Roy Parker

**DEFENDANTS**

Ronald Lee, Teresa Lee, Jeffrey Mai, Cannan Reality Investment Group, Teresa Lee Revocable Trust and

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Diego
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

Attorneys *(If Known)*

Kenneth L. Baritz, Esq., 100 South Broad St., Philadelphia, PA 19110

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability  ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability  ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine     Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability  **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 370 Other Fraud | | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 371 Truth in Lending | **LABOR** | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability  ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury  ☐ 385 Property Damage | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | Relations | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights  **Habeas Corpus:** | Leave Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting  ☐ 463 Alien Detainee | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment  ☐ 510 Motions to Vacate | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☒ 443 Housing/     Sentence | Income Security Act | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations  ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment  **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other  ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education  ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fair Housing Act (28 USC §1331)

Brief description of cause:
Violations of the Fair Housing Act and other claims

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $
5,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____