**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GORDON ROY PARKER | : | Civil Case No.: 2:23-cv-03999-GJP |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| RONALD LEE; TERESA LEE; | : | |
| JEFFREY MAI; CANAAN REALTY | : | |
| INVESTMENT GROUP; | : | |
| TERESA LEE REVOCABLE TRUST; and | : | |
| KENNETH L. BARITZ, ESQUIRE | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2024, upon

consideration of the Motion to Dismiss Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6)

of Defendants, Jeffrey Mai and Canaan Realty Investment Group, and any Response thereto, it is

hereby ORDERED and DECREED that the Motion is GRANTED.  Plaintiff, Gordon Roy Parker's

Complaint is hereby Dismissed with prejudice as to Defendants, Jeffrey Mai and Canaan Realty

Investment Group.

BY THE COURT:

_____
Gerald J. Pappert, U.S.D.C.J

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GORDON ROY PARKER | : | Civil Case No.:  2:23-cv-03999-GJP |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| RONALD LEE; et al | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## MOTION OF DEFENDANTS, JEFFREY MAI AND CANAAN REALTY INVESTMENT GROUP, TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(B)(6)

Defendants, Jeffrey Mai and Canaan Realty Investment Group ("Movants"), by their undersigned counsel, respectfully move the Court jointly for an Order under Fed. R. Civ. P. 12(b)(6) dismissing Plaintiff's Amended Complaint with prejudice on the grounds that the Complaint fails to state a claim upon which relief can be granted.  In further support of the Motion, Movants rely on the accompanying Memorandum of Law:

Respectfully submitted,

**MARSHALL DENNEHEY, P.C.**
*/s/ Aaron E. Moore*

By:  _____
AARON E. MOORE, ESQUIRE
PA Attorney I.D. No. 91672
2000 Market Street, Suite 2300
Philadelphia, PA  19103
Telephone:    (215) 575-2899
Facsimile:    (215) 575-0856
E-mail:  aemoore@mdwcg.com

*Attorney for Defendants,*
*Jeffrey Mai and Canaan Realty Investment Group*

Dated: <u>January 10, 2024</u>

2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GORDON ROY PARKER | : | Civil Case No.:  2:23-cv-03999-GJP |
|  | : |  |
| *Plaintiff,* | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| RONALD LEE; TERESA LEE; | : |  |
| JEFFREY MAI; CANAAN REALTY | : |  |
| INVESTMENT GROUP; | : |  |
| TERESA LEE REVOCABLE TRUST; and | : |  |
| KENNETH L. BARITZ, ESQUIRE | : |  |
|  | : |  |
| *Defendants.* | : |  |
|  | : |  |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**OF DEFENDANTS, JEFFREY MAI AND CANAAN REALTY AND INVESTMENT**
**GROUP, TO DISMISS PLAINTIFF'S COMPLAINT FOR**
**FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)**

**I.     INTRODUCTION**

*Pro se* Plaintiff, Gordon Roy Parker claims that Defendants, Jeffrey Mai and Canaan Realty

Investment Group (collectively "Mai") are liable to him under 42 USC §1983 for allegedly

violating his civil rights (Count II), breach of contract (Count III), fraudulent and negligent

misrepresentation (Counts IV & V), violation of the Fair Housing Act for retaliation (Count VI),

and for violating the Fair Housing Act for discrimination (Count VII). Parker also seeks

declaratory relief (Count VIII). The facts as alleged by Parker, however, do not give rise to a viable

cause of action against Mai. Accordingly, Parker's complaint as against Mai should be dismissed

with prejudice.

## II.   STATEMENT OF FACTS AS ALLEGED BY PLAINTIFF[1]

Pro se Plaintiff, Gordon Roy Parker's Complaint is largely incomprehensible. It is replete with commentary that appears to have nothing to do with his claims. Parker appears to be alleging that all of the defendants were somehow involved in his eviction and/or refusal to renew the lease for an apartment he and his brother Walter lived in. Parker does not allege, and cannot truthfully allege that Mai served as the landlord or owner of the apartment, and he does not explain how Mai was involved in the eviction or refusal to renew the lease, other than to state that Mai sent Walter a text message on February 27, 2022. The text message appears to be the basis for Parker's claims against Mai. Parker claims that his brother Walter assigned his litigation rights to Parker as arising from the text message. (Amend. Comp. at ¶ 72) Parker also claims to have an individual right to assert his claims against Mai, suggesting that he relied upon the text. (Amend. Comp. at ¶ 72) The text from Mai, which is attached to the end of Parker's Amended Complaint, provides as follows:



---

[1] A copy of Plaintiff's Amended Complaint is attached hereto as Exhibit "1."

Parker has attached to his Amended Complaint as Exhibit "A-1"  a copy of a proposed lease renewal dated December 2022. The lease renewal identifies the owner of the property as the Teresea Lee Revocable Trust. Jeffrey Mai is identified as the maintenance contact at line 18 of the proposed lease renewal.

In sum, Parker claims that Mai is liable to him and Walter for sending a text message in February 2022 in response to Walter's statement that he could fix a maintenance issue. Jeffrey replies, "That is good. I talked to Ron, you have been very long term tenant, we want to solve any issue with you."

### III.    ARGUMENT

#### A.  Legal Standard for Demurrer (Fed. R. Civ. P. 12(b)(6))

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a pleading.  *Carter v. City of Phila.*, 1998 W.L. 208847, 2 (E.D. Pa. Apr. 20, 1998). In considering a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pleaded facts in the complaint as true and may consider matters of public record. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004); A complaint is properly dismissed when it clearly appears that a plaintiff has alleged "no set of facts, which, if proved, would entitle him or her to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957);  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984);  *Jones v. Pennsylvania Minority Bus. Dev. Auth.*, 1998 U.S. Dist. LEXIS 5795, Civil Action No. 97-4486 (E.D. Pa. Apr. 22, 1998) (a complaint may be dismissed when the facts alleged and the reasonably inferences there from are legally insufficient to support the relief sought).   While all well-pleaded facts, as distinguished from conclusory allegations, should be taken as true, "a court need not credit a complaint's bald assertions or 'legal conclusions' when deciding a motion to dismiss". *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  It is not "proper to assume that

[Plaintiffs] can prove facts that [they have] not alleged." *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983) (footnote omitted). The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Furthermore, the Court is not bound "to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allian,* 478 U.S. 2675, 2686 (1986).

In sum, to survive a motion to dismiss, the plaintiff must "allege facts sufficient to raise a right to relief above the speculative level." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. Sept. 4, 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Haspel v. State Farm Mut. Auto. Ins. Co.*, 241 Fed. Appx. 837, 839, 2007 WL 2030272 at *1 (3d Cir. Jul. 16, 2007) (unpublished) (quoting Twombly, 127 S. Ct. at 1969).

### B. Parker Has Failed to State a Viable Civil Rights Claim under 42 USC § 1983 (Count II)

Parker claims that all of the defendants are liable to him under § 1983, alleging that "Defendants' conduct makes little or no sense; denying a rental to a 'valued, long-term tenant,' seemingly due to his choice of [Parker] as caregiver, then doubling down with expensive lawyers, for repeated, failed, and illegal attempts to evict, including ongoing attempts at self-help eviction which Plaintiff endures solely as the lesser of many evils." (Amend Comp at ¶ 57). He claims that Defendant Kenneth Baritz, as counsel for Walter's landlord, is acting under color of state law in violating his and Walter's civil rights, and that Mai is liable under a *respondeat superior* theory. (Amend. Comp. at ¶¶ 61, 63)

In order to adequately plead a Section 1983 claim, "plaintiff must allege a deprivation of [his] Constitutional rights by someone acting under the color of state law." *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995).

Here, Parker has not alleged, and cannot truthfully allege that Mai deprived him of a Constitutional right while acting under color of state law. Parker has not imputed any conduct to Mai which would suggest that he violated Parker's Constitutional rights, and he has not alleged any facts that would suggest that Mai has acted under color of state law. Parker speciously alleges that Mai is somehow liable to him under a *respondeat superior* theory by virtue of some relationship with attorney Kenneth Baritz. There are no allegations, however, that would suggest that Mai has any relationship with Baritz. Moreover, as set forth in Co-Defendants' Memorandum of Law in Support of Motion to Dismiss, Baritz cannot be deemed to have acted under color of state law; thus, the *respondeat superior* theory is not viable. Accordingly, this claim should be dismissed with prejudice.

### C.  Parker Has Failed to State a Viable Breach of Contract Claim (Count III)

Parker has failed to allege facts that, if proven, would reflect a viable claim against Mai for breach of contract. In order to plead a proper claim for breach of contract under Pennsylvania law, a plaintiff must allege: "(1) the existence of a valid and binding contract to which he and the defendants were parties; (2) the contract's essential terms; (3) that he complied with the contract's terms; (4) that the defendants breached a duty imposed by the contract; and (5) damages resulting from the breach." *Remington Fin. Grp., Inc. v. Corcoran*, 2007 WL 2936203, at *2 (E.D. Pa. Oct. 9, 2007).

Here, Parker has not alleged, and cannot truthfully allege that either he or his brother Walter was in a contractual relationship with Mai. He has not identified a contract, let alone its essential

terms. Moreover, he has not imputed any conduct to Mai that would reflect that Mai breached a contract. Parker alleges that Defendants are bound by the terms of an "implied lease." (Comp. at ¶ 66. Even if the law recognizes implied leases, there are no facts that would suggest that Mai was a party to such "implied lease." Nor could there be because Mai does not own the property. He is merely alleged to be a maintenance man for the apartment.

### D. Parker Has Failed to State a Viable Claim of Fraudulent or Negligent Misrepresentation (Counts IV & V)

Parker alleges that Mai is liable to him for fraudulent misrepresentation and negligent misrepresentation as arising from the text message sent by Mai to Parker's brother Walter, in which Mai tells Walter that he spoke to "Ron," (presumably Defendant Ronald Lee) and that Walter has been a long term tenant, and that he wanted to resolve any issues with Walter. The elements of fraudulent misrepresentation are: "(1) A representation (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 290 (Pa. Super. Ct. 2010).

Plaintiff has merely satisfied the first element by alleging facts reflecting a representation. The referenced text message from February 2022, however, cannot be deemed to be materially related to the issue of whether the lease between Walter and the Teresea Lee Revocable Trust would be renewed ten months later. Further, the facts as alleged do not reflect that Mai's text was false, or that Mai was aware that it was false at the time it was sent to Walter. There are also no allegations that would suggest that Mai intended Walter or Parker to rely on the representation in connection with the issue of whether Walter's lease would be renewed. It is inconceivable that Walter or Parker would have relied upon this representation to their detriment in connection with

the proposed lease renewal. Lastly, Parker has not alleged any facts that would reflect that he sustained damages as a result of Walter's receipt of the text message from Mai. Accordinlgy, Parker's fraudulent misrepresntation claim should be dismissed with prejudice.

Similarly, Parker's negligent misrepresentation claim should be dismissed. The elements of negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made when defendant ought to have known its falsity; (3) with intent to induce another to act on it; and (4) which causes injury to a party acting in justifiable reliance on the misrepresentation. *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 277 (2005).

Again, the text cannot be deemed a misrepresentation of material fact. It cannot be deemed to be false, or have been made by Mai with knowledge of its falsity. It cannot be deemed to have induced Walter or Parker to act upon it, and it cannot be deemed to have caused harm to Walter or Parker. Accordingly, Parker's negligent misrepresentation claim should be dismissed with prejudice.

### E.  Parker Has Failed to State a Viable Claim under the Fair Housing Act (Count VI)

Parker claims that Mai is liable to him under the Fair Housing Act for "retaliation." "To prevail on a § 3617 retaliation claim, a plaintiff must demonstrate that (1) [he] engaged in a protected activity; (2) the defendant subjected [him] to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Butler v. Sundo Capital, LLC*, 559 F. Supp. 3d 452, 460 (W.D. Pa. 2021)

Parker claims that the Notice to Vacate that Walter received in June 2022, and the decision to not renew the lease was done for retaliation purposes. Parker does not allege, and cannot truthfully allege that Mai made the decision to send Walter the Notice to Vacate, or the decision to not renew the lease. Indeed, such would be nonsensical as Mai does not have an ownership

interest in the apartment, nor has such been alleged. In fact, Parker specifically alleges that the Notice to Vacate was sent by the landlord (Amend. Comp. at ¶ 77). In sum, Mai has not alleged facts that would reflect that Mai subjected him to an adverse action, or a causal link between a protected activity and an adverse action. Accordingly, this claims should be dismissed with prejudice.

### F. Parker Has Failed to State a Viable Claim of Fair Housing Discrimination (Count VII)

Parker claims that Mai is liable to him under the Fair Housing Act for discrimination. The FHA prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." *El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 841–42 (E.D. Pa. 2018). Parker claims that he was discriminated against because he is a white male, suggesting that the "landlord defendants rented on more favorable terms, or at all, to nonwhite female tenants . . . ." (Amend. Comp. at ¶ 85.) Again, Parker has not alleged, and cannot allege that the decision to not rent to him or Walter was made by Mai. Moreover, Parker concedes that Mai is not the owner of any apartment he sought to rent; thus, Mai did not have the authority to decide whether to rent to Parker or his brother Walter. Accordingly, this claim should be dismissed with prejudice.

### G. Parker is not Entitled to Declaratory Relief

At Count VII of his Amended Com[plaint, Parker seeks a declaration as follows:

> 90. Based on the averments hereinabove, Plaintiff seeks the following declaratory relief:
>
> a. That the attempts to evict him (and Walt) had no basis in fact or law, and are retaliatory.
>
> b. That the toilet overflowing was not the fault of Plaintiff, but of poor plumbing and unfortunate timing.

c. That any debts owed on the apartment for rent or damages are plenary in nature and not possessory.

d. That the Fairfax eviction in 2017 was illegal because Plaintiff was not given thirty days to move out.

e. That Plaintiff is an occupant of Apartment #3F in the Chinatown building, as well as a tenant-in-fact.

f. That the landlord's denial of heat, a mailbox key, and refusal to fix constitute an illegal attempt at self-help eviction.

