RECD MAR ~ 6 2024

# IN THE UNITED STATES COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **GORDON ROY PARKER,** | **Case No: 23-3999-GJP** |
| Plaintiff | |
| v. | **Second Amended Complaint for** |
| | **multiple violations of the Fair** |
| | **Housing Act, Fair Debt Collection** |
| **Ronald Lee** *et al,* | **Practices Act (FDCPA), Breach of** |
| Defendants | **Contract, and for Declaratory and** |
| | **Injunctive Relief** |

## SECOND AMENDED COMPLAINT

Gordon Roy Parker ("Gordon"), Plaintiff in the above-styled action, submits this Second Amended

Complaint, a "new document" that renders the previous complaints null and void.

## THE PARTIES

1.    Plaintiff Gordon Roy Parker ("Gordon") is a resident of Philadelphia, domiciled at the Broad

Street Ministry, 315 South Broad Street, #0106, Philadelphia, PA 19107, and resides at 1011 Cherry

Street (a/k/a 132 North 10th Street), #3F, Philadelphia, PA  19107 ("the Building" and "the Apartment").

2.    Defendants **Ronald and Teresa Lee** are domiciled in and residents of, respectively, San

Diego, CA and Philadelphia, PA, and are co-owners of The Building.  They have been served.

3.    Defendants **Jeffrey Mai** and **Canaan Realty Investment Group** are property managers for

the building, responsible for renting apartments and its day-to-day operations.  They have been served.

4.    Defendant **Kenneth L. Baritz** is an attorney in Philadelphia who was retained by the other

defendants to attempt to evict Plaintiff by evicting his brother.  He has been served.

## NATURE OF ACTION

5.    This is a complaint for violations of the retaliation, age, gender, and race provisions of the

Fair Housing Act, pertaining to apartment listings, lease renewals, or lack therefore, breach of contract,

regarding Plaintiff's lease, for violations of the Fair Debt Collection Practices Act (FDCPA), 15 USC §1692(a) *et seq.*, and for declaratory relief.

6.    The action stems primarily from two notices to vacate issued on June 3, 2022 and August 22, 2023, respectively, to Plaintiff's brother, Walter Parker ("Walt"), who originally rented unit #BR-2 ("The Basement") in 2016, but not to Plaintiff.  It also stems from fair-housing violations related to all Defendants' listing Apartment #4F on favorable, discriminatory terms relative to #3F, and their refusing to rent #2R, and #2F, each one-bedroom units on the second floor with comparable rent to the Basement.

## STATEMENT OF JURISDICTION AND VENUE

7.    Jurisdiction in federal court is proper under 28 USC §1331, because of the existence of federal questions related to the Fair Housing Act, and FDCPA.  Supplemental jurisdiction over the state law claims is also proper.

8.    Venue in this district is proper because all Defendants either reside, are domiciled, or conduct business within the district, and none have contested jurisdiction.

## BACKGROUND

9.    Plaintiff incorporates by reference, the entire contents of all previous paragraphs.

10.    Plaintiff files this suit to enforce his housing rights, which extend beyond simple possession of the Apartment.  Defendants have targeted Walt, who signed the original lease, and with whom they had no visible issue as a tenant, for the express purpose of retaliating against Plaintiff by attempting to make him homeless, in the hope he will die on the street or simply end his life.[i]

---

[i] Plaintiff is terminally ill, with ESLD, and is approaching qualification for Vermont's assisted-suicide program, which is available to out-of-state residents.  As nature tends to work faster than the federal court system, this case may resolve on its own, though his estate can continue it.  While depictions of Plaintiff as bitter, litigious, or any other stereotype imputed upon *whistleblowers* were never accurate, they are even less so now.  Plaintiff has not filed a *pro se* lawsuit since 2017, though he did use San Diego-based attorney Michele M. Betti, to file Parker v. Anger, #19STCV39095, in the Superior Court of Los Angeles in 2019, seeking $2.6 million for child sex abuse by legendary filmmaker Kenneth Anger in New York City in 1984.  The case has since resolved, though it is worth noting that Ms. Betti, who normally bills at $750.00 an hour, had offered to sue Defendant Ron Lee in San Diego, but the "litigious" Plaintiff declined, in the interest of Walt's housing stability.

**Tenant History (The Basement, 2016-2021)**

11.   Walt moved into the Basement on or around November 15, 2016:

a.   Plaintiff supplied the initial $950.00 deposit to secure the apartment prior to Walt receiving the lease, and ultimately all move-in costs of around $2,500.00. The lease specified only one occupant, which is family discrimination under the FHA, and direct discrimination against Walt (and Plaintiff), as the Basement had been occupied by two tenants (mother and child) for five years.

b.   At the time, Plaintiff and Walt were suing the Fairfax[2] over FLSA violations relating to unpaid overtime and overcharged rent under 29 USC 203(m).[3] and had been overtly threatened with a retaliatory eviction which, at the time, constituted a near-total *blacklist* for future rentals. Consequently, Plaintiff prioritized Walt's housing stability, and remained in the Fairfax after Walt moved.

c.   In or around March, 2017, the Fairfax offered to "suspend" the wage lawsuit and allow Plaintiff and Walt to remain there at the market rent of $1,000.00/month. Because the Basement seemed to be working out well for Walt, Plaintiff advised him (as his caregiver) to remain there.

d.   On or around June 2, 2017, *while the wage lawsuit was still pending*, Plaintiff notified the Fairfax that Walt had moved out, and was no longer in possession of the apartment. Despite this, the Fairfax retained Defendant Baritz to file an eviction action[4] against Plaintiff and Walt on or around July 3, 2017, which was served simultaneously with a thirty-day Notice to Vacate, rendering the latter moot, and inflicting the permanent damage of an "eviction lawsuit," however illegal.

---

[2] Parker v. Fairfax Apartments Associates, E.D.Pa. #16-cv-2710
[3] Plaintiff and Walt were never true "tenants" of the Fairfax, but rather employees who slept on the grounds and who were on-call 24/7/365. To the extent possible, he is asserting that evicting a live-in employee should never occur in housing court.
[4] Case #LT-07-03-3161, appealed to the Court of Common Pleas as #70801716c

e.    At trial, the Municipal Court ignored the clear violation of eviction law and said that because the hearing was thirty days after the notice, there was no harm, while ignoring the obvious and permanent harm created by the mere filing of the eviction lawsuit.

f.    Also at trial, Plaintiff introduced into evidence Walt's lease for the Basement, making Defendant Baritz well aware that he (and later Plaintiff) lived there, and causing him to dismiss Walt, but leaving the *eviction lawsuit* on his record, effectively trapping him in the Basement, and trapping Plaintiff, his primary caregiver, in Philadelphia.[5]

g.    Walt settled his wage lawsuit, while Plaintiff was given leave to refile his claims in state court, but did not.  The Fairfax won a zero-dollar judgment against Plaintiff, along with possession. Plaintiff moved out of the Fairfax on or around February 14, 2018, into the Basement, as an indefinite occupant/caregiver, who paid half of the rent and utility bills, sometimes more.[6]

h.    The COVID lockdown in 2020 trapped Plaintiff in the Basement, where they were already trapped by the eviction lawsuit.  It is here that he involuntarily established occupancy.

12.   The Basement had numerous issues:

1)    It may never have been properly licensed, since the Building's paperwork references six apartments (2R, 2F, 3R, 3F, 4F, and 5F) and not the Basement.

2)    The pipes were faulty, regularly leaking, occasionally flooding the Basement, and requiring constant surveillance by Plaintiff when Walt was at work or on errands.

---

[5] The housing laws have evolved tremendously since 2017, in part due to conduct similar to the Fairfax and Defendant Baritz's against Plaintiff and Walt.  Dismissed cases like Walt's can no longer be used to screen tenants in Pennsylvania, and even the case against Plaintiff is now stale as it is over four years old, but it is *New York* that mitigated the most, by disallowing the use of housing court records at all.  With that said, Plaintiff has now been *doxed,* and landlords will find this lawsuit, likely leading to some retaliation.  Absent the law in New York, this suit would not exist.  Plaintiff should not have to move a hundred miles for a basic human right.

[6] While Plaintiff was certainly an occupant and an implied tenant (due to his ongoing financial contributions), he did not have visitors, did not get his mail there, and had no initial intention of disputing possession should the issue have arisen.  Plaintiff attempted to move to New York City in September, 2018, but that failed.  In March, 2020, he wound up locked down in the apartment due to COVID.

3)    There is no egress window in the Basement.

4)    Almost half of the "apartment" was a maintenance area that controls the building's water, the vestibule leading outside the apartment, and a loud freight elevator, which ran at any hour, and which Defendants Lee, Lee, and Mai (the "Landlord Defendants") would often use to enter the Basement without notice, which Plaintiff and Walt were powerless to stop due to the layout.

5)    The Basement had a bad rodent infestation which, like the pipes, were the result of restaurant *Tea Do's* presence directly above the Basement.

13.   Despite the law requiring the return of half of the security deposit after one year as a tenant, the Landlord Defendants kept the extra month from Walt, even asking for an additional $100.00 when they raised the rent from $950.00 to $1,000.00, for the 2017 lease renewal.[7]

14.   The perpetual threat to invade privacy, and the elevator noise, as well as the leaks, made quiet enjoyment of the premises impossible.

15.   During the COVID lockdown, the Landlord Defendants rarely, if ever, entered the premises, and continued to ignore the problems with the flooding until, in November 2021, the Basement was condemned, and Plaintiff and Walt were "temporarily" moved from the Basement into the Apartment (#3F), yet have remained there ever since.

### Tenant History (The Apartment, 2021-present)

16.   In November, 2021, Plaintiff and Walt began living in the Apartment (#3F):

a.    They continued to pay $1,000.00/month rent, as they had in the Basement.

b.    The Apartment is a 1,650-square foot loft, much larger than the Basement, but which is not medically ideal for Plaintiff, who has limited mobility; the bedroom is a long walk to the bathroom. This also increases the monthly utility bills.

---

[7] At a PCHR hearing of February 1, 2023, Plaintiff (representing Walt) waived any penalties in exchange for applying the deposit to the December, 2022 rent.

c.   Neither Walt nor Plaintiff has ever been given a mailbox key for #3F, requiring Walt to continue to get his mail through BR-2, and Plaintiff to remain domiciled at the Broad Street Mission; Plaintiff avers that the purpose of this is to impede his becoming domiciled in the Building.

d.   The plumbing in the Apartment was faulty: the toilet had to be flushed with caution, and required toilet paper to be cleared when it got jammed.  Walt notified the Landlord defendants of this many times, yet it was never fixed.

e.   The Apartment had (and continues to have) *no heat*, since January, 2023.  Additionally, the Bedroom window was broken and could not close; after repeated requests from Walt, in December, 2023, Plaintiff paid $250.00 to a contractor who came in and fixed it by adjusting the window rail.

e.   The Apartment (#3F) is unfinished and not up to code; by comparison, #4F (directly above) is finished, has an extra room and closet, a washer-dryer, and finished flooring.

f.   As in the Basement, because the building does not provide a garbage dumpster despite being required to (as the building has seven units), resulting in trash piling up in the Apartment.

g.   The degraded condition of the Apartment made it impossible for Plaintiff to entertain clients or hold small chess gatherings, including paid lessons or high-stakes tournaments, costing him substantial income which was a factor in his funding Walt's move into Chinatown (the World Open attracts several thousand elite players from all over the world each July 4 weekend).  The building is zoned for mixed-use, and the tenants in 4F and 5F both ran photography studios.[8]

17.   On the morning of Sunday, February 27, 2022, Walt offered to move out by July 31, 2022:[9]

---

[8] Plaintiff is in the top three percent on *LiChess* in his niche (one-minute chess), and has recently defeated a top prodigy in a live event.  His value as a coach, at a minimum, is $25.00 an hour, and his physical disability precludes him from conducting chess business anywhere but his home.  Philadelphia is now without any chess club since the Franklin-Mercantile closed.  This also refutes Defendants' narrative of Plaintiff as lashing out at the world through litigation, as he is quite happily retired and seeking to be productive in his old age.

