## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GORDON ROY PARKER, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 23-3999 |
| RONALD LEE, et al., | |
| *Defendants.* | |

Pappert, J.                                                                    June 10, 2024

### MEMORANDUM

Gordon Roy Parker sued Ronald and Teresa Lee, the Teresa Lee Revocable Trust, Jeffrey Mai, Canaan Realty Investment Group and Kenneth L. Baritz, alleging violations of the Fair Housing Act and Fair Debt Collection Practices Act.  He also claims breach of contract and seeks declaratory relief.  Defendants separately moved to dismiss Parker's claims.  The Court grants the motions, but Parker may amend his complaint if he can cure its deficiencies.

### I

Parker lives with his brother, Walt, in an apartment located at 1011 Cherry Street in Philadelphia.  (Sec. Am. Compl., ¶¶ 1, 16, 28, ECF No. 23.)  But Parker is not a party to the lease.  Only Walt is.  *See* (*id.* ¶¶ 11, 18-20, 23, 25-27, 30.)  Parker believes Ronald and Teresa Lee own the building rather than the Teresa Lee Revocable Trust, but he includes the Trust as a defendant as well.  (*Id.* ¶¶ 2, 30.)  Defendants Jeffrey Mai and Canaan Realty Investment Group "are property managers for the building, responsible for renting apartments and its [sic] day-to-day operations."  (*Id.* ¶ 3.)

1

Defendant Kenneth Baritz is an attorney "the other defendants" retained "to evict [Parker] by evicting [Walt]."  (*Id.* ¶ 4.)

Walt has lived in the Cherry Street building since 2016.  (*Id.* ¶ 11.)   Parker alleges Walt initially lived in the building's basement, which was not licensed as an apartment.  (*Id.* ¶¶ 11-12.)  The basement was plagued by sanitation issues, including a rodent infestation and flooding, and was allegedly condemned in late 2021.  (*Id.* ¶¶ 12-15.)  Parker moved into the basement with Walt in 2018, acting as an "indefinite occupant/caregiver."  (*Id.* ¶ 11.)  He alleges he paid half of the rent and utility bills and "sometimes more."  (*Id.*)  When COVID-19 lockdowns took effect, Parker was "trapped" in the basement and "involuntarily established occupancy" there.  (*Id.*)

After the basement was condemned, Parker and Walt moved into Apartment 3F, in the same building.  (*Id.* ¶¶ 15-16.)  Apartment 3F allegedly has no heat, faulty plumbing, and is "unfinished and not up to code."  (*Id.* ¶ 16.)  Because the building does not have a garbage dumpster, Parker alleges trash has "pil[ed] up" in the apartment. (*Id.*)

In February 2022, Ronald Lee's wife, Joanna, emailed Walt a notice to vacate. (*Id.* ¶ 18.)  This notice was apparently "just a lease nonrenewal," and required Walt to move out of the apartment by the end of June 2022 to avoid being sued for eviction. (*Id.*)  The notice did not name Parker.  (*Id.*)  After receiving the notice, Walt and Parker spoke with Joanna Lee on the phone.  (*Id.* ¶ 19.)  At this point, Parker "made Mrs. Lee aware of his presence and role as Walt's caregiver," because "the [n]otice required him to step forward, as Walt's advocate."  (*Id.*)  Parker believes he was the true target of the notice and that the defendants are targeting him through Walt.  (*Id.* ¶¶ 10, 20.)

In response to the notice to vacate, Walt filed a complaint with the Philadelphia Commission on Human Relations.  (*Id.* ¶ 24.)  In late December 2022, while the PCHR complaint was still pending, Mai called Walt and offered him a lease renewal agreement.  (*Id.* ¶ 25.)  Parker alleges this offer included a higher monthly rent than Apartment 4F was listed for at the same time.  (*Id.*)  This apartment was "vastly superior" to 3F, since it was in better condition and contained additional space.  (*Id.*)  At the time, Apartment 4F was being rented by "younger, nonwhite female tenants." (*Id.*)  Parker and Walt are apparently white.  Even though multiple tenants lived there, the renewal offer was limited only to Walt.  (*Id.*)  Parker believes the renewal offer "excluded [him] . . . in an attempt to evict him by making his occupancy a breach of the new lease."  (*Id.*)  Walt does not appear to have signed the renewed lease.

In February 2023, the PCHR held a hearing and "ordered the landlord not to collect rent or seek eviction due to code violations."  (*Id.* ¶ 24.)  But in August 2023, the Lees retained Baritz, who sent Walt a second notice to vacate.  (*Id.* ¶ 26.)  This notice also only named Walt, and not Parker.  (*Id.*)  It mentioned "damages" and "unpaid rent" totaled $20,300.  (*Id.*)  Because this notice violated the PCHR's order, it was "rejected by the Eviction Diversion Program."  (*Id.*)  Parker then filed his own complaint with the PCHR.  (*Id* ¶ 27.)  The Commission refused to accept this complaint because Parker "was neither a tenant nor occupant[] and did not have a lease."  (*Id.*)

In October 2023, the PCHR order prohibiting eviction and rent collection was overturned on appeal.  (*Id.* ¶ 24.)  Since then, however, the Lees have not attempted to evict Parker or Walt or collect any rent from them.  (*Id.* ¶ 28.)