Parker does not specifically seek the aforesaid declarations as against Mai; however, in an abundance of caution, Mai seeks to have this claim dismissed as against him. Again, Mai does not have an ownership interest in the subject apartment, nor has such been alleged. As a non-owner, Mai could not have evicted Walter or Parker. There is no suggestion that Mai sought to evict Parker and Walter, or sought Damages from Parker or Walter, in connection with an overflowing toilet in the apartment. There is no suggestion that Mai seeks to collect on any debt from Parker or Walter. There is no suggestion that Mai was involved in the "Fairfax eviction." Accordingly, this claim as against Mai should be dismissed with prejudice as well.

## IV.    CONCLUSION

For the foregoing reasons, Defendants, Jeffrey Mai and Canaan Realty Investment Group, Inc. respectfully request that this Court enter the proposed Order dismissing Plaintiff's claims as asserted against them with prejudice.

Respectfully submitted,

**MARSHALL DENNEHEY, P.C.**

*/s/ Aaron E. Moore*

By:    _____
AARON E. MOORE, ESQUIRE
PA Attorney I.D. No. 91672
2000 Market Street, Suite 2300
Philadelphia, PA  19103

9

Telephone:      (215) 575-2899
Facsimile:      (215) 575-0856
E-mail:  aemoore@mdwcg.com

*Attorney for Defendants,*
*Jeffrey Mai and*
*Canaan Realty Investment Group*

Dated: <u>January 10, 2024</u>
LEGAL/157618670.v1

## CERTIFICATION OF SERVICE

I, Aaron E. Moore, Esquire, do hereby certify that service of a true and correct copy of the foregoing Motion to Dismiss Amended Complaint with Memorandum of Law In Support Thereof on behalf of Defendants, Jeffrey Mai and Canaan Realty Investment Group, was made upon counsel of record listed below via electronic Court filing and/or Regular U.S. Mail, postage prepaid, and via email:

Gordon Roy Parker, Pro Se
315 S. Broad Street, #0106
Philadelphia, PA 19107
E-mail: GordonRoyParker@gmail.com
*Pro Se Plaintiff*

Adam P. Barsky, Esquire
KBK Law Group
100 S. Broad Street, Suite 1208
Philadelphia, PA 19102
E-mail: Adam@KBKLawGroup.com
*Counsel for Defendants,*
*Ronald Lee, Teresa Lee, Teresa Lee Revocable Trust*
*and Kenneth L. Baritz, Esquire*

**MARSHALL DENNEHEY, P.C.**

By: ___/s/ Aaron E. Moore_____

AARON E. MOORE, ESQUIRE
Attorney I.D. No. 91672
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Telephone:     (215) 575-2899
Facsimile:      (215) 575-0856
Email: aemoore@mdwcg.com

*Attorney for Defendants,*
*Jeffrey Mai and*
*Canaan Realty Investment Group*

Date:   January 10, 2024

# *Exhibit "1"*

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REC'D DEC 11 2023

| | | |
|---|---|---|
| **GORDON ROY PARKER,** | : | **Case No: 23-3999-GJP** |
| Plaintiff | : | |
| | : | **Complaint for breach of contract,** |
| v. | : | **invasion of privacy,** |
| | : | **fraudulent/negligent** |
| **Ronald Lee** *et al,* | : | **misrepresentation, for violations of** |
| Defendants | : | **the Fair Housing, Fair Debt** |
| | : | **Collection Practices Act (FDCPA),** |
| | : | **and 42 USC §1983, and for** |
| | : | **Declaratory Relief** |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Gordon Roy Parker ("Gordon"), Plaintiff in the above-styled action, submits this Amended

complaint, and in support thereof, sets forth and avers the following:

### THE PARTIES

1.    Plaintiff Gordon Roy Parker ("Gordon") is domiciled at the Broad Street Ministry, 315

South Broad Street, #0106, Philadelphia, PA 19107, and resides with his brother Walter "Walt"

Parker, at 1011 Cherry Street, Philadelphia, PA 19107 ("the Building"), whose legal address is

*132 North 10th Street*, under which relevant data, including open code violations, can be found.

2.    Defendants Ronald and Teresa Lee are residents of, respectively, San Diego, CA and

Philadelphia, PA, are the co-owners of record of the Building, and have waived service.

3.    Defendant Jeffrey Mai is the property manager for The Building, and is employed by

Defendant Canaan Realty Investment Group.  They have not waived service, nor been served.

4.    Defendant Kenneth L. Baritz is an attorney in Philadelphia who was retained by the

other defendants to attempt to evict his brother, and has waived service in this action.

## NATURE OF ACTION

5. This is an action for abuse of process, breach of contract, invasion of privacy, fraudulent misrepresentation, for violations of the Fair Housing Act, Fair Debt Collection Practices Act (FDCPA), 42 USC §1983, and for Declaratory Relief, related to Plaintiff's occupancy within his brother's apartment, rented and managed by all defendants except Baritz, who is being sued under the Fair Housing Act, 42 USC 3604 *et seq.*

## STATEMENT OF JURISDICTION AND VENUE

6. Subject-matter jurisdiction is conferred by 28 USC §1331, for federal questions under the Fair Housing Act, 42 USC §§3601-3631 *et seq.*, and Fair Debt Collection Practices Act (FDCPA), 15 USC §1692 *et seq.*

7. Supplemental jurisdiction is conferred over all state-law claims.

8. Personal jurisdiction is conferred over all parties, as they are all domiciled, reside, conduct business, or have minimum contacts with Pennsylvania, in this federal district.

9. Venue in the EDPA is proper because the parties either reside, are domiciled, conduct business in, or have minimum contacts with Philadelphia.

## BACKGROUND

10. Plaintiff incorporates by reference, as if set forth verbatim herein, paragraphs 1-9.

### The Highly Regarded Kenneth L. Baritz

11. Defendant Baritz, in Defendants' now-moot motion to dismiss, expresses a high opinion of himself as a "***highly respected litigator***." In rebuttal, Plaintiff turns to the record:

> On October 17, 2002, Daniels filed the instant Class Action suit, alleging violations of both the federal and Pennsylvania fair debt collection practices acts, Pennsylvania Landlord and Tenant Act and consumer protection laws, Philadelphia Fair Housing Ordinances, and common law. In his Complaint, Daniels avers that the Lease he and, alleged, thousands of other individuals entered into was a "contract of adhesion" containing "unlawful, onerous and/or unfair terms" that allegedly operated to encourage "Landlords' fraudulent and deceptive scheme to extort money from Daniels and the Class members." (Daniels' Compl. ¶¶ 21-22.) ***Daniels further avers that the Landlords imposed improper escrow procedures and unjustified deductions from security deposits, assessed illegal late charges, and***

2

***commenced unwarranted eviction proceedings,* to which *Baritz* initiated.** Daniels requests both compensatory and punitive damages as well as injunctive and declaratory relief on behalf of all members of the Class and the "Extorted Sub-Class" injured by Defendants' alleged fraudulent and deceptive actions. Daniels v. Baritz, #02-cv-7929, E.D.Pa. (2003)

12. Of the many things oozing from Defendant Baritz's litigation history, respect is not

one of them, as he was also ***disbarred*** in 1984.



Source: https://www.avvo.com/attorneys/19107-pa-kenneth-baritz-422856.html#misconduct

13. While ignoring his own litigation history, Defendant Baritz takes his financially

captive co-defendants along for the ride, in portraying Plaintiff as a vexatious, serial litigant who

blames others for his imputed failures:

> Plaintiff allegations of discrimination are devoid of merit or factual foundation. ***He is no stranger to asserting discrimination claims against members of the Commonwealth as a way to retaliate against those who do not cave to his demands.*** see Parker v. University of Pennsylvania, 128 F. App'x 944 (3rd Cir. 2005) (Plaintiff's claim against UPenn for racial and gender discrimination within UPenn's hiring practices were dismissed with prejudice).[1]

---

[1] For context, this case was dismissed for failure to make a proper constitutional challenge to Penn's affirmative-action policy (race and gender), while the disability claim was dismissed for Plaintiff's refusal to attend a Rule 35 examination to determine his "employability at Penn," despite his being ***employed*** at the time as a psychology transcriptionist (!) for a DHS subcontractor. Time would favor Plaintiff: shortly after this dismissal, Dr. Tracy McIntosh was convicted of ***drugging and raping a female job applicant,*** and after a wrist-slap (pay freeze through 2009), it was revealed he had harassed fifty-plus women in his lab, a harbinger of the ***#metoo*** problems Plaintiff was trying to stop in the hiring process. His affirmative-action claims, brought today, would prevail due to the change in controlling law in Students for Fair Admissions v. Harvard, 600 U.S. 181 (2023). That this court bought into misinformation about Plaintiff and well-known negative stereotyping about ***pro se*** litigants is no reflection on him.

14.   Plaintiff avers that the utter ***contempt*** and hostility displayed by the above statements is reflective not only of retaliatory animus, but an underlying belief that courts like this will not take him seriously, effectively neutralizing a whistleblower threat, to the public detriment.

15.   Defendants call Plaintiff a "serial litigant," yet ignore a mountain of refutational evidence: a) Plaintiff has never been deemed a vexatious litigant by this or any court ; b) has not filed ***any pro-se*** lawsuits since 2017, other than Parker v. Anger,[2] for which he hired Michele M. Betti of Betti & Associates, a San Diego-based personal-injury lawyer;[3] and c) is ***terminally ill***, and spending his remaining time on earth shoring up his chess legacy.[4]

### Defendant's Factual Averments

16.   The averments in Defendants' motion to dismiss include the following statements:

    a)   characterization of this lawsuit as an "incongruous diatribe" (¶ 1);

    b)   gratuitous ***doxing*** of Plaintiff and his brother (¶ 2);

    c)   mischaracterization of the Fairfax eviction lawsuit (¶¶ 12-14);

    d)   that Walt, and not Plaintiff, executed the lease for the basement in 1011 Cherry Street/132 North 10th Street (¶ 15);

    e)   that Defendants Ronald and Teresa Lee are not the Property's owners, and that Defendant Teresa Lee Revocable Trust is the owner (¶¶ 16-17);[5]

---

[2] #19STCV39095 in the Superior Court of Los Angeles in 2019, seeking $2.6 million in damages for child sex abuse by legendary Hollywood filmmaker Kenneth Anger in New York City in 1984. The case has since resolved.
[3] At any time from 2019-2021, Plaintiff could have instructed Ms. Betti to sue these Defendants, including Ron Lee in San Diego, on behalf of his brother Walter ("Walt") or himself, yet elected not to, because Walt's housing stability was the main concern. If this does not refute serial-litigant claims, Plaintiff does not know what would. Ms. Betti was contacted by one of Plaintiff's stalkers posing as a "reporter" inquiring about his litigation history.
[4] Plaintiff's peak one-minute *LiChess* rating is 2337, placing him in the top 3.2 percent of LiChess players in the world, at age fifty-six, long after the age where most players begin a sharp decline. Housing has helped immensely.
[5] While this may be the case, the Property's alternate address, 132 North 10th Street, is listed on the City of Philadelphia's website as being owned by Defendants Ronald and Teresa Lee, as of November 15, 2018.

f)     that "Plaintiff intentionally fails to attach a copy of the Residential Lease Agreement to the Complaint because he is not a signatory, or an approved occupant." (¶¶ 18-19);

g)     that Plaintiff, not his brother, gave notice they'd move in July, 2022 (¶¶ 24-25)

h)     a reference to the Notice To Vacate from Joanna Lee on June 3, 2022 (¶¶ 26-28)

i)     mischaracterization of the toilet-overflow from November, 2022 (¶¶ 29-32)

j)     reference to February 1, 2023 PCHR hearing and the Notice to Vacate of August 22, 2023 and subsequent PCHR hearing (¶¶ 33-39);

k)     An averment that "Plaintiff has no standing to litigate debts against his brother" (¶¶ 48-51)," to argue against his standing, now moot, as the claim was assigned to Plaintiff.

l)     Attempted dismissal of the breach of contract claim for lack of standing, premised on the lack of an implied lease, which the PCHR ruled exists, but which Defendants claim is "not persuasive." (¶ 56)

m)     A disclaimer of liability for the conduct of neighboring tenants relating to the invasion of privacy claim.  (¶¶ 57-59)

n)     A challenge to Plaintiff's fraudulent misrepresentation standing (¶¶ 60-63)

o)     Characterization of Plaintiff's legitimate claims for racial and gender discrimination by painting them as xenophobic and misogynistic (¶¶ 64-67)

p)     An attack Plaintiff's standing with a reference to all claims by Plaintiff _**except**_ the retaliation claim, for which he need not even be an occupant.  (¶¶ 68-76)

q)     A claim that "Plaintiff attempts to employ the Federal Court to preempt anticipated Municipal Court eviction proceedings." (¶¶ 71-72)

r)     Defendants Memorandum in Support contains several disparaging (libelous but for judicial immunity) factual averments concerning Plaintiff as well, such as the following:

Plaintiff allegations of discrimination are devoid of merit or factual foundation. ***He is no stranger to asserting discrimination claims against members of the Commonwealth as a way to retaliate against those who do not cave to his demands.*** see Parker v. University of Pennsylvania, 128 F. App'x 944 (3rd Cir. 2005) (Plaintiff's claim against UPenn for racial and gender discrimination within UPenn's hiring practices were dismissed with prejudice).

## Plaintiff's Averments

17.    Plaintiff is drafting this complaint in a bedroom with a broken window, of which the landlord has been aware since he moved in in November, 2021, where he has slept every night since, in an apartment which has had ***no heat*** in the wintertime since late January 2023, and which is well below sixty-eight degrees in the living room, which Plaintiff must cross on weak legs to get to the bathroom to shower.  Plaintiff has end-stage liver disease, and extreme difficulty ***thermoregulating***, making his living conditions dangerous, even with space heaters. This is ***elder abuse***.  As for litigation, he is risking both not surviving this lawsuit, or missing a deadline due to a medical emergency; this is a last resort.