[9] A copy of the relevant messages in this exchange are attached hereto as Exhibit A and incorporated by reference as if set forth verbatim herein.

a.   The Housekeeper was banging on the Apartment front door, and screaming through the door over the smell of trash caused by the lack of a dumpster.

b.   In response, Plaintiff advised Walt to give five months' notice that he was moving out on July 31, 2022, which he did.

c.   In response, Defendant Mai forwarded a message from Defendant Ron Lee in which Lee asked Jeff to "work it out" with Walt, who he considered a valued, long-term tenant.

d.   Plaintiff relied on this message to call off his plans to move with Walt, and to de-emphasize the need to build the strong cash position required to move.[10]

### The First Notice To Vacate (June 3, 2022)

18.   From February 27, 2022, nothing appeared to have changed with Walt's tenancy, and he appeared to remain in good standing.  Despite this, the first of two Notices to Vacate was sent to Walt, via e-mail from nonparty Joanna Lee (wife of Ron Lee).  The Notice was defective because it:

a.   Demanded that Walt move out by June 30, 2022 to avoid being sued for eviction;

b.   did not name Plaintiff or "all occupants";

c.   was not properly served on Walt, and not served at all on Plaintiff;

d.   did not specify any good cause for eviction, just a lease nonrenewal; and

e.   was sent after Plaintiff had encountered the housekeeper in the stairs earlier that morning, after which he heard her yelling into her cellphone in Chinese.[11]

19.   In response to the Notice, Plaintiff had Walt call Defendant Ron Lee, after which he briefly spoke with Joanna Lee prior to putting Plaintiff on the phone.  As Walt's caregiver, with a high priority on housing stability, an eviction would require him and Walt to seek new housing, or, in the event of

---

[10] Plaintiff and Walt are on a fixed income (SSDI), making tying up the several thousand dollars necessary to move an extreme inconvenience.

[11] Temporal proximity, Walt's good standing, and other evidence that will be set forth below, gave Plaintiff strong reason to believe that _he_, not Walt, was the true target of the notice.

resolution, to remain in the Apartment together. Consequently, Plaintiff made Mrs. Lee aware of his presence and role as Walt's caregiver (similar to a TSS), that he is supposed to remain as invisible as possible to prevent stigma, and that the Notice required him to step forward, as Walt's advocate.

20.   Plaintiff avers, on information and belief, that the true purpose of the Notice was to evict Plaintiff, and to do so without affording him due process, as evidenced by their conscious avoidance of naming him on any legal process, and literally treating him as invisible, including but not limited to denying Walt a mail key, and a twenty-year history of internet cyberterrorists whose primary tactic is to interfere with their targets' housing, employment, and support networks, conduct which resulted in eviction from the Fairfax.

21.   This is not some random speculation or conspiracy theory: in the Fairfax eviction lawsuit, Defendant Baritz and his co-counsel (UPenn's outside firm Montgomery McCracken Walker & Rhoads), waxed extensively about Plaintiff's "internet history." Plaintiff has been targeted by *harassthem.com* styled websites which are well-known homes for hackers and cyberterrorists,[12] and content from these pages was quoted by Defendant Baritz, on behalf of the Fairfax, as if they were legitimate. This was part of a retaliation scheme by UPenn dating back to 2001, when Plaintiff filed an EEOC discrimination complaint, leading to <u>Parker v. University of Pennsylvania</u> (E.D.Pa. #02-cv-567) on February 4, 2002.[13]

---

[12] Attached as Exhibit B and incorporated by reference as if set forth verbatim herein is an article about how these same individuals from *LulzSec*, who swatted Plaintiff in December, 2015, a few months before a death threat from someone who had read the *doxing* site's defamation of Plaintiff cost Walt his desk job, and their apartment in the Fairfax, leading him to move to Chinatown, also targeted a man named Patrick S. Tomlinson, who has been swatted forty-six times by a hacker-for-hire network recently in the news for the arrest of one of its members, *Torswats*, a/k/a Alan Filion.

[13] In Parker v. Wintermute, E.D.Pa. #02-7215, Edward "Wintermute" Zawadzki, a UPenn employee who married a female UPenn student he met through his work at the Wharton computer center, threatened to kill Plaintiff in September, 2001, shortly after he filed his EEOC complaint, and spent a year or longer defaming Plaintiff and his late mother on the USENET newsgroup *alt.seduction.fast* ("ASF"), later made famous in Neil Strauss's *The Game* (2005). Plaintiff subpoenaed Wintermute's identity, only for UPenn to claim they couldn't locate him, despite knowing his IP address. Wintermute would have destroyed UPenn's anti-misogynist narrative. Plaintiff later identified Zawadzki as he revealed more about himself many years later. UPenn also quoted postings from Derek "Odious" Trunk to ASF (in promotion of rival businesses), who was later convicted of possession of child pornography.

22. Without hijacking this Complaint with the backstory on retaliatory animus, Plaintiff has attached the following as Exhibits C, to demonstrate Fairfax and UPenn's clear retaliatory animus:

    a.    A 2001 internal UPenn memo in response to the Wintermute threat (Exhibit C-1); [14]

    b.    A 2007 letter mailed to Plaintiff's late mother four months before she died of cancer threatening "legal consequences" for allowing Plaintiff to post to the internet (Exhibit C-2); and

    c.    A 2015 e-mail from *123nonanonymouse@gmail.com* , a/k/a Assistant United States Attorney Lindsey E. Middlecamp, a UPenn law graduate and feminist activist who had made similar public threats and disparaging remarks towards Plaintiff on Twitter (Exhibit C-3).

23. Even if the foregoing were somehow not true, and the Landlord Defendants were completely unaware that Plaintiff had been living as quietly as a *123nonanonymouse* under their roof for several years, consistent with his indefinite role as Walt's caregiver, made necessary by the condition of the Basement, which Plaintiff affectionately nicknamed *88 Ways To Die* or *Warren Buffet's Rat-Infested Basement* (Fox Roach rented it to Walt), they certainly became aware on June 3, 2022.

24. In response to the Notice, Walt filed a complaint with the PCHR, which led to a hearing on February 1, 2023 when PCHR ordered the landlord not to collect rent or seek eviction due to code violations. This order was overturned on appeal on October 12, 2023.

### Flooding And Subsequent Lease Renewal (November-December, 2022)

25. While the complaint objecting to the notice was pending:

    a.    On the morning of November 21, 2022, the toilet overflowed, after Plaintiff had used it, while Walt was asleep. Plaintiff had checked the toilet after flushing, and did not notice a problem,

---

[14] In <u>Parker v. Tilles</u> (2002, Pa.CCP, case number omitted), a libel case relating to his remarks in a *Daily Pennsylvanian* article, Tilles submitted as evidence (#23) the contents of a *doxing* "hate website" concerning Plaintiff that he had retrieved from a violent, white-supremacist website. At trial, defense counsel interrogated Plaintiff over internet postings, many from imposters, and in response to the Wintermute threat, detective Blackmore of the UPenn police accused Plaintiff of making internet threats, only to backpedal when he realized they were authored by imposters.

which had a delayed onset, after which he returned to sleep.  Flooding on the floors below ensued,

mostly because the bathroom is not watertight, and because of faulty pipes that stopped up the toilet.

Calls and texts to Walt were not immediately responded to, as he was asleep, and no one knocked on the

door or entered the apartment for around ninety minutes.

      b.    Defendant Jeffrey Mai called Walt on or around December 27, 2022, a month prior to

the PCHR hearing, offering a lease renewal for the Apartment:[15]

      1)    The renewal was for $2,200.00 a month, which, presuming good faith:

      a)    Was $300.00 more than Apartment #4F (which is finished) was listed for

during this time, and $400.00 more than it was renting for, to younger, nonwhite female tenants.  The ad

was placed by Defendants Mai/Caanan, on behalf of the Landlord Defendants.  As the ad shows, #4F

was vastly superior to #3F, with an extra enclosed room, and finished floors and closets, and a better

kitchen, while little if any maintenance of #3F has been performed to rectify its defects.  By putting Walt

in #3F, the Landlord Defendants made use of their worst apartment (as they had with the basement), in

order to more easily rent the two one-bedroom apartments on the second floor, in which they belong:



_____

15 A copy of the proposed renewed lease is attached hereto as Exhibit E and incorporated by reference as if set forth
verbatim herein.

    b) Should not have been for more than the identical rent on the basement, due to the breach of that lease, which could have been rectified by offering one of two one-bedrooms on the second floor, each of which were listed for $950.00 a month.

    c) Limited a 1,650-square foot apartment to one occupant (Walt), despite the tenant in #4F having a roommate.

    d) Excluded Plaintiff from the renewal offer in an attempt to evict him by making his occupancy a breach of the new lease.

    e) Was retaliatory in nature, particularly against Plaintiff, who had used protected conduct to exercise his tenant and other housing rights, including but not limited to representing Walt with the PCHR as his advocate.

<b><u>The Second Notice To Vacate</u></b>

26. On August 22, 2023, the landlord Defendants (other than Mai/Caanan) retained Defendant Baritz to send Walt another notice to vacate:

    a. The notice did not name Plaintiff, an unambiguously known occupant and tenant;

    b. The notice was in violation of the PCHR order, which had yet to be overturned, and was rejected by the Eviction Diversion Program, effectively terminating the notice.

    c. The notice was not properly served at all on Walt, and was not served at all upon Plaintiff, his known advocate at the municipal level.

    d. The notice specified "damages" and "unpaid rent" in an amount totaling $20,300.00, which has presumably increased by now.

27.   In response to this notice, Plaintiff filed a complaint with the PCHR, which they refused to accept, claiming, contrary to state and municipal law, that he was neither a tenant nor occupant, and did not have a lease.[16]   A copy of that Notice is attached hereto as Exhibit D and incorporated by reference.

28.   Even after the order of October 12, 2023, the Landlord Defendants have not attempted to evict Walt (or Plaintiff), and have not attempted to collect rent, leaving them in limbo, and resulting in this lawsuit, as Plaintiff was denied due process by the PCHR, who did not apply Pennsylvania law in deciding Plaintiff lacked standing, even though he is clearly and legally in possession of the premises.

## COUNT I: FAIR HOUSING ACT RETALIATION (All Defendants)

29.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

30.   This count is against all Defendants, who have previously claimed that the Building is owned by Defendant Teresa Lee Revocable Trust, but that appears not to be the case:

    a.   None of the Notices to Vacate came from the Trust;

    b.   Until March, 2021, Walt was making rent checks payable to Defendant Ron Lee, which seems to constitute some type of fraud (speaks to Defendants' character).[17]

    c.   The Building was sold in 2018 for ***one dollar***, far below its market value.

31.   Defendants Mai and Caanan are named because they handle both the day-to-day operations of the Building, and rental listings, including the ones for Apartments 4F, 3F, 2R, and 2F.  Defendant Mai is listed as the contact for the 4F listing.

---

[16] As noted in paragraph 12, section 204 of the Landlord Tenant Act of 1951, relating to mortgages, states that "***As used in this section, the word "tenant" shall include a subtenant holding under a sublease from a tenant under a prime lease from the owner.***"  This is a clear denial of Plaintiff's due process rights, though at some point, the landlord would have to sue to evict, and as of this writing has yet to initiate any proceedings.  Plaintiff is eager to resolve this conflict and move on.
[17] A copy of a sample rent check from February, 2021 and an e-mail from Defendant Mai requesting that the checks after that be made payable to the Trust are attached hereto as Exhibit F and incorporated by reference.

32.    Temporal proximity to the encounter with the housekeeper on June 3, 2022, Defendant Baritz's retaliatory animus, the near-certainty that at least one of the Landlord Defendants was contacted by the publishers of the doxing page on *harassthem.com,* or simply performed a search of Plaintiff's name to find the content, and the nearly-absolute certainty that they did so after speaking with Plaintiff on the phone on this date, all suggest retaliatory animus.