Parker contends all defendants unlawfully retaliated against him in violation of the FHA (Count I).  He alleges all defendants other than Baritz violated the FHA by discriminating against him based on sex (styled as gender) (Count II), race (Count III) and age (Count IV). He further alleges Baritz violated the FDCPA by using the second notice to vacate to collect debt (Count V).  He brings a breach of contract claim against the Lees and the Trust (Count VI) and seeks various forms of declaratory relief against "all relevant defendants." (Count VII).  The Lees, the Trust and Baritz ("Lee Defendants") moved to dismiss (ECF No. 24), as did Canaan and Mai (ECF No. 25.)

## II

To avoid dismissal for failure to state a claim under Rule 12(b)(6), a complaint must contain facts sufficient to state a claim that is facially "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the facts pleaded permit a court to make the reasonable inference that the defendant is liable for the alleged misconduct.  *Id.* The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Id.* at 678-79 (quoting *Twombly*, 550 U.S. at 570).

Determining plausibility is a "context-specific task" requiring a court to use its "judicial experience and common sense."  *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (quotations omitted).  In making this determination, the court assumes well-pleaded facts are true, construes those facts in the light most favorable to the plaintiff, and draws reasonable inferences from them.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016).   "Conclusory assertions of fact and legal

4

conclusions," however, are not entitled to the presumption of truth. *Schuchardt*, 839 F.3d at 347. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. And "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Because Parker is proceeding *pro se*, the Court construes his claims liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021). However, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013)).

III

A

The Lee Defendants contend Parker lacks standing to bring his FHA and FDCPA claims. (Lee Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 24-1, at 6.)[1] They seem to contend Parker does not have standing to sue under the FHA because he was not named on the lease and because the notice to vacate was directed to Walt, not him. (*Id.* at 3-5.) For similar reasons, they also believe he lacks standing to sue under the FDCPA. (*Id.* at 4-6.) In essence, they argue Parker cannot sue under either statute because they do not permit a plaintiff in his position to do so.

These are challenges to Parker's statutory rather than Article III standing. "Unlike Article III standing, statutory standing is not jurisdictional." *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320, 323-24 (3d Cir. 2015). "Statutory standing goes to

---

[1]     Defendants Canaan and Mai do not challenge Parker's "standing" of any type. *See* (Canaan Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 25.) Page numbers in citations to the parties' briefing are those assigned by ECF unless otherwise specified.

whether Congress has accorded a particular plaintiff the right to sue under a statute, but it does not limit the power of the court to adjudicate the case." *Id.*; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128-29 & n.4 (2014); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 n.1 (explaining that the question of whether appellants' alleged harm fell within a statute's "zone of interests" is "a question of statutory standing" properly assessed under Rule 12(b)(6) rather than Rule 12(b)(1)).[2]

Because "a dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim," the Court considers Parker's FHA and FDCPA claims on the merits. *See Leyse*, 804 F.3d at 320 (quoting *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73-74 (3d Cir. 2011); *see also Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 83-84 & n.25 (D.N.J. 2023).[3]

---

[2]    While "statutory standing" is therefore a "misleading" term, *see Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 270 (3d Cir. 2016), the Court uses it consistent with the defendants' characterization and because several cases quoted *infra* frame similar issues in terms of statutory "standing."

[3]    Whether a particular plaintiff can invoke the FHA's protections is a question of statutory rather than Article III standing. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196-98 (2017) (explaining that "the question is whether the [FHA] grants the particular plaintiff the cause of action he asserts" and concluding the plaintiff's injuries "f[e]ll within the zone of interests the FHA protects").
         Courts also treat the question of whether non-debtors can sue under the FDCPA as one of statutory rather than Article III standing. *See Magdy v. I.C. Sys.*, 47 F.4th 884, 886-90 (8th Cir. 2022); *Gabriel v. Newrez LLC*, No. 19-6738, 2023 WL 47846, 2023 U.S. Dist. LEXIS, at *19-24 (E.D.N.Y. Mar. 21, 2023); *Wood v. N. Miss. Health Servs.*, No. 1:20-42, 2023 WL 6396045, 2023 U.S. Dist. LEXIS 175323, at *17-18 (N.D. Miss. Sept. 29, 2023) (explaining that a similar argument was "more properly addressed under a statutory standing analysis").

B

The Lee Defendants' FHA standing argument reads the statute too narrowly. The FHA makes it unlawful to, *inter alia*, "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  It also makes it unlawful "to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  *Id.* § 3604(a).  And it allows "any 'aggrieved person' to file a civil action seeking damages for a violation of the statute."  *Bank of Am. Corp.*, 581 U.S. at 193 (quoting 42 U.S.C. §§ 3613(a)(1)(A), 3613(c)(1)).  The statute's definition of "aggrieved person" includes "any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur."  42 U.S.C. § 3602(i)(1)-(2).  And the Act's protections from retaliation apply to "any person."  42 U.S.C. § 3617; *see also* 24 C.F.R. § 100.400(c)(5)-(6).