18.    In its motion to dismiss, lack of standing is the only defense raised by Defendants, who rely on a seven year-old lease which was never valid in the first place, rather than Plaintiff's continued occupancy since March, 2020, when his planned relocation to New York City was cancelled due to a lockdown in which he was ***mandated*** to shelter in place.

19.    Plaintiff's continued occupation of the premises beyond twenty-one days, and every day in the third-floor apartment since 2021, gives him standing.  Plaintiff lived openly in the apartment, perhaps initially unnoticed by the absentee landlord, but on June 3, 2022, after the first notice to vacate, he put the landlord on explicit notice of his occupancy.  Plaintiff has paid half the bills since 2018, including the rent, and also has standing as a tenant-in-fact.[6]

---

[6] Defendants' claim that Plaintiff was not an "authorized occupant" when Walt signed his lease in 2016 is irrelevant: Plaintiff was still living in the Fairfax, and was even offered, with Walt, a chance to remain there as late as May, 2017.  Plaintiff did not set foot into the apartment until January, 2018 (save for a ten-minute visit in 2017), and while he "crashed" there after leaving the Fairfax.  Only the mandatory COVID lockdown of 2020 established his occupancy, as he was required by law to shelter in place, had nowhere else to go (as he was on his way to New York

20.  Defendant has accused Plaintiff of using the federal court to stave off an eviction lawsuit, yet at some point Defendants will have to give him standing ***unless they want him living out his days rent-free on their property***.  Nothing is stopping Defendants from litigating in municipal or state court, independent of Plaintiff's eternally valid forum selection.

## Fairfax/UPenn Background (1998-2013)

21.  Plaintiff has been the target of a ***Black PR***[7] campaign first initiated on the internet in 1996, and then continued by the University of Pennsylvania in retaliation for Parker v. University of Pennsylvania, and also in retaliation for Parker v. Wintermute, E.D.Pa. #02-7215, in which Plaintiff attempted to subpoena Edward "Wintermute" Zawadzki's identity from UPenn, only to be told they couldn't locate him, after Detective James Blackmore of the UPenn police explicitly informed Plaintiff that he had spoken with Zawadzki, who confirmed this in an internet posting.

22.  Parker v. University of Pennsylvania (I of II) was intended as a constitutional challenge to UPenn's affirmative-action program, and included retaliation and disability claims:

    a.  The disability claim was dismissed when Plaintiff refused a fascist Rule 35 psych exam from a former UPenn Law professor (Hon. Anita B. Brody), to determine Plaintiff's "employability as a secretary," despite Plaintiff being ***employed*** as a medical transcriptionist. The retaliation claim was also dismissed.

---

City within the month), and was needed frequently in the apartment to watch for flooding (Plaintiff stopped two of them) or rats (Plaintiff killed thirty-two of them) when Walt was working, sleeping, or away.  If Defendants would like to argue that Plaintiff was an "unauthorized occupant," that is a clear basis for rental-discrimination claims.
[7] ***Black PR*** is an attempt to destroy the lives of its target, and is the go-to weapon for internet stalkers: it involves defamation, harassment, doxing, threats (even violent, if deemed necessary), and attempting to undermine the target's support network by convincing friends, relatives, employers, and ***landlords*** to disassociate from the target, as well as efforts to deplatform and censor.

b.    UPenn also tried for another psych exam to determine Plaintiff's standing in the race and gender claims, but was denied, as Brody realized this tactic could be used against *any* Title VII Plaintiff (a ruling harming just Plaintiff was fine).

c.    Parker v. Tilles (citation omitted) was a state-court case resulting from a pair of highly disparaging *Daily Pennsylvanian* articles which mocked Plaintiff's Title II lawsuit.[8]

d.    Shortly after the Wintermute threat, and Plaintiff's EEOC complaint, Tilles circulated an e-mail among UPenn, referencing the threat and the Title VII conduct:

---

[8] Exhibit 23 of that lawsuit was a copy of a highly defamatory "hate website" hosted on a white-supremacy site, the first linkage between UPenn and those targeting Plaintiff online. As Defendants' subsequent conduct indicates, they continue to target Plaintiff to the present.

**Tilles, Eric A.,9/13/01 11:59 AM -0400,FW: Threat from a Penn Student**

```
From: 'Tilles, Eric A.' <eric.tilles@ogc.upenn.edu>
To: ''trambo@pobox.upenn.edu'' <trambo@pobox.upenn.edu>
Cc: ''vhayes@pobox.upenn.edu'' <vhayes@pobox.upenn.edu>,
     'Fraser, Brenda'<brenda.fraser@ogc.upenn.edu>
Subject: FW: Threat from a Penn Student
Date: Thu, 13 Sep 2001 11:59:15 -0400
MIME-Version: 1.0
Status:
```

Under the category of better safe than sorry. I thought I should make you
aware of the record from a Penn chat room that appears at the bottom of this
e-mail. The name person, Gordon Ray Parker, has acted aggressively with
members of the Office of Affirmative Action. Valerie Hayes has a full file
on him. Let me know if you would like me to do anything.

Eric


Eric A. Tilles
Associate General Counsel
University of Pennsylvania and
   University of Pennsylvania Health System
Suite 300
133 South 36th Street
Philadelphia, PA 19104

(215) 746-5250 (office)
(215) 746-5222 (fax)


-----Original Message-----
From: Fraser, Brenda
Sent: Thursday, September 13, 2001 11:12 AM
To: Tilles, Eric A.; Bohner, Robert; Terrell, Robert R.
Subject: FW: Threat from a Penn Student


Bob and Eric,
   Does this name ring a bell.  Supposedly, this former employee (believed
to be a former HUP employee) has filed an agency complaint over alleged
threats against him by unidentified person(s) in this "fastseduction" chat
group.  OSC told him that it does not have the resources to handle and
directed him to the police.

Rob,
   Do you think that more should/could be done in terms of trying to
identify the sender of the alleged threat? (Note that posting host=greeknet
at Penn).  Have you heard anything about this through ISC?

         -- Brenda --

-----Original Message-----
From: Michele Goldfarb [mailto:goldfarb@pobox.upenn.edu]
Sent: Wednesday, September 12, 2001 1:33 PM
To: brenda.fraser@ogc.upenn.edu
Subject: Fwd: Threat from a Penn Student

Brenda -- We received this today along with a very disturbed/disturbing
phone call from this individual who calls himself Gordon Ray Parker or Ray

---

**Printed for Valerie Hayes** <vhayes@pobox.upenn.edu>

UP 00083

23. UPenn's *retaliatory animus* towards Plaintiff, expressed most recently in Defendants'

Motion to Dismiss, continues strong to this day, and includes conduct which would normally

defy credulity, but which resulted from a *perfect storm* directed at Plaintiff:

a. Through two Title VII and one RICO lawsuit between 2001-2005, UPenn unashamedly called Plaintiff *unemployable*, even while it knew that Dr. Tracy McIintosh had drugged and raped a female job applicant, and harassed over fifty women in his lab, all but proving Plaintiff's hostile-environment claims, but not in time. In a second discrimination lawsuit, a woman (Tina Vignali) had been hired without an interview process, then harassed.

b. In 2005, Plaintiff attempted to work the Fairfax front desk in place of his dying mother, who had Shingles, but was reminded that UPenn would blacklist the Fairfax if his mother hired him.[9] In 2007, three days before she died, Penny fell in the lobby.

c. After a brief pause in their harassment, the Fairfax (as a proxy for UPenn) escalated their conduct towards Plaintiff and his brother. Because of UPenn, Walt was forced to work up to *100 hours in a single week* at the desk, including all seven overnight shifts, two evening shifts, and any *24/7 on-call shifts*, at times on as little as one hour of sleep. Plaintiff would "shadow" the desk as a "town watch" to circumvent the ban, whenever Walt needed a brief respite or to run an errand. His next night off after 2008 would be *February 29, 2016*, a streak of 2,981 days, longer than even Cal Ripken's.

d. In 2008, the Fairfax moved Plaintiff and his brother from apartment 806, which had been damaged by a 1988 roof collapse over 906 in a rainstorm (921 and 804 also flooded), leading to falling marble that almost maimed Plaintiff and his mother, roach infestations due to the water (for which Plaintiff was blamed), into apartment 119, previously occupied by a

---

[9] This relates to an incident in 1998 where a female tenant "gave the finger" to Plaintiff's mother while she was working the desk, after which Plaintiff notified her "that was my *mother* you did that too." In return, the tenant threatened to "kick [Plaintiff's] ass," then complained to UPenn, who misinformed the Fairfax that the woman had a restraining order against Plaintiff. Another tenant witnessed the incident and wrote a favorable letter for Plaintiff, and the Fairfax decided to allow Plaintiff's family to continue working and living in the building if he agreed to resign the desk, since they had been threatened with Blacklisting. Suing the tenant or building were not options due to this *extortion*.

maintenance worker whose undocumented DIY repairs had wrecked the plumbing, for which Plaintiff and his brother were repeatedly blamed.

e.    In 2009, and again in 2013, the Fairfax threatened to evict Plaintiff and his brother, but backed down after threats of litigation.  Repeated entry into the apartment without notice, general treatment as employees rather than a tenant, and general hostility from building staff, who often lied to management about Plaintiff and his brother, made the living experience barely tolerable: Plaintiff had a solution for Walt until he could collect social security (the overtime would enhance his retirement check), and bided his own time with chess, writing, and developing AI databases for financial markets, which he cannot do while engaged in litigation.

### Internet Harassment (2014-2017)

24.   Its experience with Plaintiff caused UPenn to become very active in controlling the internet narrative from multiple points.  Other UPenn alumni have become general counsel for other social media companies, or assumed high-ranking positions in feminist nonprofits with extreme influence over content on these networks, but two names stand out:

a.    Alumni Yoel Roth became the head of Twitter's ***Trust And Safety*** department, with full censorship power that was used repeatedly against Plaintiff.

b.    Penn Law grad and current AUSA Lindsey E. Middlecamp is an avid antifeminist who sits on the boards of several feminist internet organization, and who runs ***cardsagainstharassment.com***, an aggressive campaign against "street harassment," which placed Plaintiff front-and-center in her crosshairs.

25.   It appears UPenn offloaded its online activities against Plaintiff to Middlecamp and Roth, each of whom targeted Plaintiff for several years, causing extreme damage:

a. In 2014, after the Elliot Rodger mass shooting in California, Plaintiff was targeted by feminists who began blaiming *incels* (the involuntarily celibate) for "gender violence," and stereotyping men while noting that *#yesallwomen* have been targeted, while blaming men who don't *cave to feminists demands* as "bystanders." When Plaintiff challenged this narrative, AUSA Middlecamp called out Plaintiff, developing an unchallenged narrative thanks to Roth's censorship, while simultaneously allowing for *open season* on Plaintiff, including links to a reincarnation of the defamatory website used by UPenn in Tilles.

b. On January 9, 2014, Adam Steinbaug, a "revenge porn" advocate, linked to a *harassthem.com* styled website with a page libeling and doxing Plaintiff (naming the site here would exacerbate the issue), leading to death threats, doxing, and ongoing targeting of Plaintiff on Twitter, when Roth wasn't busy terminating his accounts once Plaintiff's speech became a threat to their political agenda.

c. Steinbaugh was acting on behalf of Kenneth "Popehat" White, whose *pope signal* created a global referral network of attorneys who would defend and/or crowdfund *pro se* libel lawsuits, of the kind Plaintiff had brought, while Steinbaugh and Popehat would ridicule these suits. Steinbaugh worked in concert with a hacker and defamation-for-hire network who created the appearance of third-party conduct (conveying Section 230 immunity) whenever anyone linked. Plaintiff's *Trial By Google: May I Please Have My Reputation Back?* (2012) also put him in Steinbaugh's crosshairs.

d. On November 8, 2015, Ms. Middlecamp, using a "burner" e-mail, sent the following highly threaetening message to Plaintiff, as "proof" that she was not Patrick McNeil (this e-mail was not proof but could only have come from her):

-----Original Message-----
From: A Non <123nonanonymouse@gmail.com>
To: bettoroffsingle <bettoroffsingle@aol.com>
Sent: Sun, Nov 8, 2015 9:08 am
Subject: Your recent threats of lawsuit / ChessPlayPUA

Gordon,

I am writing because I cannot, in good conscience, allow your adamant mistaken belief of who is behind the @ChessPlayPUA account on Twitter to continue to the extent it risks annoyance or expense to innocent parties. Note that if you persist in targeting the wrong parties or actually pursue litigation against the innocent individuals after I have given you such express, unequivocal notice as contained in this email, I will attach this email and other supporting documentation to an abuse of process tort claim and/or sanctions motion to permanently bar you from filing frivolous suits without representation by an attorney, or to otherwise assist the innocent parties in recovering a judgment against you for intentionally and willfully proceeding against them despite express written notice that you have the wrong people.

***When I set up my @ChessPlayPUA account earlier this year, you had burned through several accounts, consistently targeting persons posting on #YesAllWomen and #StreetHarassment hashtags.*** Because of this history of yours, I went through those hashtags and followed people or organizations who were associated with anti-street harassment work or other feminist initiatives, occasionally retweeting to establish a timeline that reflected the account's purpose: supporting the issues you so adamantly disparage. I did not follow my own additional twitter account.

Fast forward to this fall, when you--based on no information whatsoever other than the fact that I used a modified picture of a man's face--decided a man "must" be behind the @ChessPlayPUA account. You started sending messages about how you "knew" who I am, "knew" that I'm gay, "knew" I work with a nonprofit, and referring to me as your "gay stalker." These seemed like such specific, inaccurate details that I became concerned about who you would target based on a mistaken belief. It was then that I looked at my list of who I follow, and realized that although I followed over a dozen men earlier that year in setting up the account, only one had an actual picture of his face, and his internet footprint indicated he is a gay man working with a street harassment nonprofit. When you sent the @ChessPlayPUA account messages claiming you knew my initials and listed ones that matched his, my stomach sank for this individual, who I have never met.

So, I emailed him at the address listed on his account and sheepishly shared my theory that he was in your crosshairs based on no information whatsoever other than who I had opted to follow at the time my account was set up. He confirmed that in fact, someone had just that day called his employer, and I volunteered to speak with the employer by phone just to reassure them this account had nothing to do with him and was in fact run by a woman. When the separate nonprofit with which he works received contact from you I spoke with them as well to verify that, in fact, a woman administers the @ChessPlayPUA account and giving them my theory as to how you had drawn incorrect associations.