33.    The retaliatory *conduct* resulting from the retaliatory animus above includes:

a.    Both Notices to Vacate, each of which targeted Plaintiff under pretext of targeting Walt, and each of which was fatally defective, the latter in violation of the PCHR order of February 1, 2023, which had yet to be overturned at the time of the Notice.

b.    Omitting Plaintiff from the lease renewal in December, 2022, and offering Walt highly unfavorable and more expensive terms than for any other tenant.

c.    Not offering Plaintiff (and Walt) either #2F or #2R, both one-bedroom units which had been listed for $950.00-975.00 during the period in controversy.

d.    Retaining Defendant Baritz, who has a history of prior bad acts, and prior retaliatory animus, to target Plaintiff through his brother:

1)    He was *disbarred* in 1984 for misconduct:



2)    And he was sued in 2003:

Daniels further avers that the Landlords imposed improper escrow procedures and unjustified deductions from security deposits, assessed illegal late charges, ***commenced unwarranted eviction proceedings***, to which Baritz initiated. Daniels v. Baritz, #02-cv-7929, E.D.Pa. (2003) Daniels v. Baritz, #02-cv-7929, E.D.Pa. (2003)

     e.     Not fixing the heat in the apartment, despite repeated requests to do so.

     f.     Denying Plaintiff's legal occupancy and/or tenancy in the premises, and denying Walt a mailbox key, to prevent Plaintiff from establishing residence in #3F.

     g.     Further retaliating against Plaintiff for his exercise of his fair housing rights on June 3, 2022 and thereafter.

34.    Defendant Baritz, through his work with the Fairfax, who in turn was retaliating against Plaintiff for his exercise of his fair-housing, Title VII, and wage rights, had special and privileged access to otherwise highly confidential information, and was hired to provide the Landlord Defendants with this access.

35.    Plaintiff avers that all Defendants' conduct, or responsibility for same as ***respondeat superior*** or co-conspirator, as set forth hereinabove, constitutes retaliation under the Fair Housing Act, 42 USC §3601 ***et seq***, and states this claim for relief on that basis.

36.    As a direct and proximate result of Defendants' conduct, Plaintiff has endured pain and suffering, mental anguish, damage to his finances because he has to divert money to potential new housing, and extreme and completely unnecessary housing instability, all because Defendants have chosen to hang a perpetual threat of life-threatening eviction over his head.

37.    Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but which is not less than FIVE MILLION DOLLARS ($5,000,000 US), punitive damages, injunctive relief sufficient to terminate the actionable conduct, costs of suit, including any reasonable attorney fees (none so far), and any other relief this court deems just and proper to make Plaintiff whole.

## COUNTS II-IV: FAIR HOUSING ACT DISCRIMINATION
## (GENDER, RACE, AGE) (ALL DEFENDANTS EXCEPT BARITZ)

38.    Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

39. The Landlord Defendants discriminated against Plaintiff as follows: by giving preferential treatment to nonwhite females, both in renting, and in their treatment as tenants. Examples include, but are not limited to:

    a.    Defendants Mai/Canaan's listing of Apartments 4F, 2F, and 2R, and refusal to rent them to Plaintiff (or Walt, to prevent Plaintiff from renting).

    b.    Two instances of allowing nonwhite, female, younger neighbors to *__trespass__* into the Basement (in 2021, during a flood), and the Apartment, stigmatizing Plaintiff and Walt, and expressing hostility towards Plaintiff and Walt that was then acted upon by the Landlord Defendants.

    b.    Offering two-occupant leases to nonwhite, female, and younger tenants for the same apartments for which Walt was offered a one-occupant lease.

    c.    Giving preferential treatment in general to nonwhite, female, and/or younger tenants, the full scope of which will be demonstrated at trial.

    d.    Allowing nonwhite, female and younger tenants to conduct business in their apartments, in a building zoned for mixed use.

40. Defendants' conduct, as set forth hereinabove, constitute violations of the gender (Count II), race (Count III), and age (count IV) provisions of the Fair Housing Act, 42 USC §3601 *et seq*; Plaintiff states these claims for relief on that basis.

41. As a direct and proximate result of Defendants' conduct, Plaintiff has endured irreparable economic harm, in an amount to be proven at trial, and other harms related to the housing insecurity inflicted upon him by Defendants' egregious conduct.

42. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, punitive damages, injunctive relief sufficient to terminate the actionable conduct, costs of suit, including any

reasonable attorney fees (none so far), and any other relief this court deems just and proper to make Plaintiff whole.

<u>**COUNT V: FDCPA VIOLATIONS (DEFENDANT BARITZ)**</u>

43.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

44.   The second notice to vacate, of August 22, 2023, was an attempt to collect a debt for damages and unpaid rent, which threatened legal action to recover the debt:

  a.   The notice offered no supporting documentation for the debt.

  b.   The alleged debt was not itemized.

  c.   The amount owed was incorrect.

  d.   Bogus legal action (no standing due to the PCHR order) was threatened as a means of collection.

  e.   No legal action has ensued, despite the PCHR order being vacated on October 12, 2023, rendering the litigation threat a fraudulent or negligent misrepresentation, in violation of the FDCPA.[18]

45.   Though not explicitly named on the Notice (which would be moot for possession as it did not name any occupants), it was the proximate cause of injury to Plaintiff, in part because a) he could still be held liable, b) possession of the Apartment for which he has a lease is impacted; c) any attempt to evict Walt is also an attempt to evict him, and d) Plaintiff was its true target.

46.   Plaintiff avers that Defendant Baritz's conduct, as set forth, constitutes a violation of Fair Debt Collection Practices Act, 15 USC 1692(d), and states this claim on that basis.[19]

---

[18] Plaintiff is asserting his own standing under the FDCPA; he has undone the assignments of claim from previous pleadings.
[19] While Defendant has argued that Plaintiff lacks standing to litigate his brother's debt, this is now moot, as Plaintiff has purchased an assignment of this claim from his brother (¶ 48), and has standing.

47.   Plaintiff is entitled to a) statutory damages of ONE THOUSAND DOLLARS $1,000.00, and is further entitled to b) costs of suit, including any attorney fees (none incurred so far), and c) such other and further relief as deemed necessary to make him whole.

<u>**COUNT VI: BREACH OF CONTRACT (DEFENDANTS LEE, LEE, AND TRUST)**</u>

48.   Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

49.   Defendants' conduct, as set forth hereinabove, constitute numerous breaches of contract, including but not limited to:

    a.   Not providing the mailbox key;

    b.   Repeated breaches of quiet enjoyment and the warrant of habitability (3F is not up to code);

    c.   Commercial and residential code violations which have made it impossible for Plaintiff to conduct chess-related business from a prime location in Center City, mere blocks from the largest open chess tournament in the world each July 4 weekend.

50.   While all breaches of contract as set forth hereinabove, entitle Plaintiff to rent offsets dating back several years, in an amount at least equal to any profits derived from the rental (which should be engorged anyway due to the code violations), the overwhelming majority of the pecuniary damage stems from the total loss of business use of the mixed-use Apartment, for which Plaintiff was not even required to be an occupant.

51.   Defendants' conduct, as set forth hereinabove, entitles Plaintiff to relief for the Pennsylvania tort of breach of contract; he states this claim for relief on that basis.

52.   As a direct and proximate result of the breaches, Plaintiff has endured the following injuries and damages, in an amount to be proven at trial:

a.   Loss of quiet enjoyment and privacy.

b.   Loss of money spent curing the breaches, including but not limited to, extra heating.

c.   Loss of chess-related income.

b.   Loss of time spent dealing with Defendants' conduct.

53.   Plaintiff is entitled to compensatory damages in an amount to be determined at trial, punitive damages, injunctive relief sufficient to terminate the actionable conduct, costs of suit, including any reasonable attorney fees (none so far), and any other relief this court deems just and proper to make Plaintiff whole.

## <u>COUNT VII: DECLARATORY RELIEF (ALL RELEVANT DEFENDANTS)</u>

54.   Plaintiff incorporates the entire contents of all previous paragraphs by reference.

55.   Plaintiff seeks the following declaratory relief:

a.   That Plaintiff is a tenant in Apartment 3F, with his brother.

b   That the toilet overflowing was accidental, caused primarily by faulty plumbing, and exacerbated by the bathroom flooring not being watertight.

c.   That the two notices to vacate were retaliatory in nature, and that no good cause exists to evict Plaintiff or his brother (and by extension, him).

d.   That any back rent or damages claimed to be owed are more than offset by the breaches of contract, including but not limited to relocation from the Basement.

e.   That any rent in excess of $1,000.00 a month, or a reasonable annual increase in that rent (minus offsets) is damages payable back to Plaintiff, with interest.

f.   That, in part due to laches, any money owed at present, due to back rent or damages, is plenary and not possessory in nature.

g.    That the lease renewal offer of December 27, 2022 constitutes a transactional waiver of any cause to evict either Plaintiff or his brother.

## **PRAYER FOR RELIEF**

WHEREFORE, for all counts, or any combination thereof, Plaintiff seeks the following relief:

1.    Compensatory damages in an amount to be determined at trial, but which is not less than FIVE MILLION DOLLARS ($5,000,000).

2.    Punitive damages in an amount to be determined at trial.

3.    Costs of suit, including any reasonable attorney fees where applicable (none have been incurred as of now).

4.    A declaration that the Notice to Vacate is legally invalid.

5.    An injunction enjoining the Landlord from pursuing eviction for any reason based on events up to and including the date of this filing.

6.    A declaration that Plaintiffs owe no money to the Landlord as of the date of this filing, and an injunction enjoining Defendants from attempting to collect.  Alternatively, a declaration that any money owed to the landlord as of the date of the order is plenary rather than possessory.

7.    A declaration that no good cause for eviction exists, based on anything which has occurred up to and including this date.

8.    A declaration that the toilet overflowing was not the fault of Plaintiff or his brother.

9.    A declaration that Defendants have violated the race, gender, age, disability, national origin, and retaliation provisions of the Fair Housing Act.

10. Such other and further relief as this court deems just and proper.

This the 6th day of March, 2024.

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131

*e-mail or text preferred contact

**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **GORDON ROY PARKER,**<br><br>   v.<br><br>**Ronald Lee** *et al,* | |
| Plaintiff<br><br>Defendants | Case No: 23-3999-GJP |

## CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff in the above-styled action, hereby attest that I have served a copy of

the foregoing **Response To Defendants' Motion To Dismiss Amended Complaint**, on the following

parties, by **hand delivery** (with follow up by e-mail):

Aaron E. Moore, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin PC
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Attorney for Defendants Caanan and Mai*

Adam M. Barsky, Esq.
KBK Law Group
100 South Broad, #1205
Philadelphia, PA 19110
*Attorney for all other defendants.*

This the 6th day of March, 2024

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA 19107
gordonroyparker@gmail.com
(215) 951-4131

**Exhibit A**
**Messages of February 27, 2022**



**Exhibit B**
**Tomlinson Article**

**(Full Text)**



**This man has been swatted 47 times for making a joke about Norm Macdonald**

**What began with a seemingly harmless hot take on Twitter turned into an years-long campaign of harassment, death threats and dozens of 'swatting' attacks at Patrick S Tomlinson's Milwaukee home. Bevan Hurley reports**

For 18 months, a teenager allegedly operated a "swatting" service out of his father's California home, where criminals could call in a hoax bomb threat or mass shooting almost as easily as ordering a burger on UberEats.

Alan Winston Filion, 17, is suspected of targeting hundreds of high schools, mosques, historically Black churches, US senators and even the US Supreme Court with swatting attacks that placed thousands of people in the crosshairs of heavily armed police response teams.

Prosecutors say the 6ft 3in teenager advertised his services under the pseudonym Torswats on the encrypted messaging app Telegram, charging as little as $40 to get someone's gas shut off, $50 for a "major police response", and $75 for a "bomb threat/mass shooting threat". Mr Filion would then post chilling audio of the 911 calls on Telegram as a proof of purchase, according to court documents. Among the hundreds of "swats" that Torswats allegedly claimed credit for were multiple hoax callouts at the home of Patrick S Tomlinson, a Milwaukee-based science fiction author who says he has been swatted dozens of times in the past four years as part of a targeted harassment campaign by a group of "sociopathic" stalkers.