Parker plausibly alleges he is an "aggrieved person" under the FHA.  Whether a plaintiff qualifies as an aggrieved person "is a question of standing."  *Hannan v. Rose*, No. 18-9878, 2020 WL 3965341, 2020 U.S. Dist. LEXIS 35840, at *30 (S.D.N.Y. Feb. 28, 2020), R&R adopted 2020 WL 1903282, 2020 U.S. Dist. LEXIS 68436 (S.D.N.Y. Apr. 17, 2020).[4]  And "the Supreme Court has recognized that standing under the FHA exists in

---

[4]      It is not entirely clear whether the *Hannan* court treated the issue as one of Article III or "statutory" standing. *See Hannan*, 2020 U.S. Dist. LEXIS at *17-18, 30-32.  Because the analysis is one of statutory interpretation, *see id.* at *31 ("the Supreme Court 'has repeatedly written that the FHA's definition of person 'aggrieved' reflects a *congressional intent to confer standing broadly*"

a variety of contexts, including instances where the plaintiffs are not 'tenants.'" *Id.* at

*31 (citing *Bank of Am. Corp.*, 581 U.S. at 198-201).

Residents may challenge discriminatory practices under the FHA even if they

"are not 'tenants of record' for a dwelling." *See id.* In *Hannan*, the plaintiff "moved into

an apartment . . . with his friend . . . who was the 'tenant of record' for the apartment."

*Id.* at *3-4. He shared keys with his friend and roommate and paid him rent every

month. *Id.* at *4. After the landlord told the plaintiff's friend he was breaching the

lease by allowing him to stay in the apartment, the apartment building's security

guards stopped letting the plaintiff into the building. *Id.* at *5-7. The plaintiff sued,

alleging in relevant part family, gender and disability discrimination in violation of the

FHA. *Id.* at *9. The defendants moved to dismiss, arguing the plaintiff was not an

"aggrieved person" because he was not a lawful tenant. *Id.* at *30. The court found this

argument contrary to the FHA's text and rejected it. *Id.* at *31 ("Nowhere does the text

of the statute limit standing only to 'lawful tenants'").

Like the plaintiff in *Hannan*, Parker lives with the apartment's "tenant of

record," Walt. And under the FHA, "any person harmed by discrimination, whether or

not the target of the discrimination, can sue to recover for his or her own injury." *San*

*Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) (citing

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 212 (1972)); *see also Brown v. Suri*

---

(emphasis added) (quoting *Bank of Am. Corp.*, 581 U.S. at 197), *Hannan* is best read as a statutory
standing case. *See Fair Hous. Just. Ctr., Inc. v. 203 Jay St. Assocs.*, No. 21-1192, 2022 WL 3100557,
2022 U.S. Dist. LEXIS 138975, at *11-13 (citing *Hannan* as an example of a court finding statutory
standing under the FHA); *see also City of Oakland v. Wells Fargo & Co*, 14 F.4th 1030, 1039 (9th Cir.
2021) (explaining that the Supreme Court in *Bank of America* "considered whether, for purposes
of statutory standing, Miami was an 'aggrieved person' under the FHA"); *Miss. Rising Coalition v.*
*City of Ocean Springs*, 910 F.3d 191, 193 (5th Cir. 2018) (per curiam) (finding plaintiffs lacked
"statutory standing" because they were not aggrieved persons under the FHA).

*Hurley, LLC*, No. 22-1057, 2023 WL 4108082, 2023 U.S. Dist. LEXIS 107224, at *6-7

(E.D. Cal. June 20, 2023) ("Defendant cites no authority supporting its view that the

FHA requires a plaintiff to have formally applied for housing or to have been listed on a

lease agreement in order to have standing"). Parker claims the defendants treated him

and Walt differently than nonwhite, female tenants and therefore plausibly alleges

"injuries fall[ing] within the zone of interests that the FHA protects." *Bank of Am.*

*Corp.*, 581 U.S. at 190. But he nonetheless fails to state a claim, either for retaliation

or discrimination, under the FHA.

IV

A

Parker has not alleged he engaged in activity protected by the FHA, a

prerequisite for a retaliation claim. Section 3617 of the FHA makes it unlawful to

"coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment

of, or on account of his having exercised or enjoyed, or on account of his having aided or

encouraged any other person in the exercise or enjoyment of, any right granted or

protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

Regulations promulgated by the Department of Housing and Urban

Development further define conduct unlawful under § 3617, *Lloyd v. Presby's Inspired*

*Life*, 251 F. Supp. 3d 891, 904 (E.D. Pa. 2017), including, *inter alia*, "[r]etaliating

against any person because that person has made a complaint, testified, assisted, or

participated in any manner in a proceeding under the [FHA]." 24 C.F.R. §

100.400(c)(5). These regulations further prohibit "[r]etaliating against any person

because that person reported a discriminatory housing practice to a housing provider or other authority." *Id.* § 100.400(c)(6).