So that brings us until now. You continue to use an unfounded leap of assumptions to justify bigoted comments against homosexuals, and ultimately that is your first amendment right. ***However, if you proceed in bringing litigation against either Mr. McNeil or any entity he is associated with, despite this unequivocal notice and past notice that they have no connection whatsoever to the @ChessPlayPUA account, there will be sufficient evidence against you to support an abuse of process claim or sanctions motion and the scope of relief sought will be to permanently bar you from pursuing legal relief without a licensed member of the bar acting on your behalf (relief which courts have granted in the past in the face of serial litigants and relief which, I believe, would effectively ban you.)***

13

In the meantime, because you have demonstrated that you cannot withstand reasonable disagreement online without resorting to scorched earth tactics against completely unrelated persons, *I am deactivating the account and will be focusing my energies on calling upon Twitter to take steps to ban you from the platform permanently.* I suggest you focus on making positive contributions rather than abusive ones to the platform.

Sincerely,
ChessPlayPUA

### "Whisability" And Eviction From The Fairfax

26. On December 4, 2015, a month after Middlecamp's threats, Plaintiff was *SWATted* by the same cybercriminal mob that was defaming him on *harassthem.com* (on behalf of UPenn and Middlecamp), and on February 29, 2016, everything came to a head:

a. A horseplayer to whom a cohort of Steinbaugh's had linked to the hate website threatened to "smash Plaintiff's head open," claiming to be "two hours away" and on his way, with Walt scheduled to work at midnight, and at extreme risk of mistaken-identity.

b. As his caregiver, Plaintiff advised Walt to take immediate leave from the desk and to seek legal counsel for workman's compensation, unemployment, and disability claims, while preparing for both of them to move immediately to New York City, without a place to go, but which is also their hometown, which has a right-to-shelter, and where they could rebuild. Upon hearing Walt call out, numerous building staff harassed Plaintiff and Walt by pounding on their door, demanding he come out and go to work.

c. Around 12:35 a.m. that evening, Plaintiff ascertained the identity of the individual who threatened him, and contacted the Philadelphia Police, who arrived around 1:30 a.m. to take a report, during which time Plaintiff noticed a Fairfax employee *eavesdropping*, after which he asked the police to ask him to leave, which he did. The police witnessing this event led to the Fairfax finally "backing off."

d. With eight years of accumulated time off, Walt was finally able to take this from February-June, during which time he applied (and was later approved for) disability (as was

14

Plaintiff in 2015), after having been denied a return to the desk on June 1, 2016, shortly after
which the Fairfax rent was raised to $1,000.00 a month, from a wage-offset $450.00,[10] carrying
out their eviction threat first by dint of finance.  When that failed, they escalated.

     e.    Defendants did offer to resolve the wage dispute by allowing them to remain as
tenants in May 2017, just prior to Plaintiff informing them that Walt had already moved out, and
not to name him in any eviction lawsuits, which they did anyway.

     f.    On or around July 3, 2017, Plaintiff was served with an eviction lawsuit in which
Walt was also named, and a simultaneous, ***moot*** notice to vacate, immediately stigmatizing both
of them with an eviction lawsuit, greatly increasing their risk of everything from homelessness to
death, thanks to a literal ***ambush*** which violated Pennsylvania law concerning notice, and which
caused irreparable harm the moment it was filed.[11]

     g.    Walt was dismissed from the eviction lawsuit, filed by Defendant Baritz on
behalf of UPenn, and Fairfax ultimately won possession, after which Plaintiff landed in the
Chinatown apartment, to assist Walt, and prepare for his own move to New York, where housing
is a constitutional right.  As far as UPenn was concerned, they had won; on appeal, their outside
lawfirm, Montgomery, McCracken, Walker & Rhoads joined Baritz in representing Fairfax.

     h.    From 2018-2020, Plaintiff maintained a "stray cat" relationship with the
Chinatown apartment, with frequent, indefinite visits that became increasingly necessary as the

---

[10] Walter and Plainiff filed a wage-and-hour lawsuit which Walt settled, and which was dismissed against Plaintiff,
relating to violations of 29 USC 203(m).  The term ***whisability*** refers to the retaliation which caused both Plaintiff
and Walt to qualify for disability based on lack of income (they were always disabled but earned too much).
[11] Walt had already moved to Chinatown by this point, to avoid just this outcome, and Plaintiff had intended to move
with him, but for an illegal lease which specified one occupant.  With housing stability the main priority, Plaintiff
remained in the Fairfax, and had nothing whatsoever to do with the Chinatown apartment, whose purpose was to
transition Walt to independent living.  Fast-forward to today and a blanket no-eviction policy to deny rentals is no
longer legal, while evictions four years old or older, or where the tenant (like Walt) prevailed cannot be used, either.

pipes began to burst, and a rodent infestation took hold, while the Defendants began abusing Walt and invading his privacy, requiring the protection of a caregiver (Plaintiff).

      i.    Plaintiff's presence was medically necessary, his invisibility ideal for Walt, and neither was ever questioned about this arrangement, which lasted until Plaintiff assumed permanent occupancy in March, 2020 due to COVID. Once there, circumstances necessitated that he remain; as the landlord had not raised any issue, he was not "unauthorized," and if they claim he were, then they were illegally discriminating against him and violating the ADA.

      j.    In November 2021, what Plaintiff affectionally called ***Warren Buffet's rat-infested basement*** (it was rented by Fox Roach), and ***88 Ways To Die***, was condemned by the city, in clear breach of the already-invalid basement lease, which Walt signed under duress of a $950.00 nonrefundable deposit by Plaintiff, who also supplied the other $1,500.00 or so that it cost Walt to move in. Even without occupying the basement, Walt's housing stability eliminated a chore for Plaintiff. That apartment had numerous violations, and shouldn't have been licensed:

      1)    The rental license for the Chinatown building ("the Building") specified ***six*** apartments, for a building with ***seven*** apartments, including the basement.

      2)    The basement had no egress window.

      3)    Half or more of the square footage of the basement was a maintenance area which controlled the building's water, and which contained an elevator directly outside the "bedroom." A railroad-flat layout separated that room and its bathroom a long walk from the kitchen and additional bathroom, in which Plainttiff slept.

      4)    The landlord would have loud conversations in the office, just above the apartment, while ***Tea Do,*** the restaurant directly above, made noise while open, particularly after midnight during cleanup and closeup. Their massive water usage also contributed to pipe

erosion, causing floods in the basement, whose plumbing was also defective, leading to toilet stoppages and overflows.

5) The landlord would also enter the apartment directly from the extremely noisy elevator, at times without notice, creating a perpetual threat to privacy, and destroying quiet enjoyment of the demised premises.

6) The apartment would leak water from the ceiling perpetually, requiring constant surveillance and water collection, requiring substantial expenidutres on towels.

7) A rodent infestation required constant surveillance and purchase of traps.

8) Condemnation by the City of Philadelphia in November, 2021, resulting in relocation to the third-floor.

### The Third-Floor Apartment (2021-present)

27. In November, 2021, Walt was relocated to the third floor, with Plaintiff in tow, as his caregiver but also an occupant and/or tenant-in-fact, as he continued paying half the rent and utilities, as he had done since March, 2020.

28. The third-floor apartment (#3F) is currently not up to code, and has not been up to code since November, 2021:

a. The bedroom window is broken, requiring extensive use of portable heaters, increasing the utility bills. Defendants are well aware of this, as they complained about the cardboard used to plug the hole dangling from the window. Even with these measures, and space heaters, the apartment gets well below the required sixty-eight degrees frequently in the winter, and hotter than it should in the summer. As Plaintiff has difficulty thermoregulating, this puts his health and even his life in danger.

b.      The heating system in the living room has been broken since early 2023, making it extremely difficult for Plaintiff to "commute" the hundred-plus feet to the bathroom in winter.

c.      The elevator is broken, giving no egress to Plaintiff in a medical emergency, and requiring Plaintiff to climb several flights of stairs to reach the third-floor.

d.      The building, has a rodent infestation which is impossible to cure, due to the numerous food establishments on the block, from which the rats spill into the building.  Plaintiff has killed at least thirty-two rats since occupying the basement.

e.      The building has no garbage disposal or dumpster, instead requiring tenants to store their garbage in their apartments until collected by the City each Thursday morning.

f.      Walt has never been provided with a mailbox key, which also prevents Plaintiff from accepting mail at his residence, and Walt to get his mail at BR-2, his old apartment.

g.      The outside noise is well above the legal limits, and occurs at all hours.

29.     On or around Sunday February 27, 2022, the building housekeeper ***pounded*** on Plaintiff's door, and screamed about the smell of garbage in the staircase, a direct consequence of the lack of anywhere to put it.

30.     Plaintiff advised Walt to give five months' notice to the landlord that as of July 31, 2022, he would be moving, along with Plaintiff, whose primary interest in the apartment has always been to support Walt, without whom he would have left Philadelphia in 2018.[12]

31.     In response to Walt's notice, Defendant Ron Lee instructed Defendant Mai to "work it out" with Walt, who he said was a valued long-term tenant.  Plaintiff relied on this statement to

---

[12] As this was 2022 and no longer 2017, with Plaintiff and his brother protected by the Renters Access Act, and changes to New York law barring the use of housing court records to deny rentals Plaintiff cannot overstress the role these changes in law have played in enabling him to no longer remain quiet.  The same conduct by Defendants that was so effective in nearly making Plaintiff homeless in 2017 would no longer work today, though Plaintiff would not rather, and ***should not*** have to uproot his life, particularly given his age and declining health.

presume that all was fine in the new apartment, Walt revoked his notice, and continued to pay rent of $1,000.00 a month, but with the original $2,000.00 security deposit still in Defendants' possession.[13]

32. On the morning of Friday, June 3, 2023, Plaintiff crossed paths on the staircase with the housekeeper while returning from an errand, only to hear her make a quick call on her cellphone, and begin talking loud and fast to someone in Chinese, with the temporal proximity suggesting it was about Plaintiff, who dismissed that notion, only to find out later that evening that Defendant Ron Lee's wife, Joanna, had e-mailed a defective Notice to Vacate to Walt:

      a.    The notice was not personally served.

      b.    The notice violated the Renters Access Act by not specifying good cause, or providing notice of the eviction diversion program, Phildaelphia's effort to find alternatives to putting people on the street (of no interest to the retaliatory landlord, as this was their goal).

      c.    The notice contradicted their assertion in February, 2022 that Walt was a valued, long-term tenant, while Plaintiff had also occupied the apartment for two years by that point.

33. The eviction threat, which triggered Plaintiff's representation of Walt as his legal advocate (paralegal), caused Plaintiff to take the phone from Walt and speak directly with Ms. Lee, who said it was "time to move" and that they'd been "living in that expensive apartment too long." Plaintiff explained his role as Walt's live-in caregiver, explicitly informing Defendants of his occupancy, and beginning their three-month window to object, which the landlord did not, thereby accepting Plaintiff as an occupant.

### Overflowing Toilet (November, 2022)

---

[13] Defendants never refunded one month from the two months' security provided by Walt in 2016 and 2017, but while representing Walt at the PCHR hearing of February 1, 2023, he agreed to waive damages if the deposit were applied to the December, 2022 rent.

34.    On November 21, 2022, the bathroom toilet overflowed, causing water damage:

    a.    Plaintiff, not Walt, is the one who used the toilet prior to its overflowing.

    b.    The toilet had (and still has) notoriously bad pipes, which required monitoring after use. Plaintiff checked the toilet after its use and before returning to bed; it seemed fine.

    c.    ***The bathroom was not watertight***, which caused any damage attributable to the lower floors, or alternatively, that flooding occurred behind the walls.

    d.    Neither Plaintiff nor his brother have ever abused the toilet by using it to dispose of subsances other than toilet paper.

    e.    A while afterward, the landlord contacted Plaintiff's brother, perhaps after knocking on the door, to inform him of the flooding, and that someone would be entering the apartment to take pictures of the damage, "for insurance."

    f.    Instead, the landlord sent a worker into the apartment, with a cellphone camera, taking pictures not just of the water damage, but the entire living room, with Plaintiff in a state of undress. Moments later, a female neighbor entered the apartment despite being told she was unwelcome. Her ***trespass*** irreparably compromised Plaintiff's privacy and his brother's medical privacy, as well as their reputation. Plaintiff certainly would never have entered her apartment.

**Lease Renewal Offer (December, 2022)**

35.    Despite the damage claim relating to the toilet, and alleged breach of the lease (which had already been breached by Defendants), Defendant Jeffrey Mai called Walt on or around December 27, 2022, a month prior to the PCHR hearing relating to the previous notice to vacate, offering a lease renewal to Walt.[14]

36.    The lease renewal had several problems:

_____

14 A copy of the proposed renewed lease is attached hereto as Exhibit __ and incorporated by reference as if set forth verbatim herein.

a.   It offered apartment #3F to Walt for **_$2,200.00_** a month, when #4F, a superior apartment (finished bedroom, extra bedroom, washer/dryer) with an identical layout, for $1,800.00 a month to its existing tenant, and would advertise it in June, 2023 for $1,900.00.

b.   Defendant Mai asked Walt to meet alone, outside, with a "friend" of Defendant Mai, likely attorney Jeffrey Katz, who represented Defendants at the PCHR hearing of February 1, 2023, despite their having been made aware of Walt's disability and Plaintiff's role as his caregiver and advocate.  While fighting off a "liver attack," Plaintiff advised Walt not to meet the lawyer, who did not identify himself as such.

### The PCHR Hearing (February 1, 2023)

37.   On February 1, 2023 the PCHR held a hearing relating to the June notice to vacate,[15] at which they a) ordered the landlord to not collect rent until open code violations were resolved; b) held that Plaintiff and his brother held an implied lease on 3F; and c) that the security deposit was wrongfully withheld (but Plaintiff waived that issue).  Also at the hearing, Defendant Mai acknowledged knowing that Plaintiff "is [in the apartment] **_all the time_**."