"You can't fathom the amount of clinical obsession that grips these people," Mr Tomlinson told The Independent. "Trying to destroy my world is their full-time lives."

Milwaukee Police Department police officers at the home of Patrick S Tomlinson (Patrick S Tomlinson) Mr Tomlinson told The Independent he had awoken in the middle of the night to find officers banging on his door, been handcuffed, and had guns shoved in his face during the years-long ordeal. He was once swatted four times in one day.

Mr Filion has not been charged in relation to the swats on Mr Tomlinson's home, and investigators believe there are at least two individuals behind the Torswats account.

The FBI, Milwaukee Police Department and the Seminole County Sheriff's Office in Florida, where the teenager is facing four felony counts, declined to provide further information beyond an extensive account of Mr Filion's activities in a probable cause charging document.

After Mr Filion was arrested on 18 January at his home in Lancaster, Los Angeles County, Mr Tomlinson said he and his wife Niki Robinson had their first decent night of sleep in years.

Their relief was short-lived. A new Telegram channel named "Torswats Return" was created by someone claiming that their "partner has been arrested", according to posts viewed by The Independent.

The channel stated that it would continue offering "swats" for as little as $40, and offered returning customers a discounted rate. It also posted derogatory photographs and text about Mr Tomlinson – noting that there would be no charge for requested swats against him.

"And of course swats to Patrick... are free," read the Telegram message.

On January 31, Milwaukee Police Department officers arrived at Tomlinson's home after receiving a hoax report of a shooting at the address – for what Tomlinson says is the 47th time their home had been "swatted" in a little over three years.

"It's just farcical at this point," Mr Tomlinson told The Independent. "Nobody told them this had happened 46 previous f***ing times."

The MPD denied an open records request by The Independent for callouts to Mr Tomlinson's home, citing an open FBI investigation.

ii

The science-fiction author has endured relentless harassment from an anonymous online army of what he describes as "cyber terrorists". He says they have stalked and impersonated him, defaced his home, and continue to send a daily avalanche of abusive phone calls, voicemail messages and emails.

"I wont stop until one of them die (sic)," a message posted to the channel on 6 January stated, referring to Mr Tomlinson.

As swatting incidents have spiked in recent months, victims and cybersecurity experts say law enforcement is failing to deal with the threat.

Last month, Republican presidential candidate Nikki Haley revealed she was targeted by swatting hoaxes twice in two days and has requested Secret Service protection amid the rising threats to her safety. She is among the dozens of lawmakers, judges in Trump trials and public figures who have experienced tactical response teams turning up at their homes in response to the false callouts.

Swatting, defined by the Anti-Defamation League (ADL) as a "malicious act of reporting a false crime or emergency to evoke an aggressive response", emerged from online gaming communities in the early 2000s, where rivals would call 911 on each other and watch the armed response on livestream.

The ADL estimates there were over 1,000 swatting incidents in 2019, but the true figure is unclear as there is no federal statute against swatting that would enable convictions to be recorded.

Republican presidential candidate and former US Ambassador to the United Nations, Nikki Haley was swatted twice last month (Reuters) Schools, synagogues, mosques and churches are frequent targets. When hackers stole cancer patient records from the Fred Hutchinson Cancer Center in Seattle in December, they threatened to "swat" their homes if ransom demands weren't met.

Even the White House itself was "swatted" last month, sending multiple Washington DC fire and emergency units to the nation's most famous address.

White House press secretary Karine Jean-Pierre addressed the growing swatting scourge from the presidential podium last month, saying it was "creating a danger and a risk to our society".

Experts say swats not only place the victims in danger of being shot by police, they also cost law enforcement around $10,000 per callout.

Gregory Winger, a cyber security expert and assistant professor at the University of Cincinnati, told The Independent that current laws are not fit to properly punish or deter swatters.

He says that lawmakers and celebrities will typically have additional security measures in place, while regular citizens such as Mr Tomlinson are exposed to the very real danger of being shot by police.

Mr Tomlinson notes the dangers posed by heavily militarised US police departments.

"If one of these calls came in in Nottingham, England, they wouldn't show up with ballistic shields and sub-machine guns. That's why it's so dangerous, that's why it's attempted murder."

Mr Tomlinson wants to see repeat swatters charged with attempted murder and terrorism.

"You're not dealing with internet trolls here, these are hardened criminals," he told The Independent.

"You have to treat it like a domestic terror cell, they get off on creating chaos and trying to harm people. And in order to keep chasing that high, they are only going to escalate."

The most swatted man in America

Mr Tomlinson, who dabbles in stand-up comedy, came to the attention of a hardcore group of online stalkers five and a half years ago after posting an innocuous tweet about the late Saturday Night Live comedian Norm Macdonald.

"Hot take: I've never found Norm Macdonald funny and was pretty sure all my comedy friends who did were either nuts or screwing with me," he posted on 11 September 2018.

Days later, Mr Tomlinson was locked out of his verified Twitter account @stealthygeek. He later discovered a 30,000-strong Reddit group of fans of the former shock jock radio show Opie and Anthony had mass-reported him for breaching community standards.

Opie and Anthony was canned by SiriusXM in 2014 after the network said co-host Anthony Cumia made "racially charged and hate-filled remarks" on Twitter. Fans of the show later coalesced on the internet around a shared enjoyment of posting hateful content attacking the LGBTQ community, their supporters and any left-wing commentators they took a dislike to

Author Patrick S Tomlinson has been relentlessly stalked and harassed for years (Patrick S Tomlinson ) Mr Tomlinson told The Independent his accounts on YouTube, Instagram and Facebook were targeted over the next few months with false complaints.

He said the trolls created Twitter accounts impersonating him, which he says posted racist and homophobic abuse in an attempt to discredit him.

The Reddit group also posted photoshopped images of Mr Tomlinson and doxed his home address and phone number.

The harassment quickly escalated to death threats left on Mr Tomlinson's voicemail. Mr Tomlinson said the stalkers began following him to science-fiction conventions where they would secretly photograph him and post the images online, and contacted his book publishers claiming they had kidnapped his wife.

In June 2019, one of the stalkers paid Macdonald to record a Cameo Call in which the comedian, who died in 2021, says he was told that someone named Patrick had said he wasn't funny. He then calls on "Patrick's friends" to "please continue insulting that fat loser".

The video appears to have encouraged the stalkers to ramp up their efforts.

In May 2020, Mr Tomlinson's home was swatted for the first time when two police officers turned up "ready to go" at his home late one night demanding to know where "the children" were.

The swat came soon after stalkers had created a bogus Craigslist advert with Mr Tomlinson's home address bizarrely claiming that he was kidnapping African-American children, and "grinding them down to make pepperoni".

The twisted claim has echoes of the "pizzagate" conspiracy theory, which claimed that Democratic Party insiders were keeping child sex slaves in a pizza restaurant in Washington DC.

The coordinated campaign continued to escalate. The harassers flooded book sale sites Amazon and Goodreads with bogus one star reviews of Mr Tomlinson's publications in a coordinated assault.

After the Opie and Anthony subreddit was removed in 2019 for repeated breaches of its terms of service, the harassers migrated to the website new.onaforums.net where the campaign of torment continued.

The site's message boards have attracted more than 40,000 threads and around one million comments dedicated to what Mr Tomlinson describes as their "total, clinical obsession with my every tweet, thought, public appearance".

iv

Milwaukee Police Department police officers have been called out to hoax threats at the home of Patrick S Tomlinson dozens of times in the past four years (Patrick S Tomlinson) Mr Tomlinson wrote in a lengthy tweet thread at the time that the site was being used "to coordinate new attacks, execute, and then brag about the crimes and suffering they've inflicted".

The group's stated goal was to "destroy his career, his marriage and drive him to suicide", he said.

Mr Tomlinson says that security cameras captured stalkers defacing his house and motorcycles. In another cruel move, the group also posted audio on YouTube of Mr Tomlinson screaming in frustration as he is being swatted.

Mr Tomlinson reported the group's obsessive harassment to the police and the FBI in May 2020. He said a special agent from the Milwaukee field office was assigned to look into the case, but that he has heard little back about their investigation.

"The FBI is a black hole as far as their investigation is concerned," he told The Independent. "We throw evidence down the hole, and nothing comes out."

Mr Tomlinson said he has reported each swat to the Milwaukee PD and the FBI, and personally gone to his local precinct on several occasions to ask that they stop sending armed police to his home "every time our stalkers tell them to".

After Alan Filion's arrest, the Torswats Telegram channel is back advertising 'swats' for as little as $40 (Telegram) In a response to The Independent, The Milwaukee Police Department (MPD) declined to address why it hasn't put measures in place to recognise serial swatting attacks at Mr Tomlinson's home, instead just sharing the same statement it has given other outlets.

"Swatting is unacceptable, illegal and potentially very dangerous behaviour, as it can lead to a very dynamic situation, placing both the residents involved and our officers at risk," an MPD spokesperson said.

"Out of an abundance of caution, MPD has a duty to respond to calls for service in order to ensure that no one is in danger and that the necessary precautions are taken into consideration during these incidents."

Mr Tomlinson's attempt to involve law enforcement only seemed to embolden his stalkers, who doubled down on the campaign of emotional torment.

At 1am on 25 July 2022, the MPD responded to a hoax 911 call by someone claiming to be Mr Tomlinson saying he had killed his wife and a man in their bed. Mr Tomlinson said he was in bed asleep and woke up to hear pounding on his door, and officers armed with assault rifles surrounding his home.

Security footage taken by his home cameras shows him handcuffed on the porch while the MPD searched his home.

Mr Tomlinson may be the main target, but the stalkers also harass those around him. The same month, while attending her grandfather's funeral, Mr Tomlinson's wife discovered she had been impersonated by someone who sent racist emails to Black influencer Marvin Toliver.

She was temporarily suspended from work before being cleared of any involvement in sending the hateful messages. Mr Toliver later posted a video to Instagram explaining that the racist messages he'd received were a hoax.

Mr Tomlinson's elderly parents have also been swatted three times, he said.

A dedicated 'swatting' channel on Telegram has made explicit threats and derogatory posts about author Patrick S Tomlinson (Telegram)

In September 2022, cyberstalkers sent a "detailed, explicit" death threat to the organisers of the WorldCon in Chicago where Mr Tomlinson was due to appear.

A few months later, singer Patti LaBelle was pulled off stage at a concert in Milwaukee and 2,000 audience members were evacuated due to a bomb threat. Six downtown city blocks were shut down for hours while bomb-sniffing dogs checked buildings.

Mr Tomlinson told The Independent that MPD officers stopped by his home that night to tell him that the bomb threat had come from stalkers using his name, one of more than half a dozen such hoax bomb threats he had been accused of.

In April 2023, he was swatted four times in one day. On the fourth visit, the MPD sent six officers with assault rifles to his home at 9pm.

His home has since been swatted a further 20 times, the most recent being just last week.

Mr Tomlinson has documented the years of harassment on Twitter, now X, with the posts often enraging the stalkers and drawing dozens of abusive responses.

He first spoke at length about the harassment to the Daily Beast in October 2022, and has given interviews to local and national media in the hope it might deter the stalkers, but each time it only seemed to spur them on.

Mr Tomlinson also filed a lawsuit in 2020 to try to force the internet service provider Cloudflare to reveal the names of the individuals behind the website.

The request to subpoena Cloudflare was denied by the Superior Court of California after a judge ruled it fell under Section 230 of the Communications Decency Act, which shields blogs and social media sites from problematic content on their platforms posted by third parties.

A judge also ordered Mr Tomlinson to pay the anonymous blogger behind the website $23,700 in legal fees.

That figure has ballooned to $50,000 with interest and penalties, and Mr Tomlinson said the group behind the blog was trying to bankrupt him and take his house.

Mr Tomlinson has refused to cave despite the ongoing threats to his life, and he and his wife suffering from PTSD and chronic insomnia.