"To prevail on a § 3617 retaliation claim, a plaintiff must demonstrate that (1) [he] engaged in protected activity; (2) the defendant subjected [him] to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Rosado v. Whitcraft*, No. 23-3717, 2023 WL 8720137, 2023 U.S. Dist. LEXIS 224332, at \*18 (E.D. Pa. Dec. 15, 2023) (alterations in original) (quoting *Lloyd*, 251 F. Supp. 3d at 904)).  Parker must show, "among other things, that [the defendants] 'coerced, threatened, intimidated, or interfered with [him] on account of [his] protected activity under the FHA." *Riley v. City of Kokomo*, 909 F.3d 182, 191-92 (7th Cir. 2018) (quoting *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005)).

Whether a complaint to a federal, state or local agency constitutes protected activity under the FHA depends on its substance.  While "a HUD complaint alleging religious discrimination against the plaintiff by the property manager" constitutes protected activity, "complaints to HUD or the local housing authority about general conditions of the apartment or mismanagement of the apartment complex are not." *Kris v. Dusseault Fam. Revocable Tr. of 2017*, No. 18-566, 2019 WL 4647211, 2019 U.S. Dist. LEXIS 163029, at \*13-14 (D.N.H. Sept. 24, 2019).

## B

It is not clear what exactly Parker believes the defendants retaliated against him for.  He believes at least one of the defendants found libelous information about him online.  (Sec. Am. Compl. ¶ 32.)  He further alleges Baritz harbors animus towards him since he represented a prior landlord in eviction proceedings against him and Walt.  (*Id.*

¶¶ 11, 34.)  Parker also claims that on the same day Walt received the first notice to vacate, he had run into the building's housekeeper, "after which he heard her yelling into her cellphone in Chinese."  (*Id.* ¶ 18.)

And although he alleges both he and Walt filed complaints with the PCHR, Parker does not specify what these complaints were for, though it appears they may have pertained to housing code violations.  *See* (*id.* ¶¶ 24, 27.)  Consequently, it is not clear whether Parker was engaged in protected activity, and he fails to state a claim for retaliation under the FHA.

V

A

Parker's purported discrimination claims based on age, race and sex fail as well.  First of all, age "is not a protected characteristic under the FHA."  *Ewing Citizens for Civ. Rights, Inc. v. Twp. of Ewing*, No. 05-1620, 2007 WL 2065832, 2007 U.S. Dist. LEXIS 50826, at *16 (D.N.J. July 13, 2007); *Stefanowicz v. SunTrust Mortg.*, No. 3:16-00368, 2017 WL 1103183, 2017 U.S. Dist. LEXIS 3592, at *21 n.11 (M.D. Pa. Jan. 9, 2017); *Logan v. Matveevskii*, 175 F. Supp. 3d 209, 227 (S.D.N.Y. 2016) ("age is not a protected class under the FHA").

The statute does protect against discrimination based on race and sex.  Specifically, § 3604(a) of the FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 381 (3d Cir. 2011) (quoting 42 U.S.C. §

11

3604(a)).[5]  And § 3604(b) prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).

The FHA recognizes both disparate treatment and disparate impact claims.  *Tex Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524, 545-46 (2015).  Parker appears to assert a disparate treatment claim.  He therefore "must establish that the defendant[s] had a discriminatory intent or motive."  *Id.* at 524 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

To state a claim for disparate treatment under the FHA, "[a] plaintiff must show that 'some discriminatory purpose was a motivating factor behind the challenged action."  *White v. Barbe*, 767 F. App'x 332, 334 (3d Cir. 2019) (per curiam) (quoting *Wind Gap*, 421 F.3d at 176-77).  Plaintiffs can raise "an inference of discrimination" by pleading "comparator evidence . . . or direct evidence of discrimination" suggesting animus.  *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (considering a Title VII employment discrimination claim); *see also Curto v. A Country Place Condo. Ass'n*, 921 F.3d 405, 411 n.4 (3d Cir. 2019) ("we frequently rely on our Title VII jurisprudence to guide our understanding of the FHA's antidiscrimination provisions").  Plaintiffs can use comparator evidence to show "they were treated differently from similarly situated persons or groups because of race, color, religion, sex, familial status, or national origin."  *30 Clinton Place Owners Inc. v. City of New*

---

[5]      The Fair Housing Amendments Act extended the FHA's coverage to include people with disabilities.  *Cmty. Servs. Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005).

*Rochelle*, No. 13-3793, 2014 WL 890482, 2014 U.S. Dist. LEXIS 31839, at *12 (S.D.N.Y. Feb. 27, 2014).

B

Parker contends the defendants discriminated against him "by giving preferential treatment to nonwhite females, both in renting and in their treatment as tenants." (Sec. Am. Compl. ¶ 39.)  Many of these allegations raise no inference of discrimination at all.