### The Second Notice To Vacate

38.   On October 12, 2023, the PCHR ruling was overturned.  Two months prior, however, on August 22, 2023, Defendant Baritz (who had taken over as attorney from Jeffrey Katz), issued a fatally defective notice to vacate on behalf of his co-Defendants:[16]

a.   The Notice was not personally served on Walt.

b.   Plaintiff was not named in the notice.

---

[15] Pennsylvania and Philadelphia law have a convoluted housing-court system which required Walt to be the petitioner; he did not initiate the civil proceedings (the notice did), and in an eviction trial, possession and damages are unified in municipal court, yet separated upon appeal into two cases. Plaintiff considers this unconstitutional.
[16] A copy of the Notice is attached hereto as Exhibit A and incorporated by reference as if set forth verbatim herein.

      c.    The notice claimed over $20,000.00 in "damages" without itemization, as required by the Fair Debt Collection Practices Act (FDCPA).

39.  On November 15, 2023, a PCHR hearing was held, at which Walt defaulted due to not being served only by an e-mail that he missed, and not personally served, while Plaintiff, as his advocate (he had e-mailed PCHR in August to explicitly notify them he was representing Walt and had represented him at the February 1 hearing), should also have been served notice.

### Present

40.  Since October 12, 2023, and especially since the hearing of November 15, 2023, Defendant has been free to send Plaintiff and/or Walt another Notice to Vacate (the Eviction Diversion Program had refused to recognize the August notice and said the clock would start only when the order was lifted), yet has not done so, leaving Plaintiff and his brother in limbo.

41.  Defendants have claimed that Plaintiff is not an occupant of his own residence, calling the PCHR ruling of an implied lease "not persuasive," and further claimed that he is misusing the federal court system to "stave off an eviction lawsuit" they have refused to file. Defendants further claim Plaintiff lacks standing, as if there were no controversy, as if they are fine with a status quo that has Plaintiff paying no rent. Several controversies exist, including legitimate federal questions, which can be resolved here or in state or municipal Court, and Plaintiff has chosen the former, which may not be common, but which is certainly valid, as in Daniels.

42.  As a mixed-use building, the code violations have also prevented Plaintiff from entertaining business clients or holding private chess tournaments in a 1,650-square-foot loft (3F) that would be ideal for such an event, which would have had no difficulty filling given the annual presence of thousands of elite chessplayers at the World Open, a mere few blocks away.

## **Defendants' Refusal To Rent To Plaintiff**

43.   In a normal world, Defendants would have added Plaintiff to the lease renewal, and moved he and Walt into one of the one-bedroom apartments on the second floor, each of which were rented in violation (at the time) of the PCHR's order, but not made available to Walt and Plaintiff, in part due to a refusal to rent to Plaintiff, but also because the third-floor is not up to code, making it easier for them to rent the second-floor apartments, last advertised for $925.00-950.00/month.

44.   By offering Walt a one-occupant lease, Defendants were attempting a backdoor eviction of Plaintiff, while simultaneously refusing to rent.  Plaintiff had made his desire to move with Walt into a second-floor apartment, but this was also ignored.  They are obviously acceptable tenants, even in light of the toilet overflowing (which was not their fault), as the lease renewal offer came a month later.

45.   The stated reason for eviction in the second Notice to Vacate – a non-itemized claim for back rent and for damages – does nothing to change Defendants' clear animus and intent to evict, without good cause, dating back to at least June 3, 2002.  The questions are *why* and *when,* between February 27 and June 3, 2022, things so drastically changed.

46.   Plaintiff's standing to file this suit is obvious, and many of the violations are ongoing, and beyond the scope of a simple eviction lawsuit, as was the case with Daniels.  As an additional measure of caution, he exercised his Article III rights and bought the assignment of Walt's FDCPA claim from him for $0.01; a copy of the assignment is attached hereto as Exhibit B and incorporated by reference herein.

47.   Finally, if this court were to dismiss this lawsuit, Plaintiff will still be waiting for the Defendants to file in state or municipal court, but they do not appear eager to give Plaintiff a

chance to respond to such an initiative. Until such time, Plaintiff seeks redress here while enjoying a 1,650-square foot loft for which he has not paid a dime in rent since February, 2023 (he guesses to avoid establishing a new lease), and for which he is not facing eviction, until Defendants decide to litigate a controversy which gives Plaintiff standing under Article III to file, as does his legal occupancy of the third-floor apartment. It is not he who is hiding.

48. Plaintiff is not as Defendants characterize him, and has sued only because they are preventing him from being who he is: an elite chessplayer, in the top three percent of players in the world in his niche, with an extensive portfolio that he is focused on converting into a legacy.

49. In New York, housing is now more like any utility, and not denied to people as if rejected by a personals ad, but in Pennsylvania, renters must beg for the approval of landlords, with tenant screening giving any one power to ***blacklist*** an undesirable or whistleblower tenant, which Plaintiff clearly is. Even under Pennsylvania law, however, Plaintiff should not have to endure even one more moment of Defendants' conduct, nor should he have to move to New York to survive, particularly given his deteriorating health and that he and his brother are thriving just where he is.

## COUNT I: FDCPA VIOLATIONS (DEFENDANT BARITZ)

50. Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-49.

51. The Notice to Vacate sent on August 22, 2023 by Defendant Baritz (¶ 38), on behalf of the other defendants, to Plaintiff's brother, has several fatal and actionable defects:

    a.    The notice offered no supporting documentation for the debt.

    b.    The alleged debt was not itemized.

    c.    The amount owed was incorrect.

    d.    Bogus legal action (no standing) was threatened as a means of collection.

a.   The notice offered no supporting documentation for the debt.

b.   The alleged debt was not itemized.

52.   The Notice to Vacate was an attempt to collect a debt within the scope of the FDCPA.

53.   Though not explicitly named on the Notice (which would be moot for possession as it did not name any occupants), it was the proximate cause of injury to Plaintiff, in part because a) he could still be held liable, b) any attempt to evict Walt is also an attempt to evict him, and c) Plaintiff was its true target.

54.   Plaintiff avers that Defendant Baritz's conduct, as set forth, constitutes a violation of Fair Debt Collection Practices Act, 15 USC 1692(d), and states this claim on that basis.[17]

55.   Plaintiff is entitled to a) statutory damages of ONE THOUSAND DOLLARS $1,000.00, and is further entitled to b) costs of suit, including any attorney fees (none incurred so far), and c) such other and further relief as deemed necessary to make him whole.

## COUNT II: VIOLATIONS OF 42 USC §1983 (ALL DEFENDANTS)

56.   Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-55.

57.   Defendants' conduct makes little or no sense: denying a rental to a "valued, long-term tenant," seemingly due to his choice of Plaintiff as caregiver, then doubling down with expensive lawyers, for repeated, failed, and *illegal* attempts to evict, including ongoing attempts at self-help eviction which Plaintiff endures solely as the lesser of many evils.

58.   As an officer of the court, Defendant Baritz is a state actor whose primary loyalty is to the University of Pennsylvania ("UPenn"), whose outside counsel joined Baritz in the Fairfax eviction lawsuit in 2017.

---

[17] While Defendant has argued that Plaintiff lacks standing to litigate his brother's debt, this is now moot, as Plaintiff has purchased an assignment of this claim from his brother (¶ 48), and has standing.

59. Since 2001, UPenn has engaged in a clear pattern of ***stalking*** behavior directed at Plaintiff, with Defendant Baritz the latest "hired gun." This conduct includes:

      a.    The e-mail from Eric Tilles in response to the threat from Wintermute; (¶ 4).

      b.    ***Perjury*** in refusing to disclose Wintermute's identity, despite knowing it.

      c.    The disparaging ***Daily Pennsylvania*** articles.

      d.    Lindsey Middlecamp's conduct from 2014-2019, including but not limited to the highly threatening e-mail of November 8, 2015 (¶ 25d), which contained threats to ***deplatform*** Plaintiff from Twitter (a decision made by Penn graduate Yoel Roth many times).

      e.    Repeated, defamatory mischaracterization of Plaintiff in numerous lawsuits, where UPenn's outside counsel would mysteriously show up, including the Fairfax eviction case. These include portrayals of Plaintiff as a "rape enabler," while ignoring the indirect admission that landlords are "googling" their tenants, in violation of fair-housing laws.

      f.    The "shadow" use of Baritz to file an illegal eviction lawsuit for the Fairfax in 2017 (no proper notice to vacate), and again to attempt to evict Plaintiff by sending Walt a Notice to Vacate (the claims for which have been purchased by Plaintiff).

60. The conduct set forth in paragraph 57 hereinabove has the primary objective of silencing Plaintiff over the internet, as he continues to speak out about the Fairfax and UPenn.[18]

61. Defendant Baritz's conduct, as set forth hereinabove, is an attempt to use the color of law as an officer of the court to suppress Plaintiff's constitutional, First Amendment right of free speech, either through the threat of eviction and homelessness, or by actually making him homeless. All other defendants are liable under a theory of ***respondeat superior***.

---

18 e.g., the Fairfax uses a different address for tenants (4231 Locust instead of 4247 Locust) and L&I to cloak their history of code violations. Defendants do the same thing with the Chinatown building: using 1011 Cherry as the rental address and 132 North 10th with the City of Philadelphia and L&I.

62.    These threats to Plaintiff's freedom of speech have already irreparably chilled his self-expression, as he no longer feels safe livestreaming on YouTube, just as his rapidly improving chess rating is increasing the market value of his livestreams, and his political influence.

63.    Because Defendant Baritz is an officer of the court, acting under the Landlord Tenant Act of 1951, P.L. 69, Plaintiff is entitled to relief under 42 USC 1983, and states this claim on that basis.

64.    Plaintiff is entitled to a) compensatory damages in an amount to be determined at trial, b) punitive damages, c) costs of suit, including any attorney fees he may accrue (none so far), d) injunctive relief sufficient to terminate the actionable conduct, and e) such other and further relief as deemed necessary to make Plaintiff whole.

### COUNT III: BREACH OF CONTRACT (ALL EXCEPT BARITZ)

65.    Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-64.

66.    As a continuous occupant of the third-floor apartment, with his brother, Plaintiff (and the Defendants) are bound by the implied lease the PCHR found to exist. Any breach of this lease injures Plaintiff equally to Walt.

67.    All of the violations in the basement (¶ 26(j)), and the ongoing denial of a mail key, heating system, and properly secured bedroom window in the new apartment, all constitute breaches of contract; Plaintiff states this claim against all defendants except Baritz on that basis.

68.    As a direct and proximate result of the breaches, Plaintiff has endured the following injuries and damages:

a.    Loss of quiet enjoyment and privacy.

    b.    Loss of money spent curing the breaches, including but not limited to, extra heating, rodent traps, loss of time getting mail and compromised logistics, and any future costs of moving, should that become necessary.

69.   Plaintiff is entitled to a) compensatory damages in an amount to be determined at trial, b) costs of suit, including any attorney fees he may accrue (none so far), c) injunctive relief sufficient to terminate the actionable conduct, and d) such other and further relief as deemed necessary to make Plaintiff whole.

### COUNTS IV-V: FRAUDULENT/NEGLIGENT<br>MISREPRESENTATION (ALL EXCEPT BARITZ)

70.   Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-69.

71.   To resolve any issue of standing, Plaintiff has purchased from Walter any claims relating to the text(s) sent by Defendant Mai on February 27, 2022,[19] but asserts his own standing under Article III of the Constitution due to a direct injury attributable to his reliance on the text.

72.   Just over three months after a text explicitly rejecting Walt's offer to move at the end of July, 2022, Defendant Ronald Lee's wife, Joanne, sent a fatally defective Notice to Vacate, in total contradiction to the note of February 27, 2023.  No good cause or reference to eviction-diversion was specified, and the given reason was "refusal to renew the lease," also not valid under the Renters Access Act.

73.   Relying on this misrepresentation, whether fraudulent or, in the alternative, negligent, Plaintiff "let his guard down" both psychologically and financially, on the assumption he would not need to keep a reserve as long as his and Walt's monthly bills were paid.  The notice *hijacked* his operating capital, resulting in missed opportunity and the inability to enjoy what relatively little money he does have, then and continuing to the present.

---

[19] A copy of the Assignment is attached hereto as Exhibit C and incorporated by reference as if set forth verbatim.

74.   For Defendants' conduct above, Plaintiff is entitled to relief under the Pennsylvania tort of fraudulent misrepresentation (Count IV), or negligent misrepresentation (Count V); he states this claim against all Defendants other than Baritz on that basis.

75.   Plaintiff is entitled to a) compensatory damages in an amount to be determined at trial, b) costs of suit, c) injunctive relief sufficient to terminate the actionable conduct, and d) such other and further relief as deemed necessary to make Plaintiff whole.

### COUNT VI:   FAIR HOUSING VIOLATION (RETALIATION)

76.   Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-75.

77.   At some point in the past few years, the landlord Defendants were put in contact with Defendant Baritz, who litigated the Fairfax lawsuit, and their former attorney, Jeffrey Katz, who would have researched Plaintiff (and Walt) in the course of representation.[20]

78.   Given Defendants' praise of Walt as a valued long-term tenant in February, 2022, animus towards Plaintiff which predates the June 3, 2022 notice is evidenced, though it is clear that retaliatory animus towards Plaintiff was established no later than when Katz was retained, and likely after the telephone call between Plaintiff and Joanna Lee.

79.   Specific retaliatory acts by Defendant include the Notices to Vacate, and omitting him from the lease renewal in 2022, as well as the continued denial of heating, a mailbox key, and not fixing the bedroom window.  Plaintiff need not be a mindreader to establish retaliatory animus, given the temporal proximity between his protected Title VII conduct and the adverse housing actions.  The motion to dismiss treats UPenn's twenty-year internet stalking campaign targeting Plaintiff as if it were somehow reflective of him, when all he does when litigating is attempt to preserve his rights, or in this case his home.

---

[20] The question of when the landlord formed the "joint" opinion expressed in the motion to dismiss, but that further evidences the antagonistic animus which has resulted in the retaliatory conduct set forth above.