Rather than relocating or going into hiding, he said he had invested in a top-of-the line security system and bought a "small arsenal of weapons" to protect himself.

"I bought my wife a gun for Christmas, just so she could feel more at ease."

'Nobody would ever dare swat himself, right?'

Court documents from Mr Filion's arrest this week provided a rare glimpse into the dark web nexus between an underground network of professional "swatters" and the criminal stalkers who hire them.

According to a charging document, the Torswats Telegram channel first came onto law enforcement's radar in October 2022, when Anacortes High School in Skagit County, Washington was targeted five times in a week with hoax bomb threats and shooting callouts.

Police initially believed a 17-year-old student at the school was behind the swats, before concluding that he had also been a victim of swatting attempts. The Telegram channel that authorities have tied to Mr Filion later posted audio of the 911 calls.

Over a month-long period, Torswats posted recordings of fake 911 bomb threats at schools and non-profit organisations in Pennsylvania, Oklahoma, Louisiana, Texas, Maryland and Iowa.

In one swatting incident in February 2023, a teenager in Dubuque, Iowa, who had been in contact with Torswats was arrested for ordering a bomb threat at a local high school.

In April 2023, Motherboard revealed for the first time how the Torswats Telegram channel was offering to swat victims using a synthesized speech programme for a $75 fee.

The next month, Torswats posted audio of a swatting at the Masjid Al Hayy Mosque in Sanford, Florida.

The caller allegedly told a dispatch operator that he had a handgun and explosive devices and was going to kill everyone inside "in the name of Satan" while playing audio of gunfire.

Around 30 heavily armed police officers were sent to the mosque, Seminole County Sheriff's Office said in a statement.

The Torswats Telegram channel was also filled with screeds of racist, misogynistic, transphobic and anti-LGBTQ postings, according to prosecutors.

In one post, Mr Filion allegedly wrote that he "sent police to the homes of people I don't like (f****** and transsexuals) for fun", according to a charging document.

"While a number of victims targeted by Torswats were the product of conducting a swatting' service, there is an obvious trend observed in the subject's targeting and his own words, in which victims are chosen due to their sexual orientation and identity, race or religion," detectives from the Seminole County Sheriff's Office wrote.

In May 2023, the FBI set up a national database to "track and create a real-time picture of swatting incidents" and share information between hundreds of police departments and law enforcement agencies across the country.

In late June, Scott Schubert, the section chief of the FBI Criminal Justice Services Division, gave an interview to NBC News about a new swatting national database that would enable law enforcement to monitor the growing threat.

In the following days, Mr Schubert, and the FBI special agents in charge in Pittsburgh, San Antonio and Oklahoma City were targeted in swatting calls.

An FBI spokesperson told The Independent that more than 550 swatting incidents have been reported to the database, known as the National Common Operation Picture, in the past seven months.

Experts say that figure could be just the tip of the iceberg, as police departments are often reluctant to report swats due to the embarrassment of being duped.

"That the FBI is starting to take this seriously and get some data, is a useful thing," Professor Winger, the cybersecurity expert, told The Independent.

"It helps you identify underlying systemic behaviours that might indicate a larger problem."

Swatters are typically prosecuted under state False Information and Hoaxes laws.

But without a federal statute, law enforcement is constrained from devoting additional resources to training 911 dispatchers or investigating cases, Professor Winger said.

Meanwhile, "swatters" are sharing information and learning from one another's tactics to stay one step ahead of authorities, Professor Winger said.

He called for more sophisticated IT systems in police call centres to identify the location of where the phone call is coming from, and mandatory reporting of swats.

"People seem willing to do things online that they would never do in real life. And this is an illustration of where that kind of online harassment mentality can lead. It's never been good, but now it's actually dangerous," Professor Winger said.

"It used to be spamming, it used to be doxing, it used to be pizza orders – swatting is a much more destructive evolution of online harassment."

The FBI alleges that in order to learn his trade, Mr Filion placed nine swatting calls to his own home in Andale Avenue, Lancaster, over a three-month period between September and December 2022 to test what the police response would be.

The suspect allegedly boasted about calling out the swats on Telegram: "How would I know my methods would work otherwise. Swatting my neighbor means I'm in suspicion. But nobody would ever dare swat himself, right?"

His listed home address is in a quiet residential neighbourhood, across the street from a daycare centre.

Mr Filion would frequently post content from JRR Tolkien's Lord of the Rings on Telegram, Google, Discord and YouTube. He allegedly used the handles "Witch King of Angmar" and variations of the word "Ringwraith" to call in swatting incidents, and posted images of Nazgul to Telegram.

The LOTR references left investigators with a trail of clues that led FBI agents to his parent's home in Lancaster, California, in July that year.

They interviewed Mr Filion in the presence of his father William and seized phones and computer equipment. A search of the devices located screenshots and images posted to the Torswats Telegram channel, Google map searches of some of the targets, and emails between Mr Filion and cryptocurrency companies Crypto.com, CoinGate and CoinPayments.

A person who answered William Filion's phone hung up when contacted by The Independent.

'If you hire a hitman, you're just as guilty of murder. Mr Tomlinson says the swatting attacks against him stopped suddenly in July last year, right around the time of the FBI raid on the Filion home.

Then the day after Thanksgiving, Mr Tomlinson said his home was swatted again for the first time in months. He captured screenshots from a Torswats Telegram channel advertising that it would "resume normal operations" on Christmas. Mr Tomlinson's home was then targeted again on Christmas morning.

The same day, swatters called in hoax threats to the homes of GOP House member Marjorie Taylor Greene and Mayor of Boston Michelle Wu. Florida senator Rick Scott's home in Naples was swatted on 27 December while he was having dinner with his wife.

Mr Filion was arrested on 18 January, and extradited to Seminole County, Florida, where he was charged with four felonies related to making a false police report of a mass shooting at a local mosque in May 2023. His arrest was first reported by Wired. His attorney did not respond to The Independent's multiple requests for comment.

Mr Filion made his first appearance in court on 31 January and is being charged as an adult on four felony counts including false reporting of a bomb or weapon of mass destruction, and use of a two-way communication device while involved in an act of terrorism. Both are punishable by decades in prison.

Mr Tomlinson told The Independent he hopes the arrest will allow police to work out who was paying Mr Filion and who else is behind Torswats. Investigators stated in court documents that they had traced a Discord account to a "privacy-friendly 'virtual private network' in Sweden".

Mr Tomlinson says the stalkers who ordered the swats should be just as liable as the person phoning them in.

"If you hire a hitman, you're just as guilty of murder."

Exhibit C-1
Internal UPenn Memo 2001

**Tilles, Eric A.,9/13/01 11:59 AM -0400,FW: Threat from a Penn Student**

From: "Tilles, Eric A." <eric.tilles@ogc.upenn.edu>
To: "'trambo@pobox.upenn.edu'" <trambo@pobox.upenn.edu>
Cc: "'vhayes@pobox.upenn.edu'" <vhayes@pobox.upenn.edu>,
    "Fraser, Brenda"<brenda.fraser@ogc.upenn.edu>
Subject: FW: Threat from a Penn Student
Date: Thu, 13 Sep 2001 11:59:15 -0400
MIME-Version: 1.0
Status:

Under the category of better safe than sorry, I thought I should make you
aware of the record from a Penn chat room that appears at the bottom of this
e-mail. The same person, Gordon Ray Parker, has acted aggressively with
members of the Office of Affirmative Action. Valerie Hayes has a full file
on him. Let me know if you would like me to do anything.

Eric

Eric A. Tilles
Associate General Counsel
University of Pennsylvania and
    University of Pennsylvania Health System
Suite 300
133 South 36th Street
Philadelphia, PA  19104

(215) 746-5250 (office)
(215) 746-5232 (fax)


-----Original Message-----
From: Fraser, Brenda
Sent: Thursday, September 13, 2001 11:12 AM
To: Tilles, Eric A.; Bohner, Robert; Terrell, Robert R.
Subject: FW: Threat from a Penn Student


Bob and Eric,
    Does this name ring a bell. Supposedly, this former employee (believed
to be a former HUP employee) has filed an agency complaint over alleged
threats against him by unidentified person(s) in this "fantaseduction" chat
group.  OSC told him that it does not have the resources to handle and
directed him to the police.

Rob,
    Do you think that more should/could be done in terms of trying to
identify the sender of the alleged threat? (Note that posting host-greeknet
at Penn). Have you heard anything about this through ISC?

    -- Brenda --

-----Original Message-----
From: Michele Goldfarb [mailto:goldfarb@pobox.upenn.edu]
Sent: Wednesday, September 12, 2001 1:33 PM
To: brenda.fraser@upenn.edu
Subject: Fwd: Threat from a Penn Student


Brenda -- We received this today along with a very disturbed/disturbing
phone call from this individual who calls himself Gordon Ray Parker or Ray

Printed for Valerie Hayes <vhayes@pobox.upenn.edu>

UP 00083

**Exhibit C-2**
**Letter from Derek Trunk (2007)**
**(excerpted)**

Dear Ms. Parker:

I am writing you about your son, Gordon Roy Parker, and his activities on the Internet and in various courts in Pennsylvania and Delaware. Gordon first came to my attention in October of 1996, when he would have been 28 years old. At this point in time, Gordon was posting mostly in groups related to hypnosis under the nic 'WhizardRay' and calling himself Ray Gordon. Allow me to quote from the Usenet article that brought your son to my attention, originally posted by a third party

It was around this time that your son started filing numerous meritless lawsuits against several people and entities. The list of defendants in your sons lawsuits include, but are not limited to, The University of Pennsylvania, Ross Jeffries of California, Learn The Skills, and Thom Geiger of Mississippi. Most of these lawsuits have been dismissed because of filing errors made by your son. For example, _**the reverse gender discrimination lawsuit against UPenn was dismissed because Gordon never applied for a specific job**_, and the case against Learn The Skills was dismissed for lack of jurisdiction. The most noteworthy lawsuit that Gordon filed was a copyright infringement case that he brought against Google claiming damages in excess of ten billion dollars. This case was dismissed last year for failure to state a claim. Right now, Google is trying to claim eleven thousand dollars in damages against your son. While Google attempts to win that claim against your son, Gordon is busy trying to prosecute another lawsuit against Learn' The Skills, Ross Jeffries and Thom Geiger. This case is being prosecuted in Delaware. In the Delaware case, Gordon's pleadings consist of movie quotes and blatantly inaccurate information. As you can imagine, Gordon's case isn't going well. It is only a matter of time before Gordon is called to task over his recent behaviour in the judicial system.

_**You may want to examine what kind of liability you would encounter**_ should Google's motion for damages be approved, considering that you are his primary method of support. One thing is clear: Over the past decade, your son's condition has deteriorated. If you're still his primary means of support, you should consider what would become of him after you pass on. You should also consider weather or not your son is in need of psychiatric help, before the decision is made for you, most likely by law enforcement, as there is a possibility that your son will stop fantasizing about violence and actually try some of the things he writes about

So that brings us until now. You continue to use an unfounded leap of assumptions to justify bigoted comments against homosexuals, and ultimately that is your first amendment right. *However, if you proceed in bringing litigation against either Mr. McNeil or any entity he is associated with, despite this unequivocal notice and past notice that they have no connection whatsoever to the @ChessPlayPUA account, there will be sufficient evidence against you to support an abuse of process claim or sanctions motion and the scope of relief sought will be to permanently bar you from pursuing legal relief without a licensed member of the bar acting on your behalf (relief which courts have granted in the past in the face of serial litigants and relief which, I believe, would effectively ban you.)*

In the meantime, because you have demonstrated that you cannot withstand reasonable disagreement online without resorting to scorched earth tactics against completely unrelated persons, *I am deactivating the account and will be focusing my energies on <u>calling upon Twitter to take steps to ban you from the platform permanently</u>.* I suggest you focus on making positive contributions rather than abusive ones to the platform.