For instance, he alleges the defendants twice allowed nonwhite, female neighbors to trespass into his and Walt's living space.  (*Id.*)  But this is not an allegation of disparate treatment.  While he describes these trespassers as female and nonwhite, he does not claim he was "treated differently" than anyone else, or that race or sex played any role in these incidents.  *See Moody v. Related Co., L.P.*, 620 F. Supp. 3d 51, 55-56 (S.D.N.Y. 2022) ("For disparate treatment claims, [p]laintiffs must allege — in a non-conclusory manner — that [d]efendants were motivated by discriminatory intent" (citing *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021))).

Similarly, Parker alleges the defendants allowed nonwhite, female tenants "to conduct business in their apartments, in a building zoned for mixed use." (Sec. Am. Compl. ¶ 39.)  More specifically, he contends the apartment's "degraded condition" made it "impossible" for him to host chess gatherings, "including paid lessons or high-stakes tournaments" there.  (*Id.* ¶ 16.)  Tenants ran photography studios in two other apartments.  (*Id.*)  Again, none of this raises an inference of discrimination.  While the apartment's poor condition apparently prevented Parker from hosting gatherings,

13

Parker alleges no facts indicating he or Walt were prohibited from conducting business in the apartment because of their race or sex.

Parker further claims the defendants gave "preferential treatment in general to nonwhite, female" tenants.  (*Id.* ¶ 39.)  But this conclusory statement is not entitled to the presumption of truth and is insufficient to support a discrimination claim.  *See Carter v. Murray*, No. 21-3289, 2021 WL 4192055, 2021 U.S. Dist. LEXIS 175130, at *8-10 (E.D. Pa. Sept. 14, 2021) (dismissing an FHA claim where the plaintiff made "only general, conclusory allegations regarding possible . . . discrimination").

Parker also contends the defendants engaged in racial and sex discrimination by making Walt an unfavorable lease renewal offer.  Again, he alleges Mai offered Walt a renewal of his lease of Apartment 3F for $2,200 a month.  (Sec. Am. Compl. ¶ 25.)  Although Apartment 4F was "vastly superior" in several ways, it was advertised for $300 less, presumably monthly.  (*Id.*)  And at the time, Apartment 4F was being leased by nonwhite, female tenants who were paying $1,800 in monthly rent.  *See* (*id.*)  He also alleges the defendants refused to lease Apartments 2F or 2R to him or Walt, even though these one-bedroom units "had been listed for $950.00-975.00 during the period in controversy."  (*Id.* ¶¶ 33, 39.)  Finally, Parker claims the defendants offered two-occupant leases to nonwhite and female tenants "for the same apartments for which Walt was offered a one-occupant lease."  (*Id.* ¶ 39.)  Two tenants lived in Apartment 4F, which had an "extra enclosed room," unlike Apartment 3F.  (*Id.* ¶ 25.)  He does not specify how many tenants lived in 2F and 2R.

These allegations also fail to state a claim.  Plaintiffs relying on indirect evidence of discrimination "generally must allege 'circumstances supporting a plausible inference

of discrimination.'" *Livingstone v. Haddon Point Manager, LLC*, No. 19-13412, 2020 WL 902218, 2020 U.S. Dist. LEXIS 32029, at \*20 (D.N.J. Feb. 25, 2020) (quoting *Curto*, 921 F.3d at 410 n.3).

Parker has not done so.  He compares the proposed rent in Walt's lease renewal offer to the rent in the advertisement for Apartment 4F, *see* (Sec. Am. Compl. ¶ 25), but this comparison does not indicate differential treatment on the basis of race or sex. Parker does not allege, for instance, that he or Walt sought to rent Apartment 4F or that either of them were offered less favorable terms than people of a different race or sex.  And while he describes the rent paid by the tenants in Apartment 4F, he does not say how much Walt was paying to live in Apartment 3F at the same time. Consequently, Parker has not "adequately pleaded a comparator who is similarly situated but treated better."  *See Moody*, 620 F. Supp. 3d at 56.  And without comparator evidence, nothing else indicates race or sex motivated the defendants to offer Walt a worse apartment for more money.  *See Wind Gap*, 421 F.3d at 177.

Parker's references to Apartments 2F and 2R suffer from the same defect.  His allegations that the defendants refused to lease either apartment to him or Walt are untethered to either man's sex or race.  The same goes for his claim that Walt was only offered a one-occupant lease.  While two nonwhite, female tenants shared Apartment 4F, this apartment had an additional room that 3F did not.  (Sec. Am. Compl. ¶ 25.) While Parker otherwise contends the defendants offered two-occupant leases "to nonwhite, female . . . tenants for the same apartments for which Walt was offered a one-occupant lease," (*id.* ¶ 39), he offers no nonconclusory facts to support this claim. While this sentence appears to imply Walt was offered leases in multiple apartments,

nothing else in the Second Amened Complaint indicates this is the case.  And it is unclear whether Parker intends to refer to any "nonwhite, female" tenants other than those in Apartment 4F.