80.    As a direct and proximate consequence of Defendants' conduct, Plaintiff has suffered

severe, irreparable permanent pecuniary and nonpecuniary harm, the scope of which cannot be

understated: this is an attempt to ***kill*** a terminally-ill Plaintiff by inducing housing instability and

homelessness, linked to sharply increased mortality rates for the general population, let alone

someone with end-stage liver disease, Type II diabetes, Stage III COPD, low platelets, peripheral

artery disease, and who, according to some doctors, should have died years ago.[21]

81.    On information and belief, Plaintiff avers the August 22, 2023 notice was retaliatory,

and in violation of the retaliation provision of the Fair Housing Act, 42 USC §3617; Plaintiff

states this claim for relief against all Defendants.

82.    Plaintiff is entitled to a) compensatory damages in an amount to be determined at trial,

b) costs of suit, including any attorney fees he may accrue (none so far), c) injunctive relief

sufficient to terminate the actionable conduct, and d) such other and further relief as deemed

necessary to make Plaintiff whole.

## COUNT VII:   FAIR HOUSING DISCRIMINATION
## (GENDER, RACE, AND FAMILY, ALL EXCEPT BARITZ)

83.    Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-82.

84.    At the time Defendants offered Walt a lease renewal in December 2022, apartment

#4F, directly above #3F, was rented for $1,800.00 a month to an ethnic female (either Spanish or

Chinese), who lived alone part of the time, but also with a roommate for a time, meaning her

lease allowed for two occupants instead of one.   Additionally, two one-bedroom apartments on

the second floor that rented for $950.00-975.00 a month were rented to others.

---

[21] As of July, 2021, Plaintiff did not expect to remain alive very long, let alone able to function well enough to defeat Tariq Yue, the #5-ranked nine year-old chessplayer in America (now #3), in a Paoli tournament in August, 2023, a fifty-mile trainride from the apartment, for a game lasting two hours, nor did he expect to achieve a LiChess peak one-minute rating of 2337, in the 96.8th percentile.  He had expected to be in hospice care or dead by now, and could die at any time (1.9 percent chance in three months), but has thrived with Walt as his caregiver.

85.   Plaintiff states his claims for relief for gender, race, and familial discrimination on the following basis:

a.    The single-occupant lease offered lease in 2022 constitutes familial discrimination under the Fair Housing Act (FHA).

b.    The same lease also constitutes retaliation against Plaintiff, by refusing to include an existing occupant as a backdoor eviction (had Walt signed the lease).

c.    Because the landlord Defendants rented on more favorable terms, or *at all*, to nonwhite, female tenants, including two they allowed to *trespass* into the third-floor apartment, and because of blatant anti-White racism in Chinatown due to the proposed 76ers arena (which became an issue in temporal proximity to the June, 2022 Notice to Vacate), the lease renewal offer, and failure to offer the second-floor apartments to cure the breach of the basement lease, constitute gender and racial discrimination.

86.   As a direct and proximate consequence of Defendants' conduct, Plaintiff has suffered severe, irreparable permanent pecuniary and nonpecuniary harm, the scope of which cannot be overstated: housing instability, fear of death and deterioration secondary to the fear of homelessness.  Even the mere *filing* of an eviction lawsuit, such as the one Baritz filed in 2016 on the same day as a moot Notice to Vacate, can have devastating consequence, though not as many now as in 2017, thanks to more tenant-friendly laws, particularly in New York state.

87.   For the conduct set forth hereinabove, Plaintiff is entitled to relief under the Fair Housing Act, 42 USC §3604(d), and states this claim for relief against all Defendants except Baritz.

88.   Plaintiff is entitled to a) compensatory damages in an amount to be determined at trial, b) costs of suit, including any attorney fees he may accrue (none so far), c) injunctive relief

sufficient to terminate the actionable conduct, and d) such other and further relief as deemed necessary to make Plaintiff whole.

## COUNT VIII: FOR DECLARATORY RELIEF

89.    Plaintiff incorporates by reference, as if set forth verbatim, paragraphs 1-88.

90.    Based on the averments hereinabove, Plaintiff seeks the following declaratory relief:

a.    That the attempts to evict him (and Walt) had no basis in fact or law, and are retaliatory.

b.    That the toilet overflowing was not the fault of Plaintiff, but of poor plumbing and unfortunate timing.

c.    That any debts owed on the apartment for rent or damages are plenary in nature and not possessory.

d.    That the Fairfax eviction in 2017 was illegal because Plaintiff was not given thirty days to move out.

e.    That Plaintiff is an occupant of Apartment #3F in the Chinatown building, as well as a tenant-in-fact.

f.    That the landlord's denial of heat, a mailbox key, and refusal to fix constitute an illegal attempt at self-help eviction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

1.    Compensatory damages in an amount to be determined at trial, but not less than FIVE MILLION DOLLARS ($5,000.000.00).

2.    Punitive damages in an amount to be determined at trial.

3. Costs of suit, including any reasonable attorney fees where applicable (none have been incurred as of now).

4. A declaration that the Notices to Vacate are legally invalid due to improper service, and are retaliatory, with no basis in fact or law.

5. An injunction enjoining the Landlord from pursuing eviction of Plaintiff for any reason based on events up to and including the date of this filing.

6. A declaration that Plaintiffs owe no money to the Landlord as of the date of this filing, and an injunction enjoining Defendants from attempting to collect.

7. A declaration that no good cause for eviction exists, based on anything which has occurred up to and including this date.

8. A declaration that Defendants have violated the race, gender, and retaliation provisions of the Fair Housing Act.

9. Such other and further relief as this court deems just and proper.

This the 11th day of December, 2023.

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131

33

**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **GORDON ROY PARKER,** <br> Plaintiff <br><br> v. <br><br> **Ronald Lee *et al*,** <br> Defendants | **Case No: 23-3999-GJP** |

## CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff in the above-styled action, hereby attest that I have served a copy of

**Plaintiff's First Amended Complaint** on the following parties, by **hand delivery**: (insert all).

Aaron E. Moore, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin PC
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Attorney for Defendants Caanan and Lee*

Adam M. Barsky, Esq.
KBK Law Group
100 South Broad, #1205
Philadelphia, PA 19110
*Attorney for all other defendants.*

This the 11th day of November, 2023

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA 19107
gordonroyparker@gmail.com
(215) 951-4141

315 South Broad, #0106
Philadelphia, PA 19107
(267) 951-4131

December 11, 2023

Clerk of Courts, Civil Division
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

*REC'D DEC 1 1 2023*

Re:     Parker v. Lee: E.D.Pa Case #29-3999-GJP

TO THE CLERK:

Attached are the exhibits from the Amended Complaint sent over earlier, that were intended for inclusion in the filing:

Exhibit A-1:   Proposed Lease of December 2022
Exhibit A:     Notice to Vacate (August 2023)
Exhibit B:     Assignment of Claim (FDCPA)
Exhibit C:     Assignement of Claim (Fraud)

Please add the exhibits to the case file and to the documents on PACER.  Thank you.

Sincerely,

Gordon Roy Parker, Pro Se
/grp

**Parker v. Lee et al EDPA #23-3999 Exhibit A-1**

# RESIDENTIAL LEASE

**RL**

Pennsylvania Association of Realtors®

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

## PARTIES

**TENANT(S): Walter Parker**

**TENANT'S MAILING ADDRESS:**

**LANDLORD(S): Teresa Lee Revocable Trust**

**LANDLORD'S MAILING ADDRESS:**
**11418 Raedene Way, San Diego, CA  92131-6131**

## PROPERTY

Property Address _____ **1011 Cherry St 3FL** _____

**AKA 132 N 10Th St** _____ Unit ____ **3FL** ____ ZIP ____ **19107** ____ ,

in the municipality of _____ **Philadelphia** _____ , County of _____ **Philadelphia** _____ ,

in the School District of _____ **Philadelphia** _____ , in the Commonwealth of Pennsylvania.

## TENANT'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Tenant is not represented by a broker)**

Broker (Company) _____

Company License # _____
Company Address _____

Company Phone _____
Company Fax _____
Broker is:
☐ Tenant Agent (Broker represents Tenant only)
☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name) _____

State License # _____
Direct Phone(s) _____
Cell Phone(s) _____
Fax _____
Email _____
Licensee(s) is:
☐ Tenant Agent (all company licensees represent Tenant)
☐ Tenant Agent with Designated Agency (only licensee(s) named above represent Tenant)
☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Tenant)

## LANDLORD'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Landlord is not represented by a broker)**

Broker (Company) _____

Company License # _____
Company Address _____

Company Phone _____
Company Fax _____
Broker is:
☐ Landlord Agent (Broker represents Landlord only)
☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name) _____

State License # _____
Direct Phone(s) _____
Cell Phone(s) _____
Fax _____
Email _____
Licensee(s) is:
☐ Landlord Agent (all company licensees represent Landlord)
☐ Landlord Agent with Designated Agency (only licensee(s) named above represent Landlord)
☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Landlord)

## DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Tenant and Landlord in the same transaction. A Licensee is a Dual Agent when a Licensee represents Tenant and Landlord in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Tenant and Landlord. If the same Licensee is designated for Tenant and Landlord, the Licensee is a Dual Agent.

**By signing this Agreement, Tenant and Landlord each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Tenant initials: _____ / _____ 　　　　RL Page 1 of 7　　　　Landlord Initials: _____ / _____

THIS FORM SHOULD NOT BE USED FOR THE LEASE OF A MANUFACTURED HOME

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2017
rev. 9/17; rel. 1/18

Canaan Realty Investment Group, 6509 Frankford Avenue Philadelphia PA 19135　　Phone: 2153331826　　Fax:　　　1011 Cherry St
Canaan Realty Investment Group　　Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201　www.lwolf.com

1. **LEASE DATE AND RESPONSIBILITIES**

This Lease for the Property, dated _____**December 11, 2022**_____ , is between the Landlord and Tenant. Each Tenant is individually responsible for all of the obligations of this Lease, including Rent, fees, damages and other costs.

2. **CO-SIGNERS**

Co-signers: _____

Each Co-signer is individually responsible for all obligations of this Lease, including Rent, late fees, damages and other costs. Co-signers do not have the right to occupy the Property as a tenant without the Landlord's prior written permission.

3. **PROPERTY CONTACT INFORMATION**

**Rental Payments** (see Paragraph 7(H) for additional information)
Payable to: **Teresa Lee Revocable Trust** _____ Phone: **(858)722-0283**
Address: **11418 Raedene Way, San Diego, CA 92131**
**Maintenance Requests**
Contact: **Jeffrey Mai** _____ Phone: **(267)226-6082**
Address: **6509 Frankford Ave, Philadelphia, PA 19135**
Email: **jeffmai9910@gmail.com** _____ Website: _____
**Emergency Maintenance Contact**
Contact: **Jeffrey Mai** _____ Phone: **(267)226-6082**
Email: **jeffmai9910@gmail.com** _____ Website: _____

4. **STARTING AND ENDING DATES OF LEASE** (also called "Term")

(A) **Starting Date:** _____**January 1, 2023**_____ , at __**12:00**__ [X] a.m. [ ] p.m.

(B) **Ending Date:** _____**December 31, 2023**_____ , at __**11:59**__ [ ] a.m. [X] p.m.

(C) Tenant is required to vacate the Property on the Ending Date unless the parties have entered into a Renewal Term as described in Paragraph 5.

5. **RENEWAL TERM**

Unless checked below, this Lease will AUTOMATICALLY RENEW for a Renewal Term of _____ (month-to-month if not specified) at the Ending Date of this Lease or at the end of any Renewal Term unless proper notice is given. Proper notice requires Tenant or Landlord to give at least _____ days (30 if not specified) written notice before Ending Date or before the end of any Renewal Term. Any renewal will be according to the terms of this Lease or any written changes to it.

[X] This Lease will TERMINATE on the Ending Date unless extended in writing.

6. **SECURITY DEPOSIT**

(A) The Security Deposit will be held in escrow by Landlord, unless otherwise stated here _____
at (financial institution): **Citizens Bank** _____
Financial institution Address: **1027 Arch Street, Philadelphia PA 19107**

(B) When Tenant moves from the Property, Tenant will return all keys and give Landlord written notice of Tenant's new mailing address where Landlord can return the Security Deposit. If Tenant fails to do this, Landlord will not have to provide the list of damages and the remaining security deposit to Tenant as stated in subparagraph (C), below and in the Pennsylvania Landlord and Tenant Act.

(C) Within 30 Days after Tenant moves from the Property, Landlord will give Tenant a written list of any damage to the Property for which the Landlord claims Tenant is responsible. Any remaining Security Deposit will be returned to Tenant within 30 days after Tenant moves from the Property. **TENANT IS ADVISED THAT FAILURE TO PROVIDE LANDLORD WITH A FORWARDING ADDRESS MAY CAUSE TENANT TO LOSE SOME RIGHTS.**

(D) Landlord may deduct repair costs and any unpaid Rent and Additional Rent from Tenant's Security Deposit. Tenant may be responsible for any unpaid expenses remaining after Landlord deducts costs from the security deposit.

7. **RENT**

(A) Rent is due in advance, without demand, on or before the __**1st**__ day of each month (Due Date).

(B) The amount of Total Rent due during the Term is: **$ 26,400.00**

(C) The Rent due each month is: **$ 2,200.00**

(D) If Rent is more than __**5**__ days (5 if not specified) late (Grace Period), Tenant pays a Late Charge of: **$ 50.00**

(E) All other payments due from Tenant to Landlord, including Late Charges or utility charges, are considered to be Additional Rent. Failure to pay this Additional Rent is a breach of the Lease in the same way as failing to pay the regular Rent.

(F) Tenant agrees that all payments will be applied against outstanding Additional Rent that is due before they will be applied against the current Rent due. When there is no outstanding Additional Rent, prepayment will be applied to the month's Rent that would be due next.

(G) Tenant will pay a fee of **$ 50.00** _____ for any payment that is returned or declined by any financial institution for any reason. If payment is returned or declined, the Grace Period does not apply and the Late Charges will be calculated from the Due Date. Any Late Charges will continue to apply until a valid payment is received.