Sincerely,
ChessPlayPUA

Exhibit D
PCHR Complaint Deficiency Notice

| | |
|---|---|
| **PHILADELPHIA COMMISSION ON HUMAN RELATIONS** | PERSON FILING CHARGE (COMPLAINANT)<br><br>Gordon Roy Parker<br>315 South Broad Street #0106<br>Philadelphia Pa 19107 |
| AGAINST (RESPONDENT):<br><br>Teresa Lee et al | DATE OF INQUIRY: 9/1/2023<br><br>Certified Mail # 7022 0410 0001 9718 9971<br>Also sent via U.S Postal Service – first class mail |

**Date: January 10, 2024**

## COMPLAINT DEFICIENCY NOTICE

The Philadelphia Commission on Human Relations (PCHR) received your inquiry about a possible act of discrimination. Your claim of housing discrimination was reviewed by the PCHR. In order for the PCHR to investigate a complaint of discrimination, the complaint must meet certain requirements. **Based on the information the PCHR received, your complaint fails to meet the following requirement:**

☒ The discrimination alleged does not involve employment, public accommodations or housing and real property practice that is enforced by our law, the Philadelphia Fair Practices Ordinance.
The allegations do not meet the requirements for a discrimination claim because:
- You are not listed on the lease as the lessor or an occupant. The landlord has no obligation to provide you with a separate lease.
- You are not covered under the Fair Practices Ordinance definition of family status. Under the Fair Practices Ordinance § 9-1102, Definitions. (J) the definition of family status with respect to housing includes one or more individuals who have not attained the age of 21 being domiciled with: (.1) a parent or other person having legal custody of such individual or individuals; or (.2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

**Accordingly, the PCHR cannot accept your claim for investigation.**

If you have additional information (information that you have not already provided) which you believe may change PCHR's decision, please contact our office immediately. Please note that a complaint of discrimination must be *formalized* within 300 days of the acts you believe to be discriminatory. This means that a *formal* complaint must be signed within 300 days of the acts you believe to be discriminatory. If a formal complaint is not signed within 300 days, you may lose the right to file a complaint with the Commission or in court.

*Rosemary Branigan, PCHR, Intake Supervisor*                    (215) 686-4687

**(Commission Staff Member)**                                        **(Telephone Number)**

PHILADELPHIA COMMISSION ON HUMAN RELATIONS
601 WALNUT STREET, SUITE 300 SOUTH
PHILADELPHIA, PA 19106
(215) 686-4670

Rev 11/2012

**Exhibit C-3**
**Text of Threatening E-mail From AUSA Lindsey E. Middlecamp**
**(Original authenticated on AOL saved mail)**

-----Original Message-----
From: A Non <123nonanonymouse@gmail.com>
To: bettoroffsingle <bettoroffsingle@aol.com>
Sent: Sun, Nov 8, 2015 9:08 am
Subject: Your recent threats of lawsuit / ChessPlayPUA

Gordon,

I am writing because I cannot, in good conscience, allow your adamant mistaken belief of who is behind the @ChessPlayPUA account on Twitter to continue to the extent it risks annoyance or expense to innocent parties. Note that if you persist in targeting the wrong parties or actually pursue litigation against the innocent individuals after I have given you such express, unequivocal notice as contained in this email, I will attach this email and other supporting documentation to an abuse of process tort claim and/or sanctions motion to permanently bar you from filing frivolous suits without representation by an attorney, or to otherwise assist the innocent parties in recovering a judgment against you for intentionally and willfully proceeding against them despite express written notice that you have the wrong people.

***When I set up my @ChessPlayPUA account earlier this year, you had burned through several accounts, consistently targeting persons posting on #YesAllWomen and #StreetHarassment hashtags.*** Because of this history of yours, I went through those hashtags and followed people or organizations who were associated with anti-street harassment work or other feminist initiatives, occasionally retweeting to establish a timeline that reflected the account's purpose: supporting the issues you so adamantly disparage. I did <u>not</u> follow my own additional twitter account.

Fast forward to this fall, when you--based on no information whatsoever other than the fact that I used a modified picture of a man's face--decided a man "must" be behind the @ChessPlayPUA account. You started sending messages about how you "knew" who I am, "knew" that I'm gay, "knew" I work with a nonprofit, and referring to me as your "gay stalker." These seemed like such specific, inaccurate details that I became concerned about who you would target based on a mistaken belief. It was then that I looked at my list of who I follow, and realized that although I followed over a dozen men earlier that year in setting up the account, only one had an actual picture of his face, and his internet footprint indicated he is a gay man working with a street harassment nonprofit.  When you sent the @ChessPlayPUA account messages claiming you knew my initials and listed ones that matched his, my stomach sank for this individual, who I have never met.

So, I emailed him at the address listed on his account and sheepishly shared my theory that he was in your crosshairs based on no information whatsoever other than who I had opted to follow at the time my account was set up. He confirmed that in fact, someone had just that day called his employer, and I volunteered to speak with the employer by phone just to reassure them this account had nothing to do with him and was in fact run by a woman. When the separate nonprofit with which he works received contact from you I spoke with them as well to verify that, in fact. a woman administers the @ChessPlayPUA account and giving them my theory as to how you had drawn incorrect associations.

**Pennsylvania Association of Realtors®**

**SIDENTIAL LEASE**    **RL**
subject to use by the members of the Pennsylvania Association of Realtors® (PAR).

## PARTIES

| TENANT(S): Walter Parker | LANDLORD(S): Teresa Lee Revocable Trust |
|---|---|
| TENANT'S MAILING ADDRESS: | LANDLORD'S MAILING ADDRESS: 11418 Raedene Way, San Diego, CA  92131-6131 |

## PROPERTY

Property Address   1011 Cherry St 3FL

AKA 132 N 10TH St    Unit   3FL    ZIP    19107

in the municipality of    Philadelphia   , County of    Philadelphia

in the School District of    Philadelphia   , in the Commonwealth of Pennsylvania.

## TENANT'S RELATIONSHIP WITH PA LICENSED BROKER

☐ No Business Relationship (Tenant is not represented by a broker)

| Broker (Company) | Licensee(s) (Name) |
|---|---|
| Company License # | State License # |
| Company Address | Direct Phone(s) |
| | Cell Phone(s) |
| Company Phone | Fax |
| Company Fax | Email |
| Broker is: | Licensee(s) is: |
| ☐ Tenant Agent (Broker represents Tenant only) | ☐ Tenant Agent (all company licensees represent Tenant) |
| ☐ Dual Agent (See Dual and/or Designated Agent box below) | ☐ Tenant Agent with Designated Agency (only licensee(s) named above represent Tenant) |
| | ☐ Dual Agent (See Dual and/or Designated Agent box below) |

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Tenant)

## LANDLORD'S RELATIONSHIP WITH PA LICENSED BROKER

☐ No Business Relationship (Landlord is not represented by a broker)

| Broker (Company) | Licensee(s) (Name) |
|---|---|
| Company License # | State License # |
| Company Address | Direct Phone(s) |
| | Cell Phone(s) |
| Company Phone | Fax |
| Company Fax | Email |
| Broker is: | Licensee(s) is: |
| ☐ Landlord Agent (Broker represents Landlord only) | ☐ Landlord Agent (all company licensees represent Landlord) |
| ☐ Dual Agent (See Dual and/or Designated Agent box below) | ☐ Landlord Agent with Designated Agency (only licensee(s) named above represent Landlord) |
| | ☐ Dual Agent (See Dual and/or Designated Agent box below) |

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Landlord)

## DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Tenant and Landlord in the same transaction. A Licensee is a Dual Agent when a Licensee represents Tenant and Landlord in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Tenant and Landlord. If the same Licensee is designated for Tenant and Landlord, the Licensee is a Dual Agent.

By signing this Agreement, Tenant and Landlord each acknowledge having been previously informed of, and consented to, dual agency, if applicable.

Tenant initials: _____    **RL Page 1 of 7**    Landlord Initials: _____

THIS FORM SHOULD NOT BE USED FOR THE LEASE OF A MANUFACTURED HOME

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2017
rev. 9/17; rel. 1/18

Canaan Realty Investment Group, 4300 Frankford Avenue Philadelphia PA 19135    Phone: 2155331826    Fax:    1011 Cherry St

Canaan Realty Investment Group    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

1. **LEASE DATE AND RESPONSIBILITIES**
This Lease for the Property, dated     December 11, 2022    , is between the Landlord and Tenant. Each Tenant is individually responsible for all of the obligations of this Lease, including Rent, fees, damages and other costs.

2. **CO-SIGNERS**
Co-signers:

Each Co-signer is individually responsible for all obligations of this Lease, including Rent, late fees, damages and other costs. Co-signers do not have the right to occupy the Property as a tenant without the Landlord's prior written permission.

3. **PROPERTY CONTACT INFORMATION**
Rental Payments (see Paragraph 7(B) for additional information)
Payable to: Teresa Lee Revocable Trust      Phone: (858)722-0283
Address: 11418 Raedene Way, San Diego, CA 92131
**Maintenance Requests**
Contact: Jeffrey Mai      Phone: (267)226-6082
Address: 6509 Frankford Ave, Philadelphia, PA 19135
Email: elfmai9910@gmail.com      Website:
**Emergency Maintenance Contact**
Contact: Jeffrey Mai      Phone: (267)226-6082
Email: elfmai9910@gmail.com      Website:

4. **STARTING AND ENDING DATES OF LEASE (also called "Term")**
(A) Starting Date:      January 1, 2023     , at    12:00    [X] a.m. [ ] p.m.
(B) Ending Date:      December 31, 2023     , at    11:59    a.m. [X] p.m.
(C) Tenant is required to vacate the Property on the Ending Date unless the parties have entered into a Renewal Term as described in Paragraph 5.

5. **RENEWAL TERM**
Unless checked below, this Lease will AUTOMATICALLY RENEW for a Renewal Term of      (month-to-month)
if not specified) at the Ending Date of this Lease or at the end of any Renewal Term unless proper notice is given. Proper notice requires Tenant or Landlord to give at least      days (30 if not specified) written notice before Ending Date or before the end of any Renewal Term. Any renewal will be according to the terms of this Lease or any written changes to it.
[X] This Lease will TERMINATE on the Ending Date unless extended in writing.

6. **SECURITY DEPOSIT**
(A) The Security Deposit will be held in escrow by Landlord, unless otherwise stated here
at (financial institution): Citizens Bank
Financial institution Address: 1027 Arch Street, Philadelphia PA 19107
(B) When Tenant moves from the Property, Tenant will return all keys and give Landlord written notice of Tenant's new mailing address where Landlord can return the Security Deposit. If Tenant fails to do this, Landlord will not have to provide the list of damages and the remaining security deposit to Tenant as stated in subparagraph (C), below and in the Pennsylvania Landlord and Tenant Act.
(C) Within 30 Days after Tenant moves from the Property, Landlord will give Tenant a written list of any damage to the Property for which the Landlord claims Tenant is responsible. Any remaining Security Deposit will be returned to Tenant within 30 days after Tenant moves from the Property. **TENANT IS ADVISED THAT FAILURE TO PROVIDE LANDLORD WITH A FORWARDING ADDRESS MAY CAUSE TENANT TO LOSE SOME RIGHTS.**
(D) Landlord may deduct repair costs and any unpaid Rent and Additional Rent from Tenant's Security Deposit. Tenant may be responsible for any unpaid expenses remaining after Landlord deducts costs from the security deposit.

7. **RENT**
(A) Rent is due in advance, without demand, on or before the    1st    day of each month (Due Date).
(B) The amount of Total Rent due during the Term is: $ 26,400.00
(C) The Rent due each month is: $ 2,200.00
(D) If Rent is more than   5   days (5 if not specified) late (Grace Period), Tenant pays a Late Charge of: $ 50.00
(E) All other payments due from Tenant to Landlord, including Late Charges or utility charges, are considered to be Additional Rent. Failure to pay this Additional Rent is a breach of the Lease in the same way as failing to pay the regular Rent.
(F) Tenant agrees that all payments will be applied against outstanding Additional Rent that is due before they will be applied against the current Rent due. When there is no outstanding Additional Rent, prepayment will be applied to the month's Rent that would be due next.
(G) Tenant will pay a fee of $ 50.00      for any payment that is returned or declined by any financial institution for any reason. If payment is returned or declined, the Grace Period does not apply and the Late Charges will be calculated from the Due Date. Any Late Charges will continue to apply until a valid payment is received.