VI

Finally, Parker contends Baritz violated the FDCPA by sending the second notice to vacate.  He believes this notice "was an attempt to collect a debt for damages and unpaid rent, which threatened legal action to recover the debt."  (Sec. Am. Compl. ¶ 44.)  Even under this characterization, these allegations fail to state a plausible claim.

Again, the Lee Defendants believe Parker cannot state a claim under the FDCPA because the notice to vacate is directed to Walt, not him.  (Lee Defs.' Mem. in Supp. of Mot. to Dismiss at 3) (arguing Parker "is not the [n]otice's intended recipient.  He lacks the requisite standing to proceed").  While this argument oversimplifies the issue, they are ultimately correct.

A

Under the FDCPA, "any debt collector who fails to comply with any provision of this title *with respect to any person* is liable to such person" for damages.  15 U.S.C. § 1692k(a) (emphasis added).  Courts interpret this language as "a broad grant available to persons," like Parker, "who are not obligated or allegedly obligated to pay the debt that the defendant sought to collect."  *Christy v. EOS CCA*, 905 F. Supp. 2d 648, 652 (E.D. Pa. 2012) (quoting *Wenrich v. Robert E. Cole, P.C.*, No. 00-2588, 2001 WL 4994, 2000 U.S. Dist. LEXIS 18687, at *8 (E.D. Pa. Dec. 21, 2000)).

But some sections of the Act require plaintiffs to be "consumers" under the FDCPA.  *Id.* at 652-53.  "[O]nly a 'consumer' has [statutory] standing to sue under

16

particular sections of the FDCPA that specifically regulate communications 'with the consumer.'" *Bank v. Pentagroup Fin., LLC*, No. 08-5293, 2009 WL 1606420, 2009 U.S. Dist. LEXIS 47985, at *12 (E.D.N.Y. June 9, 2009).[6]  The FDCPA generally defines a consumer as "any natural person obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).

It is not entirely clear which provisions of the FDCPA Parker relies on.  He believes Baritz violated 15 U.S.C. § 1692d.  Section 1692d prohibits debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  *Davis v. Phelan Hallinan & Diamond PC*, 687 F. App'x 140, 145 (3d Cir. 2017) (alteration in original) (quoting 15 U.S.C. § 1692d).

Parker lists what appear to be the reasons he believes the notice violated the statute.  For instance, he alleges it incorrectly stated the amount owed and threatened "[b]ogus legal action," since the PCHR order prohibited the Lees from collecting rent. (Sec. Am. Compl. ¶ 44.)  These claims appear to invoke a different provision, specifically 15 U.S.C. § 1692e.  Section 1692e(2)(A) prohibits the false representation of "the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  Subsection 5 prohibits threats "to take any action that cannot legally be taken or that is not intended to be taken."  *Id.* § 1692e(5).

---

[6]     While the *Bank* court did not explicitly state whether it was discussing Article III or statutory standing, its analysis is rooted in statutory interpretation.  *See Bank*, 2009 U.S. Dist. LEXIS 47985, at *13-14 (Section 1692c "is clearly intended to protect the rights of the consumer rather than the rights of third parties"); *see also Potter v. Cozen & O'Connor*, 46 F.4th 148, 156 n.5 (3d Cir. 2022) ("statutory standing is simply statutory interpretation" (cleaned up) (quoting *Graden v. Nonexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007))).

He further contends "[t]he alleged debt was not itemized."  (Sec. Am. Compl. ¶ 44.)  Claims of this nature are brought under § 1692g.  *See, e.g.*, *Huber v. Simon's Agency, Inc.*, No. 19-01424, 2021 WL 5356772, 2021 U.S. Dist. LEXIS 221628, at *10-11 (E.D. Pa. Nov. 17, 2021) (rejecting on the merits a claim that itemization was required "when a total of all accounts [was] provided").  Finally, he claims "[t]he notice offered no supporting documentation for the debt."  (Sec. Am. Compl. ¶ 44.)  This claim also appears to invoke § 1692g, which requires debt collectors to communicate certain information in their initial communications with debtors.  *See* 15 U.S.C. § 1692g(a).

## B

Plaintiffs who are not consumers under the FDCPA can sue for violations of § 1692d.  *Kaniewski v. Nat'l Action Fin. Servs.*, 678 F. Supp. 2d 541, 545 (E.D. Mich. 2009) ("[Section] 1692d does not apply to 'any consumer' but rather to 'any person'" (quoting 15 U.S.C. § 1692d)). Such plaintiffs may also sue for most violations of § 1692e. *See, e.g.*, *Corson v. Accounts Receivable Mgmt.*, No. 13-1903, 2013 WL 4047577, 2013 U.S. Dist. LEXIS 112282, at *13-14 (D.N.J. Aug. 8, 2013); *Montgomery v. Huntington Bank*, 346 F.3d 693, 697 (6th Cir. 2003); *Christy*, 905 F. Supp. 2d at 654-55); *Conboy v. AT&T Universal Card Servs. Corp.*, 84 F. Supp. 2d 492, 504 (S.D.N.Y. 2000) (non-consumers cannot sue for violations of § 1692e(11)), *aff'd*, 241 F.3d 242 (2d Cir. 2001).