Tenant initials: _____ / _____      RL Page 2 of 7      Landlord Initials: _____ / _____

| | | | | | |
|---|---|---|---|---|---|
| 58 | (H) Landlord will accept the following methods of payment: | ([X] Cash) | ([X] Money Order) | ([X] Personal Check) | |
| 59 | ([ ] Credit Cards) _____ ([X] Cashier's Check) | ([ ] Other: _____ ) | | | |
| 60 | Landlord can change the acceptable methods of payment if a method fails (check bounces, credit card is declined, etc.). | | | | |
| 61 | (I) The first $ _____ of Rent due will be made payable to _____ (Broker | | | | |
| 62 | for Landlord, if not specified). The Security Deposit will be made payable to Landlord, or Landlord's representative. | | | | |
| 63 | (J) The Security Deposit may not be used to pay Rent during the Term or Renewal Term of this Lease. | | | | |

**8. PAYMENT SCHEDULE**

| | | Due Date | Paid | Due |
|---|---|---|---|---|
| 66 | (A) Security Deposit: **$2200** | at signing | $ 1,000.00 | $ 1,200.00 |
| 67 | (B) First month's Rent: **$2200** | at signing | $ _____ | $ 2,200.00 |
| 68 | (C) Other: **The Last Month $2200** | at signing | $ 1,000.00 | $ 1,200.00 |
| 69 | (D) Other: _____ | _____ | $ _____ | $ _____ |
| 70 | (E) Other: _____ | _____ | $ _____ | $ _____ |
| 71 | **Total Rent and security deposit received to date:** | | $ 2,000.00 | |
| 72 | **Total amount due** | | | $ 4,600.00 |

**9. USE OF PROPERTY AND AUTHORIZED OCCUPANTS**

(A) Tenant will use the Property as a residence ONLY.

(B) Not more than _____ **1** _____ people will live at the Property. List all other occupants who are not listed as Tenants in this Lease:

Name _____ [ ] 18 or older   Name _____ [ ] 18 or older

Name _____ [ ] 18 or older   Name _____ [ ] 18 or older

Guide or support animals: Type _____ Breed _____ Name _____

[ ] **Additional information is attached**

**10. POSSESSION**

(A) Tenant may move in (take possession of the Property) on the Starting Date of this Lease.

(B) If Tenant cannot move in within _____ **1st** _____ days (0 if not specified) after Starting Date because the previous tenant is still there or because of property damage which makes the Property unsafe, unsanitary, or unfit for human habitation, Tenant's exclusive rights are to:

1. Change the Starting Date of the Lease to the day when Property is available. Tenant will not owe or be charged Rent until the Property is available; OR

2. End the Lease and have all money already paid as Rent, Additional Rent or Security Deposit returned, with no further liability on the part of Landlord or Tenant.

**11. LANDLORD'S RIGHT TO ENTER**

(A) Tenant agrees that Landlord or Landlord's representatives may enter the Property at reasonable hours to inspect, repair, or show the Property. Tenant does not have to allow possible tenants or other licensees to enter unless they are with Landlord or Landlord's representative, or they have written permission from the Landlord.

(B) When possible, Landlord will give Tenant _____ **12** _____ hours (24 if not specified) notice of the date, time, and reason for the visit.

(C) In emergencies, Landlord may enter the Property without notice. If Tenant is not present, Landlord will notify Tenant who was there and why within _____ **2** _____ hours (24 if not specified) of the visit. Showing the property is not considered an emergency.

(D) Landlord may put up For Sale or For Rent signs, use lock boxes, and take pictures and video on, in, or near the Property.

**12. RULES AND REGULATIONS**

(A) [ ] Rules and Regulations for use of the Property and common areas are attached.

[ ] Homeowners Association or Condominium rules and regulations for the Property are attached.

(B) Any violation of the Rules and Regulations is a breach of this Lease.

(C) Landlord may create or modify the Rules and Regulations if the change benefits the Tenant, is intended to protect the condition or value of the Property, or improves the health, safety, or welfare of others. Landlord agrees to provide all changes to Tenant in writing.

(D) Tenant is responsible for Tenant's family and guests obeying the Rules and Regulations and all laws.

(E) If any fine is imposed on Landlord by the municipality or any other governing body because of the actions of Tenant, or Tenant's family or guests, Tenant will reimburse Landlord or pay the fine. Any unpaid fines will be considered Additional Rent.

**13. PETS**

Tenant will not keep or allow any pets on any part of the Property, unless checked below. Guide and support animals are not pets.

[ ] Tenant may keep pets with Landlord's written permission according to the terms of the attached Pet Addendum and/or Rules and Regulations.

**14. CONDITION OF PROPERTY AT MOVE IN**

Tenant has inspected the Property and agrees to accept the Property "as-is," except for the following: _____

_____

_____

114   Tenant initials: _____ / _____          RL Page 3 of 7          Landlord Initials: _____ / _____

**15. APPLIANCES INCLUDED**

( [X] Range/Oven)    ( [ ] Cooktop)    ( [X] Refrigerator)    ( [ ] Dishwasher)    ( [ ] Washer)    ( [ ] Dryer)    ( [ ] Garbage Disposal)
( [ ] Microwave)    ( [ ] Air Conditioning Units -Number: _____ )    ( [ ] Other _____ )

Landlord is responsible for repairs to appliances listed above unless otherwise stated here: _____

_____
_____
_____

**16. UTILITIES AND SERVICES**

Landlord and Tenant agree to be responsible for the following utilities and services provided for the Property as marked below, including connection and payment of fees and charges. **If a service is not marked as being the responsibility of Landlord, it is the responsibility of Tenant to pay for that service.** Landlord is not responsible for loss of service if interrupted by circumstances beyond Landlord's control. Tenant will notify Landlord if Tenant receives any notices from utility companies of a pending termination of service.

| Landlord | Tenant | | Landlord | Tenant | |
|---|---|---|---|---|---|
| [ ] | [X] | Cooking Gas/Fuel | [ ] | [X] | Air Conditioning |
| [ ] | [X] | Electricity | [ ] | [X] | Air Conditioning Maintenance |
| [ ] | [X] | Cable/Satellite Television | [ ] | [X] | Heat _____ (type) |
| [ ] | [ ] | Condominium/Homeowners Association Fee | [ ] | [X] | Hot Water _____ (type) |
| [ ] | [ ] | Parking Fee | [X] | [ ] | Cold Water |
| [ ] | [ ] | Maintenance of Common Areas | [ ] | [X] | Pest/Rodent Control |
| [ ] | [X] | Trash Removal | [ ] | [X] | Bed Bugs Remediation |
| [ ] | [X] | Recycling Removal | [X] | [ ] | Snow/Ice Removal |
| [X] | [ ] | Sewage Fees _____ | [ ] | [X] | Telephone Service |
| [X] | [ ] | Sewer Maintenance | [ ] | [ ] | Lawn and Shrubbery Care |
| [X] | [ ] | Heater Maintenance _____ | [ ] | [X] | **Any city violation tickets** |
| | | | [ ] | [X] | **Any Rubbish / trash citations** |

Comments: **Gas and Electric will be change to tenant's name at the time of move-in date.** _____

_____

**17. TENANT'S CARE OF PROPERTY**

(A) Tenant will:
1. Keep the Property clean and safe.
2. Dispose of all trash, garbage and any other waste materials as required by Landlord and the law.
3. Use care when using any of the electrical, plumbing, heating, ventilation or other facilities or appliances on the Property, including any elevators.
4. Notify Landlord immediately of any repairs needed and of any potentially harmful health or environmental conditions.
5. Obey all federal, state, and local laws that relate to the Property.
6. Clean up after pets and guide and support animals on the Property, including common areas.

(B) Tenant will not:
1. Keep any flammable, hazardous or explosive materials on the Property, with the exception of common household goods intended for lawful use.
2. Destroy, damage or deface any part of the Property or common areas.
3. Disturb the peace and quiet of other tenants or neighbors.
4. Cancel or close utility accounts paid by Tenant during the term of the Lease, without the written permission of Landlord.
5. Make changes to the Property, such as painting or remodeling, without the written permission of Landlord. Tenant agrees that any changes or improvements made will belong to Landlord.
6. Perform any maintenance or repairs on the Property unless otherwise stated in the Rules and Regulations, if any.

(C) Tenant will have breached this Lease and will be responsible for damages if Tenant does not comply with any requirements listed in (A) or (B), above.

(D) **Tenant is responsible to pay the costs for repairing any damage that is the fault of Tenant, Tenant's family, guests, and/or guide and support animals.**

**18. DETECTORS AND FIRE PROTECTION SYSTEMS**

(A) Landlord has installed ( [ ] Smoke Detectors) ( [ ] Carbon Monoxide Detectors) ( [ ] fire extinguishers) in the Property. Tenant will maintain and regularly test detectors to be sure they are in working order, and will replace detector batteries as needed.

(B) Tenant will immediately notify Landlord, maintenance or emergency contact (See Paragraph 3) of any broken or malfunctioning detectors.

(C) Failure to properly maintain detectors, replace detector batteries or notify Landlord, maintenance or emergency contact (See Para-graph 3) of any broke normal functioning detectors is a breach of this Lease.

(D) Landlord may provide additional fire protection systems for the benefit of Tenant. Responsibility for maintaining these systems is stated in the Rules and Regulations, if any.

(E) Tenant will pay for damage to the Property if Tenant fails to maintain or misuses detectors or other fire protection systems.

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    1011 Cherry St

**19. DESTRUCTION OF PROPERTY**

(A) Tenant will notify Landlord, maintenance or emergency contact (See Paragraph 3) immediately if the Property is severely damaged or destroyed by fire or by any other cause. Tenant will immediately notify Landlord, maintenance or emergency contact (See Paragraph3) of any condition in the Property that could severely damage or destroy the Property.

(B) If Tenant, their family or guests cause damage by fire or by other means, this Lease will remain in effect and Tenant will continue to pay rent, even if Tenant cannot occupy the Property.

(C) If the Property is severely damaged or destroyed for any reason that is not the fault of Tenant:

    1.  Tenant may continue to live on the livable part of the Property and pay a reduced rent as agreed to by Tenant and Landlord until the damage is repaired, OR

    2.  If the law does not allow Tenant to live on the Property, this Lease is ended.

**20. INSURANCE AND RELEASE**

(A) Tenant understands that Landlord's insurance does not cover Tenant, Tenant's personal property, or Tenant's guests. Tenant is advised to obtain personal property and liability insurance to protect Tenant, Tenant's personal property, and Tenant's guests who may be injured while on the Property.

    [X]  **IF CHECKED,** Tenant must have insurance policies providing at least $ __150,000.00__ personal property insurance and $ __350,000.00__ liability insurance to protect Tenant, Tenant's personal property and Tenant's guests who may be injured while on the Property. Tenant must maintain this insurance through the entire Term and any Renewal Term. Tenant will provide proof of insurance upon request. Tenant will notify Landlord within 10 days of changes to or cancellation of these policies.

(B) Landlord is not legally responsible for any injury or damage to Tenant, Tenant's family, or Tenant's guests that occurs on the Property.

(C) Tenant is responsible for any loss to Landlord caused by Tenant, Tenant's family or Tenant's guests, including reasonable attorney's fees associated with that loss, if awarded by a court.

**21. HOLDOVER TENANTS**

If Tenant occupies the Property after the Ending Date or end of any Renewal Term, Tenant will be considered a holdover tenant and will be causing Landlord financial harm ("damages"). These damages will be equal to the monthly Rent plus _10_ %, prorated on a daily basis, plus any additional financial costs, including but not limited to eviction costs and reasonable attorney's fees that may be awarded by a court, incurred as a result of the tenant holding over. These damages are separate from and in addition to Landlord's right to seek reimbursement for any physical destruction to the Property caused by Tenant, Tenant's family, or Tenant's guests.

**22. TENANT ENDING LEASE EARLY**

Tenant may **not** end this Lease before the Ending Date of the Lease or any Renewal Term unless otherwise agreed to by the parties in writing.

**23. ABANDONMENT OF PERSONAL PROPERTY**

(A) When the Term, or any Renewal Term, ends, Tenant must remove all of Tenant's personal property from the Property. Any of Tenant's remaining personal property may be considered abandoned if any of the following apply:

    1.  Tenant has vacated the Property after termination of the Lease;

    2.  An eviction order or order for possession has been entered in favor of Landlord, and Tenant has vacated the Property and removed almost all of Tenant's personal property;

    3.  An eviction order or order for possession has been entered in favor of Landlord;

    4.  Tenant has vacated the Property, removed almost all of Tenant's personal property and provided Landlord with written notice of a forwarding address; OR

    5.  Tenant has vacated the Property without showing an intent to return, Rent is more than 15 days past due and Landlord has posted notice regarding Tenant's rights to Tenant's personal property.

(B) Before Landlord may remove or dispose of Tenant's personal property, Landlord must provide written notice to Tenant. Tenant will have ten days from the date the notice was post marked to:

    1.  Retrieve Tenant's personal property, OR

    2.  Request that Tenant's personal property be stored for up to 30 days. If Tenant requests that Tenant's personal property be stored by Landlord, Tenant understands and agrees that storage will be provided at a location chosen by Landlord, and that Tenant will be responsible for storage costs.

(C) If Tenant dies and leaves personal property in the Property, then this paragraph does not apply. See Paragraph 28, below.

**24. LANDLORD REMEDIES IF TENANT BREACHES LEASE**

(A) If Tenant breaches Lease for any reason, Landlord's remedies may include any or all of the following:

    1.  Taking possession of the Property by going to court to evict Tenant.

    2.  Filing a lawsuit against Tenant for Rent, damages and Additional Rent, and for Rent and Additional Rent for the rest of the Term or any Renewal Period. If Landlord wins (gets a money judgment against Tenant), Landlord may use the court process to garnish Tenant's wages and take Tenant's personal assets, such as goods, furniture, motor vehicles and money in bank accounts.