Tenant initials:_____ / _____      RL Page 2 of 7      Landlord Initials:_____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com      1811 Cherry St

ii

58  (H) Landlord will accept the following methods of payment   ( X Cash)   ( X Money Order)   ( X Personal Check)
59      ( Credit Cards) _____ ( X Cashier's Check)   ( Other: _____)
60      Landlord can change the acceptable methods of payment if a method fails (check bounces, credit card is declined, etc.).
61  (I) The first $ _____ of Rent due will be made payable to _____ (Broker
62      for Landlord, if not specified). The Security Deposit will be made payable to Landlord, or Landlord's representative.
63  (J) The Security Deposit may not be used to pay Rent during the Term or Renewal Term of this Lease.
64  **8. PAYMENT SCHEDULE**

| | | Due Date | Paid | Due |
|---|---|---|---|---|
| 65 | | | | |
| 66 | (A) Security Deposit $2200 | at signing | $   1,000.00 | $   1,200.00 |
| 67 | (B) First month's Rent $2200 | at signing | $ | $   2,200.00 |
| 68 | (C) Other: The Last Month $2200 | at signing | $   1,000.00 | $   1,200.00 |
| 69 | (D) Other: | | $ | $ |
| 70 | (E) Other: | | $ | $ |
| 71 | Total Rent and security deposit received to date: | | $   2,000.00 | $ |
| 72 | Total amount due | | | $   4,600.00 |

73  **9. USE OF PROPERTY AND AUTHORIZED OCCUPANTS**
74  (A) Tenant will use the Property as a residence ONLY.
75  (B) Not more than _____ 1 _____ people will live at the Property. List all other occupants who are not listed as Tenants in this Lease.
76      Name _____ ☐ 18 or older   Name _____ ☐ 18 or older
77      Name _____ ☐ 18 or older   Name _____ ☐ 18 or older
78      Guide or support animals: Type _____ Breed _____ Name _____
79      ☐ Additional information is attached
80  **10. POSSESSION**
81  (A) Tenant may move in (take possession of the Property) on the Starting Date of this Lease.
82  (B) If Tenant cannot move in within ___ 1st ___ days (0 if not specified) after Starting Date because the previous tenant is still there or be-
83      cause of property damage which makes the Property unsafe, unsanitary, or unfit for human habitation, Tenant's exclusive rights are
84      to:
85      1.   Change the Starting Date of the Lease to the day when Property is available. Tenant will not owe or be charged Rent until
86           the Property is available; OR
87      2.   End the Lease and have all money already paid as Rent, Additional Rent or Security Deposit returned, with no further liability
88           on the part of Landlord or Tenant.
89  **11. LANDLORD'S RIGHT TO ENTER**
90  (A) Tenant agrees that Landlord or Landlord's representatives may enter the Property at reasonable hours to inspect, repair, or show the
91      Property. Tenant does not have to allow possible tenants or other licensees to enter unless they are with Landlord or Landlord's rep-
92      resentative, or they have written permission from the Landlord.
93  (B) When possible, Landlord will give Tenant ___ 12 ___ hours (24 if not specified) notice of the date, time, and reason for the visit.
94  (C) In emergencies, Landlord may enter the Property without notice. If Tenant is not present, Landlord will notify Tenant who was there
95      and why within ___ 2 ___ hours (24 if not specified) of the visit. Showing the property is not considered an emergency.
96  (D) Landlord may put up For Sale or For Rent signs, use lock boxes, and take pictures and video on, in, or near the Property.
97  **12. RULES AND REGULATIONS**
98  (A)   ☐ Rules and Regulations for use of the Property and common areas are attached.
99        ☐ Homeowners Association or Condominium rules and regulations for the Property are attached.
100 (B) Any violation of the Rules and Regulations is a breach of this Lease.
101 (C) Landlord may create or modify the Rules and Regulations if the change benefits the Tenant, is intended to protect the condition or
102     value of the Property, or improves the health, safety, or welfare of others. Landlord agrees to provide all changes to Tenant in writing.
103 (D) Tenant is responsible for Tenant's family and guests obeying the Rules and Regulations and all laws.
104 (E) If any fine is imposed on Landlord by the municipality or any other governing body because of the actions of Tenant, or Tenant's
105     family or guests, Tenant will reimburse Landlord or pay the fine. Any unpaid fines will be considered Additional Rent.
106 **13. PETS**
107     Tenant will not keep or allow any pets on any part of the Property, unless checked below. Guide and support animals are not pets.
108     ☐ Tenant may keep pets with Landlord's written permission according to the terms of the attached Pet Addendum and/or Rules and
109     Regulations
110 **14. CONDITION OF PROPERTY AT MOVE IN**
111     Tenant has inspected the Property and agrees to accept the Property "as-is," except for the following: _____
112     _____
113     _____

114  Tenant Initials: _____ / _____        RL Page 3 of 7        Landlord Initials: _____ / _____

15. **APPLIANCES INCLUDED**
( X Range Oven)    ( Cooktop)    ( X Refrigerator)    ( Dishwasher)    ( Washer)    ( Dryer)    ( Garbage Disposal)
( Microwave)    ( Air Conditioning Units -Number:            )    ( Other                                    )
Landlord is responsible for repairs to appliances listed above unless otherwise stated here:

16. **UTILITIES AND SERVICES**
Landlord and Tenant agree to be responsible for the following utilities and services provided for the Property as marked below, including connection and payment of fees and charges. If a service is not marked as being the responsibility of Landlord, it is the responsibility of Tenant to pay for that service. Landlord is not responsible for loss of service if interrupted by circumstances beyond Landlord's control. Tenant will notify Landlord if Tenant receives any notices from utility companies of a pending termination of service.

| Landlord | Tenant |                                      | Landlord | Tenant |                                      |
|----------|--------|--------------------------------------|----------|--------|--------------------------------------|
|          | X      | Cooking Gas/Fuel                     |          | X      | Air Conditioning                     |
|          | X      | Electricity                          |          | X      | Air Conditioning Maintenance         |
|          | X      | Cable/Satellite Television           |          | X      | Heat                          (type) |
|          |        | Condominium Homeowners Association Fee |        | X      | Hot Water                     (type) |
|          |        | Parking Fee                          | X        |        | Cold Water                           |
|          |        | Maintenance of Common Areas          |          | X      | Pest/Rodent Control                  |
|          | X      | Trash Removal                        |          | X      | Bed Bugs Remediation                 |
|          | X      | Recycling Removal                    | X        |        | Snow/Ice Removal                     |
| X        |        | Sewage Fees                          |          | X      | Telephone Service                    |
| X        |        | Sewer Maintenance                    |          |        | Lawn and Shrubbery Care              |
| X        |        | Heater Maintenance                   |          | X      | Any city violation tickets           |
|          |        |                                      |          | X      | Any Rubbish / trash citations        |

Comments: Gas and Electric will be change to tenant's name at the time of move-in date.

17. **TENANT'S CARE OF PROPERTY**
(A) Tenant will:
   1.  Keep the Property clean and safe.
   2.  Dispose of all trash, garbage and any other waste materials as required by Landlord and the law.
   3.  Use care when using any of the electrical, plumbing, heating, ventilation or other facilities or appliances on the Property, including any elevators.
   4.  Notify Landlord immediately of any repairs needed and of any potentially harmful health or environmental conditions.
   5.  Obey all federal, state, and local laws that relate to the Property.
   6.  Clean up after pets and guide and support animals on the Property, including common areas.
(B) Tenant will not:
   1.  Keep any flammable, hazardous or explosive materials on the Property, with the exception of common household goods intended for lawful use.
   2.  Destroy, damage or deface any part of the Property or common areas.
   3.  Disturb the peace and quiet of other tenants or neighbors.
   4.  Cancel or close utility accounts paid by Tenant during the term of the Lease, without the written permission of Landlord.
   5.  Make changes to the Property, such as painting or remodeling, without the written permission of Landlord. Tenant agrees that any changes or improvements made will belong to Landlord.
   6.  Perform any maintenance or repairs on the Property unless otherwise stated in the Rules and Regulations, if any.
(C) Tenant will have breached this Lease and will be responsible for damages if Tenant does not comply with any requirements listed in (A) or (B), above.
(D) Tenant is responsible to pay the costs for repairing any damage that is the fault of Tenant, Tenant's family, guests, and/or guide and support animals.

18. **DETECTORS AND FIRE PROTECTION SYSTEMS**
(A) Landlord has installed ( Smoke Detectors) ( Carbon Monoxide Detectors) ( fire extinguishers) in the Property. Tenant will maintain and regularly test detectors to be sure they are in working order, and will replace detector batteries as needed.
(B) Tenant will immediately notify Landlord, maintenance or emergency contact (See Paragraph 3) of any broken or malfunctioning detectors.
(C) Failure to properly maintain detectors, replace detector batteries or notify Landlord, maintenance or emergency contact (See Paragraph 3) of any broke normal functioning detectors is a breach of this Lease.
(D) Landlord may provide additional fire protection systems for the benefit of Tenant. Responsibility for maintaining these systems is stated in the Rules and Regulations, if any.
(E) Tenant will pay for damage to the Property if Tenant fails to maintain or misuses detectors or other fire protection systems.

Tenant initials: _____              **RL Page 4 of 7**              Landlord Initials: _____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com     HH Cherry St

**19. DESTRUCTION OF PROPERTY**

(A) Tenant will notify Landlord, maintenance or emergency contact (See Paragraph 3) immediately if the Property is severely damaged or destroyed by fire or by any other cause. Tenant will immediately notify Landlord, maintenance or emergency contact (See Paragraph 3) of any condition in the Property that could severely damage or destroy the Property.

(B) If Tenant, their family or guests cause damage by fire or by other means, this Lease will remain in effect and Tenant will continue to pay rent, even if Tenant cannot occupy the Property.

(C) If the Property is severely damaged or destroyed for any reason that is not the fault of Tenant:

1. Tenant may continue to live on the livable part of the Property and pay a reduced rent as agreed to by Tenant and Landlord until the damage is repaired, OR

2. If the law does not allow Tenant to live on the Property, this Lease is ended.

**20. INSURANCE AND RELEASE**

(A) Tenant understands that Landlord's insurance does not cover Tenant, Tenant's personal property, or Tenant's guests. Tenant is advised to obtain personal property and liability insurance to protect Tenant, Tenant's personal property, and Tenant's guests who may be injured while on the Property.

X  **IF CHECKED**, Tenant must have insurance policies providing at least $ 150,000.00 _____ personal property insurance and $ 350,000.00 _____ liability insurance to protect Tenant, Tenant's personal property and Tenant's guests who may be injured while on the Property. Tenant must maintain this insurance through the entire Term and any Renewal Term. Tenant will provide proof of insurance upon request. Tenant will notify Landlord within 10 days of changes to or cancellation of these policies.

(B) Landlord is not legally responsible for any injury or damage to Tenant, Tenant's family, or Tenant's guests that occurs on the Property.

(C) Tenant is responsible for any loss to Landlord caused by Tenant, Tenant's family or Tenant's guests, including reasonable attorney's fees associated with that loss, if awarded by a court.

**21. HOLDOVER TENANTS**

If Tenant occupies the Property after the Ending Date or end of any Renewal Term, Tenant will be considered a holdover tenant and will be causing Landlord financial harm ("damages"). These damages will be equal to the monthly Rent plus 10 %, prorated on a daily basis, plus any additional financial costs, including but not limited to eviction costs and reasonable attorney's fees that may be awarded by a court, incurred as a result of the tenant holding over. These damages are separate from and in addition to Landlord's right to seek reimbursement for any physical destruction to the Property caused by Tenant, Tenant's family, or Tenant's guests.

**22. TENANT ENDING LEASE EARLY**

Tenant may **not** end this Lease before the Ending Date of the Lease or any Renewal Term unless otherwise agreed to by the parties in writing.