Section 1692g is another matter.  To sue under this section, plaintiffs must be consumers under the FDCPA.  *Wenrich*, 2000 U.S. Dist. LEXIS 18687, at *10-12; *see also Mendoza v. Diversified Consultants, Inc.*, No. 18-2005, 2019 WL 2524117, 2019 U.S. Dist. LEXIS 101386, at *7 (E.D. Pa. June 18, 2019); *King v. IB Prop. Holdings*, 635 F. Supp. 2d 651, 658 (E.D. Mich. 2009) ("violations of § 1692g may only be brought by

'the consumer'").  Because Parker was not the tenant and was not named in the notice

to vacate, *see* (Sec. Am. Compl. ¶ 26), he is not a consumer under the FDCPA and

cannot state a claim under § 1692g.  *See* 15 U.S.C. § 1692a(3) (defining a consumer as

"any natural person obligated or allegedly obligated to pay any debt").[7]

C

Parker also fails to state a claim under § 1692d.  Again, this section prohibits

debt collectors from "engag[ing] in any conduct the natural consequence of which is to

harass, oppress, or abuse any person in connection with the collection of a debt."  *Davis*,

687 F. App'x at 145 (alteration in original) (quoting 15 U.S.C. § 1692d).  It includes a

non-exhaustive list of conduct giving rise to a violation, such as threatening or using

violence to harm a person, their reputation or property, using obscene or profane

language "the natural consequence of which is to abuse the hearer or reader," and

"[c]ausing a telephone to ring or engaging any person in telephone conversation

repeatedly or continuously with intent to annoy, abuse, or harass any person at the

called number."  15 U.S.C. § 1692d(1)-(2), (5).  Although this list "does not strictly limit

the general application of the prohibition, it illustrates the level of culpability required

to violate § 1692d."  *Davis*, 687 F. App'x at 145.

Parker does not allege any defendant engaged in conduct actionable under §

1692d.  He appears to characterize § 1692g and § 1692e claims as § 1692d claims.  *See*

*Vullings v. Arcadia Recovery Bureau, LLC*, No. 17-4361, 2018 WL 3609085, 2018 U.S.

Dist. LEXIS 125806, at *17-18 (E.D. Pa. July 27, 2018) ("Nothing in [S]ection 1692d

indicates that liability under that section should be predicated on a violation of another

---

[7]      Parker alleges he "could still be held liable" even though he was not named on the notice to
vacate.  (Sec. Am. Compl. ¶ 45).  He alleges no facts to support this theory.

provision").  Not all conduct violating the FDCPA also has the "natural consequence of harassing, oppressing, or abusing the recipient."  *Id.* at \*18 (internal quotation marks omitted).

D

Finally, Parker fails to state claims under § 1692e(2) and (5) because he lacks statutory standing.  *See Baldwin*, 636 F.3d at 73 ("A dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim").  Specifically, these subsections of § 1692e do not "extend to plaintiffs like [Parker]."  *See Lexmark*, 572 U.S. at 129.

While § 1692e plaintiffs do not have to be "consumers" under the FDCPA, these plaintiffs cannot be just anyone.  Courts disagree about which non-consumer plaintiffs can sue.  Some require debt collection activity to have been directed at a non-consumer plaintiff.  *See, e.g.*, *Gilliam v. Porter McGuire Kiakona & Chow, LLP*, No. 20-00372, 2021 WL 1681076, 2021 U.S. Dist. LEXIS 80966, at \*17 (D. Haw. Apr. 28, 2021) ("in order for a non-consumer to have [statutory] standing under the FDCPA, the alleged debt collection activities must have been directed at the plaintiff") (quoting *Amelina v. Mfrs. & Traders Tr. Co.*, No. 14-1906, 2016 WL 3982483, 2016 U.S. Dist. LEXIS 96106, at \*27-28 (S.D. Cal. July 21, 2016).

But some courts are more permissive, allowing non-consumer plaintiffs to claim FDCPA violations if they allege "injurious exposure" to debt collection activity.  *See, e.g.*, *Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.*, 155 F. App'x 10, 11-12 (2d Cir. 2005) (summary order) (suggesting a plaintiff married to a consumer could state a claim under § 1692e(5) if he alleged he and his wife "jointly received and read

20

the letters at issue"); *but see Barasch v. Est. Info. Servs., LLC*, 07-1693, 2009 WL 2900261, 2009 U.S. Dist. LEXIS 79338, at *10 (E.D.N.Y. Sept. 2, 2009) ("Simply reading the communication cannot qualify Plaintiff for standing under *Sibersky*" because "[r]eading the challenged letter by itself amounts only to 'exposure' to the communication," but not injury); *see also Schwartz v. Resurgent Cap. Servs., LP*, No. 08-2533, 2009 WL 3756600, 2009 U.S. Dist. LEXIS 103903, at *12-13 (E.D.N.Y. Nov. 9, 2009) (a plaintiff did not suffer injurious exposure where the debt collection letter was not addressed to him and he "alleged no other injury in [his] complaint" besides reading the letter").