    3.  Keeping Tenant's Security Deposit to be applied against unpaid Rent or damages, or both.

    4.  Tenant paying for Landlord's reasonable attorney's fees and costs, if awarded by a court.

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com      **1011 Cherry St**

234     (B) **IF TENANT BREACHES THIS LEASE FOR ANY REASON, TENANT UNDERSTANDS AND AGREES THAT TENANT**
235         **HAS WAIVED OR GIVEN UP TENANT'S RIGHT TO A NOTICE TO MOVE OUT UNLESS A DIFFERENT PERIOD**
236         **FOR PROVIDING NOTICE IS REQUIRED BY LOCAL ORDINANCE OR IS STATED HERE:** _____
237         _____
238         _____

239 **25. TRANSFER AND SUBLEASING**
240     (A) Landlord may transfer this Lease to another landlord. Tenant agrees that this Lease and any written changes to it remains the same
241         with the new Landlord.
242     (B) Tenant may not transfer this Lease or sublease (rent to another person) the Property or any part of the Property without Landlord's
243         written permission.

244 **26. SALE OF PROPERTY**
245     (A) If Property is sold, Landlord will give Tenant in writing:
246         1.   Notice that the Security Deposit and/or prepaid Rent has been transferred to the new landlord.
247         2.   The name, address and phone number of the new landlord and where Rent is to be paid, if known.
248     (B) Tenant agrees that Landlord may transfer Tenant's Security Deposit and advanced Rent to the new landlord.
249     (C) Landlord's responsibilities to Tenant under this Lease end after the Property has been sold and the Lease transferred to a new landlord.

250 **27. IF GOVERNMENT TAKES PROPERTY**
251     (A) The government or other public authority can take private property for public use. The taking is called condemnation.
252     (B) If any part of the Property is taken by the government, Landlord will reduce Tenant's Rent proportionately. If all the Property is
253         taken or is no longer usable, this Lease will end, Tenant will move out and Landlord will return to Tenant any unused Security
254         Deposit or prepaid Rent.
255     (C) No money paid to Landlord for the condemnation of the Property will belong to Tenant.

256 **28. DEATH OF TENANT DURING LEASE TERM**
257     (A) If Tenant dies during the Term, or any Renewal Term, of this Lease and Tenant's personal property remains in the Property, the
258         personal property will not be considered abandoned as defined in the Landlord and Tenant Act. When a tenant dies and leaves behind
259         personal property, the treatment of that personal property is governed by Title 20 of the Pennsylvania Consolidated Statues relating
260         to decedents, estates and fiduciaries.
261     (B) If Tenant dies during the Term, or any Renewal Term, of this Lease and Tenant is the sole tenant of the Property, Tenant's repre-
262         sentative may terminate this Lease upon 14 days written notice to Landlord. When Tenant's representative terminates this Lease
263         pursuant to this Paragraph, the date of termination will be the last day of the second calendar month that follows the calendar month
264         in which Tenant died or upon surrender of the rental unit and removal of all of Tenant's personal property, whichever occurs later.
265     (C) Tenant's estate will be required to pay Rent, Additional Rent and any other sums due to Landlord, including expenses that Landlord
266         may incur as a direct result of Tenant's death. Tenant's estate is not required to pay any penalty, and is not liable for any damages,
267         to Landlord for breach of contract or early termination of the Lease.

268 **29. TENANT'S RIGHTS**
269     (A) Landlord cannot increase rents, decrease services, or threaten to go to court to evict Tenant because Tenant: (1) complains to a
270         government agency or to Landlord about a building or housing code violation; (2) organizes or joins a tenant's organization; or (3)
271         uses Tenant's legal rights in a lawful manner.
272     (B) Landlord or property owner may have a mortgage on the Property. The rights of the mortgage lender come before the rights of the
273         Tenant. For example, if Landlord fails to make mortgage payments, the mortgage lender could take the Property and end this Lease.
274         Landlord will notify Tenant immediately if the property owner or Landlord receive a notice of foreclosure.
275     **TENANT MAY BE WAIVING OR GIVING UP TENANT'S RIGHTS. TENANT UNDERSTANDS THAT IF THERE IS A**
276     **FORECLOSURE, THE NEW OWNER MAY HAVE THE RIGHT TO END THIS LEASE.**

277 **30. LEAD-BASED PAINT HAZARD DISCLOSURES FOR PROPERTY BUILT BEFORE 1978**
278     ☐   Property was built in or after 1978. No Lead-Based Paint Hazards Disclosure is required.
279     ☒   Property was built before 1978. **Before signing this Lease, Tenant must receive a separate Lead-Based Paint Hazards Dis-**
280         **closure** disclosing the presence of lead-based paint and lead-based paint hazards on the Property, such as PAR form LPDR, and a
281         federally approved pamphlet on lead poisoning prevention.

282 **31. PENNSYLVANIA PLAIN LANGUAGE CONSUMER CONTRACT ACT**
283     The Office of Attorney General has not pre-approved any special conditions or additional terms added by any parties. Any special con-
284     ditions or additional terms must comply with the Pennsylvania Plain Language Consumer Contract Act.

285 **32. CAPTIONS**
286     The headings in this Lease are meant only to make it easier to find the paragraphs.

287 **33. ENTIRE AGREEMENT**
288     This Lease is the entire agreement between Landlord and Tenant. No spoken or written agreements made before signing this Lease are
289     a part of this Lease unless they are included in this Lease in writing. No waivers or modifications of this Lease during the Term of this

290   Tenant initials: _____ / _____         **RL Page 6 of 7**         Landlord Initials: _____ / _____

Lease are valid unless in writing signed by both Landlord and Tenant, including modifications made to the Rules and Regulations under Paragraph 12.

**34. SPECIAL CLAUSES**

    **(A) The following are part of this Lease if checked:**

      ☐ Change of Lease Terms Addendum (PAR Form CLT)

      ☐ Pet Addendum (PAR Form PET)

      ☐ Residential Lead-Based Paint Hazards Disclosure Form for rentals (PAR form LPDR)

      ☒ **Tenant has to show the gas and electric bill w/ no balance to get security deposit back.**

      ☒ **Tenant has to pay all violation incurred during time of tenancy.**

    **(B) Additional Terms: No Pets Allowed.**

      **1) Keep house clean; 2) Tenant is required to use reasonable effort to maintain a clean condition for sinks, toilets and tubs all the time. If the damage is caused by tenant's neglect, like hairs, toilet paper, plastic products, tenant is responsible to pay for repairs 3) If anything inside the house is damaged by tenants' misuse, tenants will be responsible for fixing it; 4) Maintain normal room temperature to prevent the frozen pipe.**

      **The landlord will hire and pay for a cleaning service to come to the apartment every 2 or 3 weeks and the tenant agrees to provide access as needed and work with the cleaning service to keep apartment clean and neat.**

**NOTICE BEFORE SIGNING:** If Tenant or Landlord has legal questions, Tenant or Landlord is advised to consult an attorney. If a real estate licensee is involved in the transaction on behalf of either party, by signing below, Landlord and Tenant acknowledge receipt of the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336 and/or §35.337.

By signing below, Landlord and Tenant acknowledge that they have read and understand the notices and explanatory information set forth in this Lease.

A property manager may be acting as an agent for Landlord and may execute this Lease on the Landlord's behalf.

| | | |
|---|---|---|
| **TENANT** Walter Parker | **DATE** | _____ |
| **TENANT** | **DATE** | _____ |
| **TENANT** | **DATE** | _____ |
| **CO-SIGNER** | **DATE** | _____ |
| **CO-SIGNER** | **DATE** | _____ |
| **CO-SIGNER** | **DATE** | _____ |
| **LANDLORD** Teresa Lee Revocable Trust | **DATE** | _____ |
| **LANDLORD** | **DATE** | _____ |

    **EXECUTED ON BEHALF OF LANDLORD BY AUTHORIZED BROKER/ASSOCIATE BROKER**

    _____ **DATE** _____

**LANDLORD TRANSFERS LEASE TO A NEW LANDLORD**

As part of payment received by Landlord, _____ (current Landlord) now transfers to _____ (new landlord) his heirs and estate, this Lease and the right to receive the Rents and other benefits.

| | | |
|---|---|---|
| **CURRENT LANDLORD** | **DATE** | _____ |
| **CURRENT LANDLORD** | **DATE** | _____ |
| **NEW LANDLORD** | **DATE** | _____ |
| **NEW LANDLORD** | **DATE** | _____ |

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

1011 Cherry St

Parker v. Lee et al EDPA #23-3999 Exhibit A

*Kenneth L. Baritz & Assoc.*
ATTORNEYS AT LAW_____

KENNETH L. BARITZ
TODD L. BARITZ
CORY M. BARITZ
JEROME M. FEINBERG *

100 SOUTH BROAD STREET
SUITE 1205
PHILADELPHIA, PENNSYLVANIA STREET 19110

\* DECEASED                    August 22, 2023

(215) 557-8608
Fax No. (215) 557-3539

OF COUNSEL
HARRY F. FEINBERG *
\* Member of PA & NJ Bars

WALTER PARKER
132 N 10th STREET
PHILADELPHIA PA 19107


RE:    NOTICE TO VACATE; BREACH OF LEASE
       TERMINATION OF LEASE AND OCCUPANCY
       NOTICE OF NON-RENEWAL

       132 N 10th STREET  , PHILADELPHIA PA 19107

Dear Tenant,

       Please be advised that this office represents the owner of the above premises,
which you occupy.  The balance owed as of this date is $ 20300.00     . Your occupancy
is terminated and will not be renewed as a result of non-payment of rent, termination of
term, and:  damages

       You must vacate the leased premises within Thirty (30) days from the date of this
letter, or no later than  09/21/2023     . Kindly accept this letter in addition to any
prior notices you have received.  Your lease agreement will not be renewed.

       Please bear in mind that this notice in no way relieves you of your responsibilities
and obligations pursuant to the terms and conditions of your written lease agreement,
including, but not limited to the payment of rent for the remainder of the lease term.  This
letter is being sent in addition to any letters or notices that you have received.

**Because of the global COVID-19 pandemic, you may be eligible for temporary protection
from eviction under the laws of your State, territory, locality, or tribal area, or under
Federal law.  Learn the steps you should take now:**
· **Visit www.cfpb.gov/eviction**
· **Or call a housing counselor at 800-569-4287**

Very truly yours,

KENNETH L. BARITZ

KLB/hf

Parker v. Lee et al EDPA #23-3999 Exhibit B

## ASSIGNMENT OF A CLAIM FOR DAMAGES

This Assignment of a Claim for Damages (the "Assignment") is made and effective as of December 6, 2023.

**BETWEEN:**      **WALTER G. PARKER,** the "Assignor," an adult male resident also domiciled in the state of Pennsylvania at 1011 Cherry Street, Philadelphia, PA 19107.

**AND:**      **GORDON ROY PARKER,** the "Assignee," an adult male resident also domiciled in the state of Pennsylvania at 315 South Broad Street, Philadelphia, PA 19107.

For VALUE received of ***$0.01*** (ONE CENT), the Assignor hereby sells and transfers to the Assignee and its successors, assigns and personal representatives, any and all claims, demands, and causes of action of any kind whatsoever which the undersigned has or may have against **RONALD LEE, TERRESA LEE, THE TERESA LEE REVOCABLE TRUST, JEFFREY MAI, AND CAANAN REALTY GROUP,** arising from the following:

> **All claims related to communications between Walter Parker and his landlord or landlord's representative which occurred on February 27, 2022, including but not limited to the text message attached as Exhibit B."***
>
> *A Copy of the above-referenced text is attached hereto as Exhibit B and incorporated by reference as if set forth verbatim herein.

And the undersigned may, in his own name and for his own benefit, prosecute, collect, settle, compromise and grant releases on said claim as it in its sole discretion deems advisable.

IN WITNESS WHEREOF, the parties have executed this Assignment on **December 6, 2023**.

Signed, sealed and delivered in the presence of:

_____
Gordon Roy Parker

_____
Walter G. Parker

Parker v. Lee et al EDPA #23-3999 Exhibit C

## ASSIGNMENT OF A CLAIM FOR DAMAGES

This Assignment of a Claim for Damages (the "Assignment") is made and effective as of December 6, 2023.

**BETWEEN:**     **WALTER G. PARKER**, the "Assignor," an adult male resident also domiciled in the state of Pennsylvania at 1011 Cherry Street, Philadelphia, PA 19107.

**AND:**     **GORDON ROY PARKER**, the "Assignee," an adult male resident also domiciled in the state of Pennsylvania at 315 South Broad Street, Philadelphia, PA  19107.

For VALUE received of *$0.01* (ONE CENT), the Assignor hereby sells and transfers to the Assignee and its successors,  assigns and personal representatives, any and all claims, demands, and causes of action of any kind whatsoever which the undersigned has or may have against **KENNETH L. BARITZ, ESQ. and KENNETH L. BARITZ & ASSOCIATES, P.C., RONALD LEE, TERESA LEE, THE TERESA LEE REVOCABLE TRUST, JEFFREY MAI, AND CAANAN REALTY GROUP** arising from the following:

> **The Notice To Vacate addressed to Assignor, dated August 22, 2023, instructing him to vacate Apartment #3F within thirty (30) days to avoid eviction proceedings.***
>
> *A Copy of the above-referenced notice to vacate is attached hereto as Exhibit A and incorporated by reference as if set forth verbatim herein.

And the undersigned may, in his own name and for his own benefit, prosecute, collect, settle, compromise and grant releases on said claim as it in its sole discretion deems advisable.

IN WITNESS WHEREOF, the parties have executed this Assignment on **December 6, 2023**.

Signed, sealed and delivered in the presence of:

_____          _____
Gordon Roy Parker                                          Walter G. Parker



don't have a trash bin of our own here and never to my knowledge did.

Please text, not call me for my

Now

Ok.

Thanks

I think I can fix the issue now that I know what it exactly is.

That is good. I talked Ron,
you have been very long team

for a building 30 times the size of this.

Sunday, Feb 26, 2023 · 3:31 PM

Update: I will be paying the rent this month as usual to avoid any problems. I'll update you later in the month regarding my future plans. Ang garbage smell is likely a result of not being able to any longer just leave the garbage outside due to not being able to just leave it outside and put it in the bins as we don't have a trash bin of our own here and never to my