**23. ABANDONMENT OF PERSONAL PROPERTY**

(A) When the Term, or any Renewal Term, ends, Tenant must remove all of Tenant's personal property from the Property. Any of Tenant's remaining personal property may be considered abandoned if any of the following apply:

1. Tenant has vacated the Property after termination of the Lease;

2. An eviction order or order for possession has been entered in favor of Landlord, and Tenant has vacated the Property and removed almost all of Tenant's personal property;

3. An eviction order or order for possession has been entered in favor of Landlord;

4. Tenant has vacated the Property, removed almost all of Tenant's personal property and provided Landlord with written notice of a forwarding address; OR

5. Tenant has vacated the Property without showing an intent to return. Rent is more than 15 days past due and Landlord has posted notice regarding Tenant's rights to Tenant's personal property.

(B) Before Landlord may remove or dispose of Tenant's personal property, Landlord must provide written notice to Tenant. Tenant will have ten days from the date the notice was post marked to:

1. Retrieve Tenant's personal property, OR

2. Request that Tenant's personal property be stored for up to 30 days. If Tenant requests that Tenant's personal property be stored by Landlord, Tenant understands and agrees that storage will be provided at a location chosen by Landlord, and that Tenant will be responsible for storage costs.

(C) If Tenant dies and leaves personal property in the Property, then this paragraph does not apply. See Paragraph 28, below.

**24. LANDLORD REMEDIES IF TENANT BREACHES LEASE**

(A) If Tenant breaches Lease for any reason, Landlord's remedies may include any or all of the following:

1. Taking possession of the Property by going to court to evict Tenant.

2. Filing a lawsuit against Tenant for Rent, damages and Additional Rent, and for Rent and Additional Rent for the rest of the Term or any Renewal Period. If Landlord wins (gets a money judgment against Tenant), Landlord may use the court process to garnish Tenant's wages and take Tenant's personal assets, such as goods, furniture, motor vehicles and money in bank accounts.

3. Keeping Tenant's Security Deposit to be applied against unpaid Rent or damages, or both.

4. Tenant paying for Landlord's reasonable attorney's fees and costs, if awarded by a court.

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   1411 Cherry St

v

234   (B)  **IF TENANT BREACHES THIS LEASE FOR ANY REASON, TENANT UNDERSTANDS AND AGREES THAT TENANT**
235       **HAS WAIVED OR GIVEN UP TENANT'S RIGHT TO A NOTICE TO MOVE OUT UNLESS A DIFFERENT PERIOD**
236       **FOR PROVIDING NOTICE IS REQUIRED BY LOCAL ORDINANCE OR IS STATED HERE:**
237
238

239 **25.  TRANSFER AND SUBLEASING**
240   (A)  Landlord may transfer this Lease to another landlord. Tenant agrees that this Lease and any written changes to it remains the same
241       with the new Landlord.
242   (B)  Tenant may not transfer this Lease or sublease (rent to another person) the Property or any part of the Property without Landlord's
243       written permission.

244 **26.  SALE OF PROPERTY**
245   (A)  If Property is sold, Landlord will give Tenant in writing:
246       1.   Notice that the Security Deposit and/or prepaid Rent has been transferred to the new landlord.
247       2.   The name, address and phone number of the new landlord and where Rent is to be paid, if known.
248   (B)  Tenant agrees that Landlord may transfer Tenant's Security Deposit and advanced Rent to the new landlord.
249   (C)  Landlord's responsibilities to Tenant under this Lease end after the Property has been sold and the Lease transferred to a new landlord.

250 **27.  IF GOVERNMENT TAKES PROPERTY**
251   (A)  The government or other public authority can take private property for public use. The taking is called condemnation.
252   (B)  If any part of the Property is taken by the government, Landlord will reduce Tenant's Rent proportionately. If all the Property is
253       taken or is no longer usable, this Lease will end. Tenant will move out and Landlord will return to Tenant any unused Security
254       Deposit or prepaid Rent.
255   (C)  No money paid to Landlord for the condemnation of the Property will belong to Tenant.

256 **28.  DEATH OF TENANT DURING LEASE TERM**
257   (A)  If Tenant dies during the Term, or any Renewal Term, of this Lease and Tenant's personal property remains in the Property, the
258       personal property will not be considered abandoned as defined in the Landlord and Tenant Act. When a tenant dies and leaves behind
259       personal property, the treatment of that personal property is governed by Title 20 of the Pennsylvania Consolidated Statutes relating
260       to decedents, estates and fiduciaries.
261   (B)  If Tenant dies during the Term, or any Renewal Term, of this Lease and Tenant is the sole tenant of the Property, Tenant's repre-
262       sentative may terminate this Lease upon 14 days written notice to Landlord. When Tenant's representative terminates this Lease
263       pursuant to this Paragraph, the date of termination will be the last day of the second calendar month that follows the calendar month
264       in which Tenant died or upon surrender of the rental unit and removal of all of Tenant's personal property, whichever occurs later.
265   (C)  Tenant's estate will be required to pay Rent, Additional Rent and any other sums due to Landlord, including expenses that Landlord
266       may incur as a direct result of Tenant's death. Tenant's estate is not required to pay any penalty, and is not liable for any damages,
267       to Landlord for breach of contract or early termination of the Lease.

268 **29.  TENANTS' RIGHTS**
269   (A)  Landlord cannot increase rents, decrease services, or threaten to go to court to evict Tenant because Tenant: (1) complains to a
270       government agency or to Landlord about a building or housing code violation; (2) organizes or joins a tenant's organization; or (3)
271       uses Tenant's legal rights in a lawful manner.
272   (B)  Landlord or property owner may have a mortgage on the Property. The rights of the mortgage lender come before the rights of the
273       Tenant. For example, if Landlord fails to make mortgage payments, the mortgage lender could take the Property and end this Lease.
274       Landlord will notify Tenant immediately if the property owner or Landlord receive a notice of foreclosure.
275   **TENANT MAY BE WAIVING OR GIVING UP TENANT'S RIGHTS. TENANT UNDERSTANDS THAT IF THERE IS A**
276   **FORECLOSURE, THE NEW OWNER MAY HAVE THE RIGHT TO END THIS LEASE.**

277 **30.  LEAD-BASED PAINT HAZARD DISCLOSURES FOR PROPERTY BUILT BEFORE 1978**
278   ☐  Property was built in or after 1978. No Lead-Based Paint Hazards Disclosure is required.
279   ☒  Property was built before 1978. **Before signing this Lease, Tenant must receive a separate Lead-Based Paint Hazards Dis-**
280       **closure** disclosing the presence of lead-based paint and lead-based paint hazards on the Property, such as PAR form LPDR, and a
281       federally approved pamphlet on lead poisoning prevention.

282 **31.  PENNSYLVANIA PLAIN LANGUAGE CONSUMER CONTRACT ACT**
283   The Office of Attorney General has not pre-approved any special conditions or additional terms added by any parties. Any special con-
284   ditions or additional terms must comply with the Pennsylvania Plain Language Consumer Contract Act.

285 **32.  CAPTIONS**
286   The headings in this Lease are meant only to make it easier to find the paragraphs.

287 **33.  ENTIRE AGREEMENT**
288   This Lease is the entire agreement between Landlord and Tenant. No spoken or written agreements made before signing this Lease are
289   a part of this Lease unless they are included in this Lease in writing. No waivers or modifications of this Lease during the Term of this

290   Tenant initials: _____ / _____       **RL Page 6 of 7**       Landlord initials: _____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   1811 Cherry St

291  Lease are valid unless in writing signed by both Landlord and Tenant, including modifications made to the Rules and Regulations under
292  Paragraph 12.
293  34.  **SPECIAL CLAUSES**
294  (A)  The following are part of this Lease if checked:
295       Change of Lease Terms Addendum (PAR Form CLT)
296  ☐    Pet Addendum (PAR Form PET)
297       Residential Lead-Based Paint Hazards Disclosure Form for rentals (PAR form LPDR)
298  X    Tenant has to show the gas and electric bill w/ no balance to get security deposit back.
299  X    Tenant has to pay all violation incurred during time of tenancy.
300  (B)  Additional Terms: No Pets Allowed.
301       1) Keep house clean; 2) Tenant is required to use reasonable effort to maintain a clean condition for sinks, toilets and tubs all
302       the time. If the damage is caused by tenant's neglect, like hairs, toilet paper, plastic products, tenant is responsible to pay for
303       repairs 3) If anything inside the house is damaged by tenants' misuse, tenants will be responsible for fixing it; 4) Maintain
304       normal room temperature to prevent the frozen pipe.
305
306       The landlord will hire and pay for a cleaning service to come to the apartment every 2 or 3 weeks and the tenant agrees to
307       provide access as needed and work with the cleaning service to keep apartment clean and neat.
308
309
310
311
312
313
314  NOTICE BEFORE SIGNING: If Tenant or Landlord has legal questions, Tenant or Landlord is advised to consult an attorney.
315  If a real estate licensee is involved in the transaction on behalf of either party, by signing below, Landlord and Tenant acknowl-
316  edge receipt of the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336 and/or §35.337.

317  By signing below, Landlord and Tenant acknowledge that they have read and understand the notices and explanatory information set
318  forth in this Lease.

319  A property manager may be acting as an agent for Landlord and may execute this Lease on the Landlord's behalf.

320  TENANT Walter Parker _____ DATE _____
321  TENANT _____ DATE _____
322  TENANT _____ DATE _____
323  CO-SIGNER _____ DATE _____
324  CO-SIGNER _____ DATE _____
325  CO-SIGNER _____ DATE _____
326  LANDLORD Teresa Lee Revocable Trust _____ DATE _____
327  LANDLORD _____ DATE _____
328      EXECUTED ON BEHALF OF LANDLORD BY AUTHORIZED BROKER/ASSOCIATE BROKER
329                                                                        DATE _____

330                     LANDLORD TRANSFERS LEASE TO A NEW LANDLORD

331  As part of payment received by Landlord, _____ (current Landlord) now transfers to
332  _____ (new landlord) his heirs and estate, this Lease and the right to receive the Rents and
333  other benefits.

334  **CURRENT LANDLORD** _____ **DATE** _____
335  **CURRENT LANDLORD** _____ **DATE** _____
336  **NEW LANDLORD** _____ **DATE** _____
337  **NEW LANDLORD** _____ **DATE** _____

**RL Page 7 of 7**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com         1411 Cherry St

Exhibit F
Rent Check payable to Ron Lee (February 2021) and e-mail changing payee

| BANK OF AMERICA | Cashier's Check | No. 1597820544 |
|---|---|---|

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement This check should be negotiated within 90 days

Void After 90 Days   30-1/1140 NTX   Date 02/04/21 10:16:58 AM

10TH AND CHESTNUT
0001     0010068     0015

Pay        BANK OF AMERICA   ONE ZERO ZERO ZERO ZERO CTSCTS

**$1,000.00**

**One Thousand and 00/100 Dollars**

To The Order Of   RONALD LEE

Remitter (Purchased By):  MR WALTER G PARKER

Bank of America, N.A.
SAN ANTONIO, TX

AUTHORIZED SIGNATURE

⑆1597820544⑆ ⑈114000019⑈ 0016410066634⑈

E ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. ■   HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENTS

2/28/24, 8:18 PM                    AOL Mail - Re: Scan of February 2021 Rent Check.

Re: Scan of February 2021 Rent Check.

From:  Jeffrey Mai (jeffmai9910@gmail.com)

To:    waltradio2003@aol.com

Cc:    rmlee168@gmail.com

Date:  Thursday, February 4, 2021 at 01:21 PM EST

Hi Walt,

Thank you.  In the future, please make the check payable to "Teresa Lee Revocable Trust" as I mentioned in the email I sent to you last month.

Jeff

On Thu, Feb 4, 2021 at 10:21 AM <waltradio2003@aol.com> wrote:

Ron and Jeff:

Please find attached a scan of my rent check for February.  It is once again s Cashier's check.

Walt

Shared via the AOL App