Parker does not adequately allege he "falls within the class of plaintiffs whom Congress has authorized to sue under" § 1692e(2) or (5). *See Lexmark*, 572 U.S. at 128; *see also Dewey v. Associated Collectors*, 927 F. Supp. 1172, 1174-75 (W.D. Wis. 1996) ("the [A]ct does not permit [plaintiff] to recover for violations in a letter addressed to someone else in this instance").

In some cases, if non-consumer plaintiffs were not permitted to sue under the FDCPA, "collection agencies would . . . escape[] liability because their illegal collection letters never reached the actual debtors." *Id.* at 1175.[8] But in this case, "there [is] no need for another individual to sue in the debtor's place because the debtor," Walt, "received the collection letter himself." *See id.*; (Sec. Am. Compl. ¶¶ 18, 26) (alleging the first notice to vacate was "sent to Walt, via email," and Baritz later "sen[t] Walt another notice to vacate"). Additionally, Parker's alleged harm duplicates Walt's. *See*

---

[8]     It is also possible a non-consumer FDCPA plaintiff could suffer harm that the consumer did not. For instance, one of multiple people threatened with imminent eviction could pay for a legal consultation.

(Sec. Am. Compl. ¶ 36) (describing emotional distress and changes to financial planning because of the threat of eviction).  Allowing Parker to sue for the same injury the consumer—Walt—suffered would circumvent the rule that FDCPA claims are not assignable.[9]  *See Young v. Portfolio Recovery Assocs., LLC*, No. 6:22-00081, 2022 WL 2163821, 2022 U.S. Dist. LEXIS 106980, at *6-7 (E.D. Tex. May 20, 2022) (concluding a plaintiff had alleged no injurious exposure and noting an absence of "any authority that would allow [the debtor] to assign his FDCPA claim to [p]laintiff"), R&R adopted 2022 WL 2161027, 2022 U.S. Dist. LEXIS 107209 (E.D. Tex. June 15, 2022).  And it would go farther still, essentially allowing both plaintiffs to recover on the same claim.

## VII

Because the Court has dismissed all claims over which it has original jurisdiction,[10] it declines to exercise supplemental jurisdiction over any purported state

---

[9]      Various courts have held, some as a question of state law and others as a matter of federal common law, that FDCPA claims are not assignable.  *See Tisdale v. Enhanced Recovery Co.*, No. 4:22-00286, 2023 WL 1810413, 2023 U.S. Dist. LEXIS 20973, at *21-22 (E.D. Tex. Jan. 17, 2023) (identifying "over forty cases" and explaining that "no court has found an assignment of FDCPA or FCRA claims valid under *any* theory applying *any* state's law.  Put simply, there is a resounding consensus among federal courts that assignments of FDCPA and FRCA claims are invalid"), R&R adopted 2023 WL 1802393, 2023 U.S. Dist. LEXIS 20536 (E.D. Tex. Feb. 7, 2023); *Cooper v. Nat'l Credit Adjusters, LLC*, No. 3:22-0521, 2022 WL 17656316, 2022 U.S. Dist. LEXIS 225155, at *8 (N.D. Tex. Nov. 28, 2022) ("no court appears to have found that an FDCPA claim is assignable under federal law"), R&R adopted 2022 WL 17631533, 2022 U.S. Dist. LEXIS 224144 (N.D. Tex. Dec. 13, 2022).  And nothing indicates Pennsylvania law would say anything different.  *See All New LLC v. Whalen*, 51 Pa. D & C.5th 28, 32-33 (Pa. Ct. Com. Pl. 2015) ("A right of action strictly personal is not assignable and the general doctrine is, both in law and equity, that a right of action for a pure tort is not the subject of assignment"); *Dotson v. AWA Collections*, Nos. 22-6078, 22-6096, 2023 WL 3055574, 2023 U.S. App. LEXIS 9729, at *10 (10th Cir. Apr. 24, 2023) (finding plaintiff's FDCPA claims "akin to tort claims" as "a matter of federal law").

[10]     In Count VII, Parker seeks various forms of declaratory relief.  (Sec. Am. Compl. ¶ 54-55.) But "[d]eclaratory judgment is a remedy and not a cause of action," and "[a] plaintiff is required to prevail on the merits to obtain declaratory relief."  *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F, Supp. 3d 482, 504 (E.D. Pa. 2018) (quotation omitted).

law claims.  28 U.S.C. § 1367(c)(3); *Fuzy v. Westfield Bd. of Educ.*, No. 19-18434, 2022

WL 1284731, 2022 U.S. Dist. LEXIS 78108, at *36-37 (D.N.J. Apr. 29, 2022).


An appropriate Order follows.

BY THE COURT:



*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.